## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **TRACIE M. HUNTER** | : | CASE NO. 1:16-cv-561 |
| c/o David A. Singleton, #0074556 | : | |
| 215 E. 9th Street, Suite 601 | : | JUDGE |
| Cincinnati, OH  45202 | : | |
| | : | MAGISTRATE JUDGE |
| Petitioner, | : | |
| | : | **PETITION FOR WRIT** |
| v. | : | **OF HABEAS CORPUS** |
| | : | **PURSUANT TO 28 U.S.C.** |
| **HAMILTON COUNTY** | : | **SECTION 2254 AND ALL** |
| **COURT OF COMMON PLEAS** | : | **OTHER APPLICABLE** |
| 1000 Main Street | : | **STATUTORY PROVISIONS** |
| Cincinnati, Ohio  45213 | : | **BY A PERSON IN STATE** |
| | : | **CUSTODY** |
| and | : | |
| | : | |
| **HON. PATRICK DINKELACKER** | : | |
| Hamilton County Court of Common Pleas | : | |
| 1000 Main Street | : | |
| Cincinnati, Ohio 45202 | : | |
| | : | |
| **Respondents.** | : | |

## I. PRELIMINARY STATEMENT

1.  Petitioner Judge Tracie M. Hunter ("Judge Hunter") is a named defendant in an Ohio criminal case pending in the Hamilton County Court of Common Pleas ("County court" or "trial court").  Following a jury trial, Judge Hunter was convicted of one count of Having Unlawful Interest in a Public Contract, a state law offense.  The trial court sentenced Judge Hunter to six months incarceration in the Hamilton County Justice Center, but the Ohio Supreme Court twice stayed the sentence – the first time to allow Judge Hunter to appeal her conviction in the state court of appeals and after the court of

appeals affirmed the conviction, the second time to allow the Ohio Supreme Court the opportunity to decide whether to hear her discretionary appeal.

2. On May 18 2016, the Ohio Supreme Court, by a 4-3 vote, decided not to accept jurisdiction of Judge Hunter's appeal. As a result, Judge Hunter is scheduled to begin serving her six-month sentence on May 20, 2016. Thus, under *Hensley v. Municipal Court*, 411 U.S. 345, 349, 93 S.Ct. 1571, 1574 (1973), Judge Hunter is in custody for purposes of the federal habeas corpus statute.

3. Judge Hunter now petitions this court for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 and all other applicable statutory provisions.

## II. JURISDICTION

4. This court has jurisdiction over this action pursuant to 28 U.S.C. § 2254 because the County court's detention of Judge Hunter is in violation of the United States Constitution and because she has exhausted her state remedies.

5. This court also has jurisdiction pursuant to 28 U.S.C. §2251 to stay further execution of Judge Hunter's state court sentence.

## III. THE PARTIES

6. Petitioner Tracie M. Hunter, is a resident of Hamilton County, Ohio, who is facing imminent imposition of her state court sentence. She is therefore in custody for purposes of the federal habeas corpus statute.

7. Respondent Hamilton County Court of Common Pleas is an Ohio trial court authorized under state law to issue orders imposing terms of incarceration for individuals convicted of offenses under state law.

8.   Respondent Judge Patrick Dinkelacker is a judge of the Hamilton County Court of Common Pleas.  Judge Dinkelacker currently presides over Judge Hunter's criminal case. Judge Dinkelacker will execute Judge Hunter's six-month jail sentence on May 20, 2016.

## IV.  FACTS

9.   Tracie M. Hunter is a suspended judge who was convicted of one count of Having an Unlawful Interest in a Public Contract and sentenced to six months in the Hamilton County Justice Center.  Her conviction followed a lengthy trial where she faced eight other counts for which the jury was unable to reach a verdict.  The other counts have since been dismissed.

10. On December 26, 2014, the Ohio Supreme Court stayed Judge Hunter's sentence during the pendency of her appeal.  The Court did so after both the trial court and the local court of appeals refused to stay her sentence.

11. Judge Hunter has exhausted her state remedies with respect to three issues which resulted in violations of her rights under the United States Constitution.  The facts underlying those three issues are set forth below.

### Denial of the Fifth and Fourteenth Amendments right to due process resulting from extensive prosecutorial misconduct

12. In total the special prosecutor engaged in fifty-one separate instances of misconduct during his rebuttal closing, the cumulative effect of which denied Judge Hunter due process under the United States Constitution.  For instance, in an effort to inflame the jury, the special prosecutor, referring to writ complaints that the public defender had filed against Judge Hunter, said:  "And the people that are adversely affected can't appeal it because she won't put on a final appealable order, so that the child who is struck in the home where there is sexual abuse until she . . ."  (T.p. at 3857.)

3

After defense counsel objected, the trial judge simply told the jury: "Again, ladies and gentlemen, the same instruction that I previously gave you." *Id.* That "same instruction" was one the trial judge repeated over and over again: "What they say in final argument is not evidence." (T.p. 3816.) There was no reason for the special prosecutor to make this false, baseless, meritless, irrelevant and highly prejudicial statement, other than trying to turn the jury against Judge Hunter.

13. In a similar vein, the special prosecutor referred to a high profile case Judge Hunter had handled: "Now [defense counsel] says [Judge Hunter] didn't want juveniles identified by their names under any circumstances and guess who had a problem immediately? Well, of course, these juveniles just happen to be the six kids who beat some guy up and hospitalized him in North College Hill because they were bored." (T.p. at 3810.) When defense counsel objected, the trial judge said, "That's enough out of both of you. That's enough. Same instruction, ladies and gentlemen. You may proceed." (*Id.*) Again, there was no reason for the special prosecutor to make such an irrelevant and inflammatory remark other than to prejudice the jury against Judge Hunter.

14. One final example of the special prosecutor's fifty-one instances of misconduct occurred when he told the jury that he knew the tricks of a defense counsel's trade because he himself engages in such tactics as a criminal defense attorney: "So 99 percent of what [defense counsel] is doing here is what I have done many times . . ., that's what every criminal defense attorney has done.." (T.p. at 3800.) The special prosecutor then went on to lecture the jury about how defense counsel "obfuscate all the issues and try to make it as confusing as you possibly can so you can stand up in front of a jury and say, I have confused you, that's reasonable doubt." (T.p. at 3801.)

4

15. At one point the special prosecutor promised the jury that he would not seek any period of incarceration for Judge Hunter, a pledge that could have persuaded some jurors to vote to convict her. Specifically, the special prosecutor said: "[Defense counsel] keeps talking about prison, his client going to prison. Well let me all surprise you about something. I hold absolutely no ill will towards Judge Hunter, none whatsoever. And I could tell you and I could give you my solemn oath and my word as a professional, that if she is convicted of these charges, I would be the last person to ask anyone to incarcerate her. That's not where I come from and that's not what it's about. Not to me." However, after Judge Hunter was convicted, the special prosecutor broke his promise in a sentencing memorandum urging the court to impose "a substantial prison sentence." (T.d. 296 at p. 9).

16. A chart showing all fifty-one instances of prosecutorial misconduct during closing argument is attached as Exhibit A.

17. Judge Hunter argued in her brief to the state court of appeals and to the Ohio Supreme Court that the prosecutor's misconduct denied her due process under the United States Constitution.

**Denial of the right to due process under the Fourteenth Amendment to the United States Constitution as a result of the state court of appeals' abuse of its accelerated calendar to restrict briefing in complicated cases**

18. Judge Hunter was not able to fully brief the prosecutorial misconduct issue because of an additional error that denied her due process of law under the United States Constitution.

19. Specifically, the First District court of appeals assigned Judge Hunter's case to the accelerated calendar, under Local Rule 11.1.1. Under that rule, briefs shall not exceed

fifteen pages. Additionally, the appellant is not afforded an opportunity to submit a reply brief. Pursuant to App.R. 19(A) and Local Rule 19.1, regular calendar appeals have a thirty-five-page briefing limit, and the appellant is allowed to reply to the appellee's brief. Under Local Rule 11.1.1(C), the First District may remove a case from the accelerated calendar for good cause shown, which includes the "unique, complex, or precedential nature of the issues presented." 1st Dist. Local R. 11.1.1(C)(2).

20. Soon after receiving the accelerated calendar assignment, Judge Hunter moved to have her case reassigned to the regular calendar. The First District overruled Judge Hunter's motion but increased the page limit from fifteen to twenty-five pages.

21. After receiving this order, counsel used twenty-one pages to brief the polling issue and an issue of evidence sufficiency that required significant statutory interpretation. However, appellate counsel also discovered fifty-one instances of prosecutorial misconduct within the state's rebuttal argument. As a result, counsel filed a thirty-five page brief with a motion seeking leave to exceed the page limit. The court summarily denied the motion and ordered counsel to file a twenty-five page brief. As a result, counsel had to cut most the argument regarding prosecutorial misconduct. The First District also denied counsel's motion to file a reply brief.

22. On January 15, 2016, eleven days after oral argument, and one business day before her scheduled re-trial on nine counts, the court affirmed Judge Hunter's convictions based on the limited briefing presented. Only after oral argument, the court finally removed the case from the accelerated calendar so that it could publish its opinion. Thus, the relief Judge Hunter had requested from the onset was only granted when it would have no effect on her ability to fully present her arguments to the court.

23. The actions of the First District in Judge Hunter's case are consistent with its treatment of appeals in general.  Unlike other courts, the First District automatically assigns all cases to the accelerated calendar, and counsel has to petition the court for the case to be moved to the regular calendar.  *See* Judge Mark P. Painter and Andrew S. Pollis, *Ohio Appellate Practice*, Section 3:31 (Rev. 2014).   A review of all cases filed in the First District between 2013 and 2015 shows that, with the exception of cases that are treated differently by rule or that were dismissed before a scheduling order was issued, all cases were initially assigned to the accelerated calendar, and motions to be removed from the calendar in criminal cases were only granted for appeals of F1 felony convictions. *See* http://www.courtclerk.org/ (online dockets for all First District cases).

24. In asking the Ohio Supreme Court to hear her appeal, Judge Hunter argued that the court of appeals misuse of the accelerated calendar denied her due process of law under the United States Constitution.  Although the Ohio Supreme Court refused to accept the appeal by a 4-3 vote, three dissenting justices indicated that they had voted to hear this particular issue.[1]

### Denial of the right to a jury trial under the Sixth and Fourteenth Amendments because of the trial court's failure to poll the jury upon announcement of the verdict in open court

25. The jury began deliberations on the afternoon of October 8, 2014.  Two days later on the afternoon of October 10, the jury entered the courtroom and informed the court that it had reached a verdict on Count Six of the indictment.  Without announcing what the verdict was, the court purported to poll the jury by asking each juror if the verdict was his or her "true verdict."

---

[1] Two specifically stated they voted to hear the appeal on this issue and the third did not limit the grounds for appeal.  See 2016-Ohio 3028.

26.  After all jurors answered "yes," the trial court said: "We are not indicating what the verdict is, but this verdict will be entered.  And I'm going to hand this verdict to the court reporter . . . and I'm going to ask him if he would seal the verdict."  Because the jury was "having difficulty in reaching verdicts on the remaining counts" the trial court gave the jurors an anti-deadlock charge, and instructed the jurors to resume their deliberations after the holiday weekend.

27. The jury deliberated for a few hours on October 14 before indicating that it could not reach a verdict on the remaining eight counts. After confirming that additional deliberation would be fruitless, the court unsealed the verdict on Count Six and announced publicly that the jury had found Judge Hunter guilty of Having Unlawful Interest in a Public Contract.  Subsequently, defense counsel requested to poll the jury, but the trial judge denied the request.  The trial judge then discharged the jury.

28. Following the verdict, defense counsel moved for a new trial based on the trial court's failure to conduct the poll the defense requested after the clerk read the verdict in open court.  The defense attached to its motion the affidavits of two jurors who indicated that, had the court polled them after unsealing the verdict and announcing it on October 14, they would have indicated that "guilty" was not their true verdict.  Later, the defense filed an affidavit from a third juror who stated she would have repudiated the verdict had the court polled her when the verdict was unsealed and published.  The trial court denied the motion for new trial.

29. A jury verdict is not final until the following three things happen:  (1) the deliberations are over, (2) ***the result is announced in open court***, and (3) the jury is polled and no dissent is registered.'" *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-

4396, 794 N.E.2d 27 (Ohio 2003). Thus, there was no final verdict when the trial judge sealed the partial verdict. Accordingly, under Ohio Crim. R. 31(D), the defense was entitled to poll the jury when the guilty verdict was announced in open court on October 14, 2014.

30. Judge Hunter also argued that the reason why there must be an opportunity to poll *after* the verdict is announced is "to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached." *Williams*, at 37 (internal quotations and citation omitted). Because of the possibility of jurors signing the wrong verdict form, there can be no such certainty of a unanimous verdict until the jury is polled, if a poll is requested, on the *announced* verdict.

31. In her motion to be heard on her discretionary appeal to the Ohio Supreme Court, Judge Hunter made clear that the trial court's failure to poll the jury after the verdict was announced not only violated state law but also her rights under the United States Constitution, specifically the right to a jury trial under the Sixth and Fourteenth Amendments to the United States Constitution.

## V. STATEMENT OF LAW

### JUDGE HUNTER IS IN STATE CUSTODY

32. A petitioner who was released on her own recognizance pending execution of sentence, who was subject to obligation to appear at all times and places as ordered by any court of competent jurisdiction, and who remained at liberty "only by grace of a stay," is in custody for purposes of the federal habeas corpus statute. *Hensley v. Municipal Court*, 411 U.S. 345, 349 (1973).

## JUDGE HUNTER'S CONTINUED CUSTODY
## IS BARRED BY THE UNITED STATES CONSTITUTION

### Pervasive prosecutorial misconduct in closing argument

33. As the accused in a criminal proceeding, Judge Hunter had the right to fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. This right is violated when a prosecutor engages in conduct that "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

34. Here, the special prosecutor's closing argument was "so egregious so as to render the entire trial fundamentally unfair." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Cook v. Bordenkircher,* 602 F.2d 117, 119 (6th Cir. 1979)). During the state's rebuttal closing, the special prosecutor engaged in fifty-one instances of prosecutorial misconduct. Paragraphs 12-15 above provide just a few of the improper, inflammatory and unfair statements the special prosecutor made. The chart attached as Exhibit A shows that the rebuttal closing thus was not a momentary lapse but a textbook example of what a prosecutor should not say in closing argument.

35. In sum, the prosecutorial misconduct that occurred in this case denied Judge Hunter due process of law under the Fourteenth Amendment to the United States Constitution.

36. Judge Hunter raised this denial of her federal constitutional rights upon appeal to the First District Court of Appeals and in her discretionary request for review by the Ohio Supreme Court. However, the appellate court restricted its review of this claim because of arbitrary page limits, and the state supreme court denied review without comment.

**Denial of meaningful opportunity to appeal**

37. Once a state provides for the opportunity for appeal, its appellate procedures must comport with the requirements of due process under the Fourteenth Amendment. *Evitts v. Lucey*, 469 U.S. 387, 401 (1985). Here, the court of appeals' use of its accelerated calendar violated due process by denying Judge Hunter a meaningful opportunity to appeal.

38. Appellate practices must comply with the Due Process Clause of the Fourteenth Amendment, including the provision of the effective assistance of appellate counsel. *Id.*; *see Halbert v. Michigan*, 545 U.S. 605 (2005). As the United States Supreme Court has explained, an appellant is entitled to "the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf." *Douglas v. California*, 372 U.S. 353, 357 (1963). The court has subsequently emphasized the importance of "[t]he assistance of appellate counsel in preparing and submitting a brief to the appellate court which defines the legal principles upon which the claims of error are based and which designates and interprets the relevant portions of the trial transcript." *Swenson v. Bosler*, 386 U.S. 258, 260 (1967). Without providing appellants an opportunity for this assistance, the state's provision of a direct appeal would be "a meaningless ritual." *Douglas*, 372 U.S. at 357.

39. Judge Hunter's appeal was not a run-of-the-mill case. Her trial lasted six weeks, producing some four thousand transcript pages. Judge Hunter's appellate counsel identified several grounds for appeal, including two issues of first impression in the Ohio courts: a statutory interpretation question on her insufficiency of evidence claim and the jury poll issue.

40. Despite the complexity of the issues, the court of appeals placed Judge Hunter's appeal on the accelerated calendar, initially limiting the brief to fifteen pages and providing no opportunity to submit a reply.  Although the court of appeals eventually increased the page-limit to twenty-five pages, it nonetheless denied Judge Hunter's motion to be removed from the calendar,  meaning that she had to brief all of her issues and respond to the state's anticipated arguments because of the lack of an opportunity to submit a reply.

41. Judge Hunter's appellate counsel tried diligently to comply with the page limit, but found it impossible to do so.  Specifically, after winnowing the issues to the two issues of first impression,[2] Judge Hunter's appellate counsel identified the fifty-one instances of prosecutorial misconduct in the state's rebuttal closing.  Although the two issues of first impression were able to be addressed within the twenty-five-page limit, the prosecutorial misconduct argument, when added to the other two issues, could not.  As a result, Judge Hunter sought permission to file a thirty-five page brief – the page limit applicable to regular calendar cases – but was denied.  In order to comply with the court's order, Judge Hunter then had to make the difficult decision to cut most of her prosecutorial misconduct argument.  Although Judge Hunter's counsel included in the court of appeals appendix the chart attached here at Exhibit A, she was denied the opportunity in her brief to argue why each of the identified statements was improper and how all of the misconduct, when considered as a whole, denied Judge Hunter her right to a fair trial.

---

[2] Appellate counsel had to forego numerous potentially meritorious issues, including whether Judge Hunter was entitled to judicial immunity.

42. Given the arbitrary restrictions on briefing, counsel was faced with the Hobson's choice of either eliminating an assignment of error, or watering down one or more of the error assignments to the point of ineffectiveness. As a result, the appellate court violated Judge Hunter's Fourteenth Amendment due process rights by denying Judge Hunter the effective assistance of counsel and the ability to present a meaningful direct appeal.

43. Judge Hunter raised this denial of her federal constitutional rights upon appeal to the First District Court of Appeals and in her discretionary request for review by the Ohio Supreme Court. Neither the appellate court nor the Ohio Supreme Court ruled on the merits of this claim.

### Denial of a full jury determination

44. A criminal defendant is entitled to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000) (quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995)) (alteration in original).

45. The verdict entered by the trial court was not the true verdict of at least three jurors. The trial court would have learned this if it had polled the jury following the reading of the verdict in open court. However, the trial court refused to poll the jury because it believed that its prior poll attempt, conducted when the verdict remained sealed, was sufficient to determine the decision of the jury. However, the futility of polling juries on an unannounced verdict has been amply demonstrated by several cases in which jurors made errors in filling out the verdict forms that were only discovered upon the announcement of the verdict. *See, e.g., United States v. Mears*, 614 F.2d 1175, 1179 (8th Cir. 1980) (Immediately after the verdict was read in open court declaring

Mears "not guilty," the jury foreman informed the court that the verdict form was incorrectly signed. The jury then retired for further deliberations, emerging four minutes later with a verdict form finding Mears "guilty."); *Helms v. United States*, 310 F.2d 236, 239-40 (5th Cir. 1962) (after clerk announces "not guilty" verdict in open court, several jurors indicate that their verdict was different, and foreperson acknowledges mistake in signing the wrong verdict form).

46. Judge Hunter was robbed of her right to be tried by a jury of her peers. Before the verdict against her became final, three members of the jury had decided that "guilty" was not their true verdict. As a result, Judge Hunter's conviction violates the federal constitution.

47. Judge Hunter raised this denial of her federal constitutional rights upon appeal to the First District Court of Appeals and in her discretionary request for review by the Ohio Supreme Court.

## PRAYER FOR RELIEF

WHEREFORE, petitioner prays that this Court:

A.  Find that the appellate court's denial of Judge Hunter's claims constitutes an unreasonable application of clearly established federal law.

B.  Grant Judge Hunter a writ of habeas corpus releasing her from all custody and control by the Hamilton County Court of Common Pleas and Judge Patrick Dinkelacker for any and all claims related to Hamilton County Case Nos. B1400110 and B1400199.

C.  Issue a stay of execution of sentence in the Hamilton County Court of Common Pleas before Judge Patrick Dinkelacker in Hamilton County Case Nos.

B1400110 and B1400199 pending final resolution of Judge Hunter's federal habeas petition.

Respectfully submitted,

/s/ David A. Singleton
David A. Singleton #0074556
Counsel for Petitioner Tracie M. Hunter
Ohio Justice & Policy Center
215 E. 9thStreet, Suite 601
Cincinnati, OH 45202
(513) 421-1108
(513) 562-3200 – fax
dsingleton@ohiojpc.org

/s/Jennifer L. Branch
Jennifer L. Branch # 0038893
*Co-counsel for Petitioner Tracie M. Hunter*
Gerhardstein & Branch Co. LPA
432 Walnut Street, Suite 400
Cincinnati, Ohio 45202
(513) 621-9100
(513) 345-5543 (fax)
jbranch@gbfirm.com

## VERFICATION

Counsel for the Petitioner of the foregoing petition verifies the truth of the allegations contained therein this 19th day of May 2016.

/s/ David A. Singleton
David A. Singleton #0074556
Counsel for Tracie M. Hunter and Acting on Her Behalf



EXHIBIT

A

## APPENDIX B: Chart Detailing 51 Instances of Prosecutorial Misconduct in Rebuttal Closing

| Alleged issue | Prosecution's statement | Cite | Objection? | Instruction given (if objected to) |
|---|---|---|---|---|
| Irrelevant & inflammatory language | "And what I will tell you is, is that a person who is unethical, a person who will commit ethics violations is by definition an unhonest or a dishonest person. [3797] A person who will violate the Court of Appeals' rules and the Supreme Court's rules of the State of Ohio as not only a lawyer but as a judge, is an aggressive, dishonest, confrontational person who is out of control." | T.P. at 3796–97 | No | |
| Irrelevant & inflammatory language | "I mean it sounds to me like she is [3808] the one that is mad. It sounds to me like she is the one that is aggressive. It sounds to me like she's one that is vindictive. It sounds to me like she is the poor loser or the poor winner, pardon me." | T.P. at 3807–08 | No | |
| Irrelevant & inflammatory language | "He has an obligation to see that the children who are being sexually abused in homes are removed from the homes. He has an obligation to see the children that are in drug-infested homes, who are not being treated properly, who are not nourished to remove them from those homes." | T.P. at 3814 | No | |
| Irrelevant & inflammatory language | "Maybe what Deters has to listen to is the social worker who says this child is being sexually abused and we can't get this child out of the home because we can't get Judge Hunter to rule on the case." | T.P. at 3816 | Yes | "Again, the same instruction that I previously have given to you: What they say in final argument is not evidence." |
| Irrelevant & inflammatory language | "It tells you, number 1, that she is more than willing to manipulate the system if it's to her advantage. It tells you that she is more than willing to manipulate the system to cover up her shortcomings. She was not getting her work out." | T.P. at 3833 | No | |
| Irrelevant & inflammatory language | "And the people that are adversely affected can't appeal it because she won't put on the final appealable order, so the child who is still stuck in the home where there is sexual abuse until she—" | T.P. at 3857 | Yes | "Again, ladies and gentlemen, the same instruction that I previously gave to you." |
| Irrelevant & inflammatory language | "Now have each of you in your own personal life ever known someone who is confrontational? Have you ever known someone who could have a bad temper? Have you ever known someone that could be vindictive? Have you known someone like that? Have you ever known someone that when they get mad can overreact in any number of ways? Have you ever known someone if they get mad could have a bad side? Well I have. I think we have all have. And I would suggest to you that the people who have the bad tempers, the [3865] people who have the bad sides, the people who always insist on getting even, you never know that somebody has always got to get even. They don't necessarily announce it. . . . But you know people just by their very presence if someone is not going to go their way you know there is going to be trouble. You look up and you go, oh, man, I know how this is going shake. If he doesn't get his way there is going to be trouble down the line." | T.P. at 3864–65 | No | |

xiii

| Alleged issue | Prosecution's statement | Cite | Objection? | Instruction given (if objected to) |
|---|---|---|---|---|
| Irrelevant & inflammatory language | "[T]hroughout the course of this trial you have seen document after document after document where she said I am the smartest human being that the good Lord ever put on this Earth. I know everything. There is nothing I don't know. There is nothing I could be wrong with that. Well, let me ask you this: How come she could be so smart about everything else, but so dumb that she doesn't understand what the law is as a judge?" | T.P. at 3902 | No | |
| Irrelevant & inflammatory language | "Tracie Hunter spent the last two years gaming the system. She spent the last two years gaming the public and what she is trying to do now is game you. That's the bottom line. If they really want to run this thing out, that's the reality of the situation and it couldn't be clearer." | T.P. at 3921 | No | |
| Irrelevant & inflammatory language | "Now he says she's didn't want juveniles identified by their names under any circumstances and guess who had a problem immediately? Well, of course, these juveniles just happen to be the six kids who beat some guy up and hospitalized him in North College Hill because they were bored. It just so happens that those kids—" | T.P. at 3810 | Yes | "That's enough out of both of you. That's enough. Same instruction, ladies and gentlemen. You may proceed." |
| Irrelevant & inflammatory language | "The very first decision she made as a [3813] juvenile court judge in the fact of the community in the fact of juvenile court was to hire as her bailiff someone who had been terminated for beating up a child." | T.P. at 3812–13 | No | |
| Irrelevant & inflammatory language | "In this case this A.C. that everybody is talking about pulled a strong-armed robbery where she stuck a gun in somebody's face and robbed them. He then skips court, they then drag him back to court. The thing drags out for so long with Judge Hunter horsing around with it that he has time to beat somebody senseless over in the jail and get sentenced on a felonious assault himself." | T.P. at 3815 | No | |
| Irrelevant & inflammatory language | "July was not a very good month for Tracie Hunter because on July 9th her brother had beat up an inmate at the detention center. And, of course, it's awfully coincidental when people look at whether Hunter cares if a juvenile gets beat up in the detention center and how much she cares about everybody and her first hire was the bailiff who had been terminated for beating children." | T.P. at 3861 | Yes | "Okay. The same instruction, ladies and gentlemen, that I have previously gave to you. What counsel says in closing argument is not evidence. The evidence that you will decide this case is what you heard from the mouths of the witnesses on the witness stand, plus the exhibits." |

xiv

| Alleged issue | Prosecution's statement | Cite | Objection? | Instruction given (if objected to) |
|---|---|---|---|---|
| Irrelevant & inflammatory language | "You know Clyde said something kind [3915] of funny at one point. What he told you was that Bill Clinton denied and denied and denied, but as he was denying he was denying, hell, yes, we knew he did it. Remember he told you that. Well, that's all true. But you know what I thought to myself as I said that, I thought to myself how cynical was it of the President of the United States to stand in front of the nation and lie? I wouldn't have any problem if he looked up and said yeah, I did it and it's none of your business. I guess he is right. He did it and it's none of my business. But instead what he did is he made a mockery of it and said he lied and lied and lied and parts his words and parts his words and he parts his words [sic]. And the biggest thing of that was the disrespect it showed government. It's no different than Richard Nixon. Who cares if they broke in some office and stole somebody's videotape. It was what happened to the people's image of [3916] the government. That was the real tragedy." | T.P. at 3914–16 | No | |
| Irrelevant & inflammatory language—appeal to community pressure | "And I would suggest to you in this case, there is no question everybody is watching this case. Everybody is watching. And everybody is wondering what is our system of justice about in this community? That is what— [objection] . . . People are looking at this. And the real question is this: All these people I told you about downstairs on the theft cases, all these people I told you [3917] about, all these people going to be held accountable. The question is, is a judge going to be held accountable?" | T.P. at 3916–17 | Yes | "Same instruction that I previously gave. . . . Same instruction that I previously have given to you." |
| Irrelevant & inflammatory language—appeal to community pressure | "It's time somebody sent a message to our community that we're not going to tolerate this nonsense and I am asking you to do that." | T.P. at 3923 | No | |
| Personal opinion | "And I have been practicing criminal law for 40 years. I have never prosecuted a case. Frankly, the thought never crossed my mind that I would ever prosecute a criminal case. Mr. Shiverdecker has been practicing law because he is a lot older than I am, 42 years. And he has practiced criminal law for the last 30, 31, 32 years. Do you believe that what we would do is trample on every belief we have ever held, on every argument we ever made that defendants are entitled to fair trial, that defendants are entitled to have cases proven against them beyond a reasonable doubt, that the evidence should be competent from the witness stand and it should not be coached? Do you think that we as the people would argue that all day long would [3796] trample on someone's rights and then go back to the defense bar as co-conspirators with prosecutors for goodness sake?" | T.P. at 3795–96 | No | |
| Personal opinion | "You know the final straw was he kind of hurt my feelings when he looked up and said, you know, I thought he was being critical when he said you know this little 105-pound woman is being prosecuted. The prosecutors didn't expect her to stand up to the whole weight of the government. I looked at Merlyn, what is the hell is he talking about? The whole weight of the government he said you [sic], I thought, wow." | T.P. at 3805 | No | |

xv

| Alleged issue | Prosecution's statement | Cite | Objection? | Instruction given (if objected to) |
|---|---|---|---|---|
| Personal opinion | "So I am sure my mother is listening. I am sure my mom is going to tell me that I should have behaved. She is going to tell me what she told Clyde. You shouldn't get angry, you shouldn't lose your temper. But, you know, there comes a point in time where if people want it broken out, they want it broken out and I could tell I had no intention. I really had no intention of it, but what I told is the absolute truth. It is the reality of the [3922] situation." | T.P. at 3922–23 | No | |
| Personal opinion; diminishing consequences of guilty verdict | "Clyde keeps talking about prison, his client going to prison. Well, let me all surprise you about something. I hold absolutely no ill will towards Judge Hunter, none whatsoever. And I could tell you and I could give you my solemn oath and my word as a professional that if, if she is convicted of these charges I would be the last person to ask anyone to incarcerate her. That's not where I come from and that's not what it's about. Not to me. But in [3800] the final analysis that's not my responsibility." | T.P. at 3799–3800 | No | |
| Personal opinion; impugning defense | "I would suggest to you that he is having a problem with his defense because his client is clearly guilty and it has been proven without any question or doubt." | T.P. at 3799 | No | |
| Personal opinion; impugning defense— insinuating belief in client's guilt | "Let's talk about defense tactics. And you know why I tell that I can't criticize Clyde, he told you his client did nothing wrong. He has known me a long time. The truth of the matter is when Clyde was in high school I was trying cases and he used to come and watch me try cases. So 99 percent of what he is doing here is what I have done many times, what Merlyn has done many times, that's what every criminal defense lawyer has done. [3801] The first thing you do if you're a criminal defense lawyer is if you have got the law, you talk about the law. Have you heard him talk about the law? If you've got the facts, you talk about the facts. Have you heard him talk about the facts? Now if you don't have the law or the facts you drop back to your defensive position and the first thing you do is your start talking about the prosecutor. You criticize the prosecutor, you criticize the police, you criticize the system, you criticize anything you could criticize. And then the next thing you do is you blame others. It's somebody else's fault. That's the next move. Then what you do is obfuscate all the issues and try to make it as confusing as you possibly can so you can stand up in front of a jury and say, I have confused you, that's reasonable doubt. Because I have confused you about a [3802] bunch of things that has got nothing to do with anything, got nothing to do with the charges, nothing to do with the proof, got nothing to do with the law but you're confused, and there, that's reasonable doubt. . . . And what I will tell you is, is that what the next move for a criminal defense lawyer is, and I am one, is to try to supplement fact with fiction and that's what has happened here today, very masterfully and very convincing, but certainly he has tried. Now as I've said to you, I understand what he is doing, I don't have any problem with that, but I would be remiss in my duties that if I accept it. When I accepted the appointment to be the prosecutor in this case, I would be remiss in my duties if I did not point that out to you." | T.P. at 3800–02 | No | |

xvi

| Alleged issue | Prosecution's statement | Cite | Objection? | Instruction given (if objected to) |
|---|---|---|---|---|
| Personal opinion; impugning defense— insinuating belief in client's guilt | "You know Clyde has presented three basic lines of defense here and they really—two of them remind me kind of the being [sic] rather childish." | T.P. at 3819 | No | |
| Personal opinion; impugning defense— insinuating belief in client's guilt | "But the big danger in cases like this when you get real good lawyers, and Clyde is a really good lawyer, they could confuse the issue . . . Well, when all else fails Clyde has a defense. He has a defense mechanism and he calls it the nuclear bomb. So what he does basically is the will have somebody come to him that gets charged with shoplifting in K-Mart and they look and he says what happened? They say [3824] well, I stole a pad of paper and I stole a box of pencils and I got caught and they have got me on videotape and I confessed. What are we going to do? Clyde looks at him and I mean they have got him on videotape, he confessed, they have got witnesses. I know. We are going to go with the nuclear bomb option. So what he does he looks up and puts a witness on the stand. The first witness looks up and says I'm a security guard there. I saw this man come in. he stole a box of pencils and he stole a pad of paper and here's the pictures and here's his confession. Clyde goes okay, fine. Well, let me ask you a question: If I told you he was a nuclear physicist, what would you say? He says, well, I don't know what I would say. Clyde says well, if I told you he was a nuclear physicist could you tell me that he is not a nuclear physicist? The guy says no. Clyde says is [sic] a nuclear physicist. Then he looks up and says what if I also told [3825] you he works for the CIA, he is a spy for the CIA, could you prove he wasn't? He says I couldn't prove he wasn't. Clyde goes he's a spy for the CIA. Then he looks up and says now, if the Russians have a bomb here in the United States and it's going to blow up in two days, if this man is an CIA agent goes to the defuse it [sic], could you prove that's wrong? Well, I don't know if it's right or wrong. There is a bomb in America. Then he looks up and he says, if I told that you in order to defuse that bomb he needs a pad and paper, could you prove he didn't need a pad and paper to work the formulas? I couldn't disprove it. He needs papers and pencils. Now let me ask you something: If I told you he had a 6-year-old child was in kindergarten who stole his pencil and paper at home, could you dispute that? I can't dispute it. Well, his 6-year-old stole a pencil and paper [sic]. Clyde looks up, yeah, he did. The [3826] guy had to steal his pencil and paper to save the world and that's essentially what he is going on here because what he has done he has continually and repeatedly asked questions, people told him they didn't know the answer, he then assumed when they tell him that he can't disprove it the assumes that it's fact and that's what he is arguing with on all of these things that he is a talking about. Whether it's time or whatever, that is what he has done here." | T.P. at 3823–26 | No | |

| Alleged issue | Prosecution's statement | Cite | Objection? | Instruction given (if objected to) |
|---|---|---|---|---|
| Personal opinion; impugning defense—insinuating belief in client's guilt | "Let me tell you about trial tactics. Why do you think it took Clyde Bennett with Lisa Miller to put in a hundred documents? [3900] You don't think in 20 minutes he could say here is a hundred documents, will you go through them and are these all continuances that were signed by Judge Hunter? Do you think that happened? Could he have done that? Sure. But what he could not have done is stood here for two days and tried to make the case that all right, here's this piece of paper. Who backdated it? Who backdated? Who backdated it? No. In fairness the question is why typed it? Who typed it? Who typed it?" | T.P. at 3899–3900 | No | |
| Personal opinion; impugning defense—insinuating belief in client's guilt | "Look, I told you before I have a world of respect for Clyde Bennett. I think he is a great lawyer and he has told you day after day I am fighting. I am fighting the fight. He fought and he fought and he fought and I admire him for it. Do not believe it." | T.P. at 3907 | No | |
| Personal opinion; impugning defense—insinuating belief in client's guilt | "As I told you before the reason that this case can't be defended is like I told you early on and I was trying to be a little cute and the only way this case could be defended is if Clyde is a magician. He is has got to be able to make these documents disappear." | T.P. at 3913 | No | |
| Personal opinion; impugning defense—integrity; inflammatory language | "Our case is based upon documents that cannot be refuted. And they presented what I would say to you, what I would say to you without hesitation was perjured testimony. That is what these people tried to do. They tried to play games with you." | T.P. at 3920 | No | |
| Impugning defense | "Now we have been accused of all kinds of things here very subtly. Mr. Bennett looks up and well, I am not saying it's a conspiracy and then he sits and argues a conspiracy for eight hours. I am not saying it's a conspiracy, but these guys are involved in the little conspiracy." | T.P. at 3794 | No | |
| Impugning defense | ". . . all of his arguments that he calls red herrings—that I'm going to call red herrings or Croswell calls it diversions [sic] and Croswell is going to do this and do that." | T.P. at 3795 | No | |
| Impugning defense | "Well, here's why I say that Clyde is not stupid. Trust me on this. If Clyde had known what he had said in the Grand Jury, Clyde would have never put him on the stand because Clyde knows I'm not stupid." | T.P. at 3838 | No | |
| Impugning defense—criticizing objections | "If I repeat myself, it's only because I can't remember where I am when I get interrupted." | T.P. at 3916 | No | |
| Impugning defense—criticizing objections | "Judge, will you tell him to stop interrupting me?" | T.P. at 3917–18 | No | |

| Alleged issue | Prosecution's statement | Cite | Objection? | Instruction given (if objected to) |
|---|---|---|---|---|
| Impugning defense—insinuating belief in client's guilt | ". . . he's just fighting his case. But he has a problem and here's his problem. His problem is in the final analysis the truth is just like an ugly baby . . . . Clyde has got to live with the truth, he has got to live with the reality of the situation and he has got to live with the proof." | T.P. at 3798 | No | |
| Impugning defense—insinuating belief in client's guilt | "You know what Clyde's biggest problem here in this case is, you see what is sitting in front of you right there? Those are documents in this case . . . And the reason Clyde is struggling so much here is he is not Harry Houdini. He is not a magician. [3828] He walks up here and abracadabra and makes them disappear. No, these are the documents in the case and this is the proof that will show you that Judge Tracie Hunter committed the crimes that we have alleged." | T.P. at 3827–28 | No | |
| Impugning defense—integrity | "I am not the one who put on the people who perjured themselves. I'm not the one who put Avery Corbin in here who [3920] came in and perjured himself and said I never told Judge Hunter what I was doing. She had no idea until he got this jammed down his throat [sic]." | T.P. at 3919–20 | No | |
| Impugning defense—integrity | "Now they are the ones and I'm not the ones who bad mouthed Deters. I didn't bad mouth all these people, Connie [3922] Murdock and all these people." | T.P. at 3921–22 | No | |
| Impugning defense; citing unused evidence | "Now I realize and I am sort of in catch 22 here. I know you all have been sitting for a long time, like for five-and-a-half weeks, four-and-a-half or five weeks and I know you have been sitting a long time today, but I have a dilemma. I would like to hurry, I [3852] case on and so I am moving through this as quickly as I can, but I have been challenged, prove your case, where is your case." | T.P. at 3851–52 | No | |
| Impugning defense; citing unused evidence | "And I have tried my very best to be a gentleman and I have tried my very best to not engage in this thing together, but if they want to take it together I will tell you what we could do. We will reopen the evidence and we could go for about six months here if that's where they want to go." | T.P. at 3921 | No | |
| Enlisting unsworn statements as evidence | "And you know that to be true because Clyde told you that. Here's what he told you in his opening statement. When you listen to all of the evidence in this case it will be clear that the charges—" | T.P. at 3806 | Yes | "Well, ladies and gentlemen: Again, we are instructing you, as we have previously done, that what counsel says to you in final argument is not evidence. Again, the evidence which you will make your decision is based upon what you hear from the mouths of the witnesses sitting on the witness stand, plus the exhibits which have been admitted during the course of the trial." |
| Enlisting unsworn statements as evidence | "[B]y January 25th, 2013 Tracie Hunter had established a reputation in this community, not just in juvenile court, but in this community of exactly what Clyde says she was in his opening statement which was a judge who won't be controlled by—" | T.P. at 3865 | Yes | "Just a moment, both of you. We have properly instructed the jury, so you may proceed. The same instructions that I have given to you several times at least." |

| Alleged issue | Prosecution's statement | Cite | Objection? | Instruction given (if objected to) |
|---|---|---|---|---|
| Burden-shifting—absent-witness argument | "And the case we presented to you [3809] all proves that we're not involved in the politics because we have not put the politics into play here and we have not put the people to come in here to bad mouth her and we have not brought the people from Juvenile Court that Clyde is anxious to get in here. If he wanted all those people in here to tell you what they knew about it why didn't he bring them?" | T.P. at 3808–09 | Yes | "Same instruction, ladies and gentlemen, that I have given to you at least four or five times. You may proceed." |
| Burden-shifting—absent-witness argument | "If he wants to be critical of why we didn't do what we would do, he had all opportunity to call anybody he wanted." | T.P. at 3810 | Yes | "Same instruction to the jury. What they say to you in closing argument again is not evidence and it's not the law either. You may proceed." |
| Burden-shifting—absent-witness argument | "Mr. Bennett keeps wanting to know why I didn't call Deters. Why didn't he call Joe Deters and ask him about the conspiracy?" | T.P. at 3817 | Yes | "Again, same instruction. Let's proceed." |
| Burden-shifting—absent-witness argument | "The reason he didn't call him is because he didn't want to hear what he had to say. More importantly, he didn't want you to hear what he had to say. And it's the reason he didn't call any of the other witnesses that he criticized us for not calling because he didn't want you to hear what they had to say." | T.P. at 3818 | Yes | "Okay. Same instruction that I previously gave to you, ladies and gentlemen. You may proceed." |
| Burden-shifting | "Now what do you think the other judges in this county think about that? I didn't see any of them come to her defense and let her pick her own lawyers." | T.P. at 3890 | Yes | "Just a moment, everybody. Same instruction as I previously gave to you, ladies and gentlemen: What counsel says to you in final argument is not evidence. The evidence on which you will make your decisions is what comes from the mouths of the witnesses sitting on that witness stand, plus the exhibits. Now counsel can—excuse me—and you determine what the evidence is. You are the sole determiner of the evidence. . . . Also, what they say about the law is not necessarily the law. What I say the law is, it is. And I will instruct you on the law and you'll have copies of what I say." |
| Burden-shifting—absent-witness argument | "Do not believe that if there was anyone anyplace that would say as either [3908] as a judge I could put any date on there that they would not be here?" [sic] | T.P. at 3907–08 | Yes | "Same instruction that I previously gave to you, ladies and gentlemen." |
| Burden-shifting—absent-witness argument | "This is not some situation here you look up and say they're all liars because if that's all we had that's what they would be saying; they are all liars." | T.P. at 3912–13 | No | |

| Alleged issue | Prosecution's statement | Cite | Objection? | Instruction given (if objected to) |
|---|---|---|---|---|
| Burden-shifting—absent-witness argument | "She has been entitled to question and challenge any witness that she wanted. She has been entitled to put any document in the record that she wanted. She has been entitled, and she didn't have to, but she was entitled to put any witness on." | T.P. at 3917 | Yes | "That's enough out of both of you. Just let's continue, Mr. Croswell. Ladies and gentlemen, the same instruction that I previously gave to you. By the way, let me give you another instruction: This has been a long trial and tempers get heated. Don't hold that against one side or the other. That's sort of in a long trial. That's normal. Both sides are representing their clients and they're great advocates. Don't hold that against one side or the other. You may proceed." |
| Burden-shifting—absent-witness argument | "He has or not [sic] been given the opportunity to bring anybody he wants." | T.P. at 3919 | Yes | "That is enough out of you. Mr. Croswell, you may continue." |
| Burden-shifting—absent-witness argument | "But I am the one that could tell you, and he could object to it, that if he has got that much for them and these people know that much and these people had this case so much he had a duty to call them and he should have called them and he should have proven it to you." | T.P. at 3922 | Yes | "Same instruction." |