# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Tracie M. Hunter , | : | **Case No. 1:16-cv-561** |
| | : | |
| Petitioner, | : | **Judge Timothy S. Black** |
| | : | |
| v. | : | **Magistrate Judge Karen Litkovitz** |
| | : | |
| Ohio Attorney General of | : | |
| State of Ohio, | : | |
| | : | |
| and | : | |
| | : | |
| Hon. Patrick Dinkelacker, | : | |
| | : | |
| Respondents. | : | |

## PETITIONER TRACIE M. HUNTER'S REPLY TO REPONDENT ATTORNEY GENERAL AND RESPONDENT THE HONORABLE PATRICK DINKELACKERS' ANSWERS

/s/ David A. Singleton
David A. Singleton #0074556
Counsel for Petitioner Tracie M. Hunter
Ohio Justice & Policy Center
215 E. 9thStreet, Suite 601
Cincinnati, OH 45202
(513) 421-1108
(513) 562-3200 – fax
dsingleton@ohiojpc.org

/s/Jennifer L. Branch
Jennifer L. Branch # 0038893
*Co-counsel for Petitioner Tracie M. Hunter*
Gerhardstein & Branch Co. LPA
432 Walnut Street, Suite 400
Cincinnati, Ohio 45202
(513) 621-9100
(513) 345-5543 (fax)
jbranch@gbfirm.com

# TABLE OF CONTENTS

I.   ARGUMENT SUMMARY ................................................................................... 1
II.  STATEMENT OF FACTS ................................................................................... 7
   A.  The Tense Relationship Between the Hamilton County Prosecuting    Attorney's
       Office and Judge Hunter Before Her Indictment. ....................................... 7
   B.  The Criminal Charges Judge Hunter Faced and Their Resolution. ......................... 9
       1.  The So-Called "Backdating" Charges. ........................................... 10
       2.  The Theft in Office and Misuse of Credit Card Counts. ........................... 12
       3.  The Having Unlawful Interest in a Public Contract Counts. ....................... 13
       a.  Steven Hunter's accumulation of four hours compensatory time for providing
           security outside Hunter's courtroom. ......................................... 13
       b.  Steven Hunter's Termination Hearing. ............................................ 14
   C.  The Prosecution's Calculated Effort to Destroy Judge Hunter's Character and
       Tarnish Her Image before Its Rebuttal Closing. ......................................... 17
       1.  Joe Deters' press release blaming Judge Hunter for the deaths of two young
           men. ........................................................................... 17
       2.  The prosecution's attempt in opening statement to smear Judge Hunter with
           irrelevant and false accusations of endangering children. ...................... 19
   D.  The Prosecution's Calculated Effort to Destroy Judge Hunter's Character With
       False Statements During Its Rebuttal Closing. ......................................... 20
       1.  Examples of prosecutorial misconduct to which the defense objected. ......... 20
       a.  Statements that were inflammatory and irrelevant because they implied   that
           Judge Hunter posed a danger to the community. ................................ 20
           i.   Example 1 .................................................................. 21
           ii.  Example 2 .................................................................. 22
           iii. Example 3 .................................................................. 23
           iv.  Example 4 .................................................................. 23
           v.   Example 5 .................................................................. 24
       b.  Treating defense counsel's unsworn statements in opening as evidence. ...... 24
           i.   Example 1 .................................................................. 24
           ii.  Example 2 .................................................................. 25
       c.  Statements that improperly shifted the burden of proof from the  prosecution
           to the defense. ............................................................... 26
           i.   Example 1 .................................................................. 26
           ii.  Examples 2 and 3 .......................................................... 27
           iii. Example 4 .................................................................. 28
           iv.  Example 5 .................................................................. 30
           v.   Examples 6 and 7 .......................................................... 30
       2.  Further examples of prosecutorial misconduct that had the cumulative   effect
           of rendering the trial fundamentally unfair. .................................. 32
       a.  Statements that were inflammatory. ............................................ 32
           i.   Example 1 .................................................................. 32
           ii.  Example 2 .................................................................. 33
           iii. Example 3 .................................................................. 33

    b.    Statements that injected the prosecutor's personal opinion into the trial. ............ 34
          i.    Example 1 ............................................................................................ 34
          ii.    Example 2 ............................................................................................ 35
    c.    Statements that impugned the defense. .................................................................. 35
          i.    Example 1 ............................................................................................ 35
          ii.    Example 2 ............................................................................................ 36
          iii.   Example 3 ............................................................................................ 38
          iv.   Examples 4 and 5 ............................................................................... 38
  E.   The Trial Judge's refusal to give limiting instructions encouraged the prosecutorial misconduct. ...................................................................................................................... 39
  F.   Judge Hunter's State Court Appeals. ......................................................................... 39
  1.   The First District's placement of Judge Hunter's appeal on the accelerated calendar. ................................................................................................................... 39
  2.   Judge Hunter's first brief. ......................................................................................... 41
  3.   Judge Hunter's amended brief. ................................................................................. 43
  4.   Judge Hunter's unsuccessful motion seeking leave to file a reply. ...................... 43
  5.   The First District's decision. .................................................................................... 44
  6.   The Ohio Supreme Court's refusal to hear Judge Hunter's discretionary appeal. 45
III. CONSTITUTIONAL CLAIMS .......................................................................................... 46
FIRST GROUND FOR RELIEF ............................................................................................. 46
THE PROSECUTION VIOLATED JUDGE HUNTER'S RIGHTS TO A FAIR TRIAL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY ENGAGING IN EXTENSIVE MISCONDUCT THAT FUNDAMENTALLY INFECTED HER TRIAL WITH UNFAIRNESS. ................................................................................................................ 46
  A.   Introduction. ................................................................................................................ 46
  B.   Procedural Posture. ..................................................................................................... 50
  1.   Judge Hunter fairly presented her prosecutorial misconduct claim to the state courts. ........................................................................................................................ 50
  2.   This Court should decide the merits of Judge Hunter's prosecutorial misconduct claim. ......................................................................................................................... 52
  C.   The Merits of Judge Hunter's Prosecutorial Misconduct Claim. ........................... 57
  1.   The remarks both misled the jury and prejudiced Judge Hunter. ......................... 58
  2.   &amp; 3. The special prosecutor's prejudicial comments were extensive and were made deliberately, not accidentally. ....................................................................... 62
  4. There was no evidence to support the charges against Judge Hunter. ..................... 64
SECOND GROUND FOR RELIEF ........................................................................................ 67
THE FIRST DISTRICT COURT OF APPEALS DENIED JUDGE HUNTER HER DUE PROCESS RIGHT TO A MEANINGFUL APPEAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY UNREASONABLY DENYING HER THE ADDITIONAL BRIEFING SHE NEEDED TO FULLY PRESENT HER PROSECUTORIAL MISCONDUCT ARGUMENT. ...... 67
  A.   Introduction. ................................................................................................................ 67
  B.   Procedural Posture. ..................................................................................................... 69
  1.   Judge Hunter fairly presented her due process denial of a meaningful appeal to the state courts. ............................................................................................................... 69

2.   This Court should decide the merits of Judge Hunter's claim that the First District denied her federal due process right to a meaningful appeal. ............................... 69

C.   The  Merits of Judge Hunter's Claim that the First District Denied Her Due Process Right to a Meaningful Appeal. ................................................................ 70

THIRD GROUND FOR RELIEF ..................................................................................... 78

THE TRIAL JUDGE DENIED JUDGE HUNTER HER SIXTH AMENDMENT RIGHT TO TRIAL BY JURY BY REFUSING TO POLL THE JURY IN OPEN COURT AFTER THE VERDICT WAS ANNOUNCED ................................................................ 78

IV. CONCLUSION .......................................................................................................... 78

V.  REQUESTED RELIEF .............................................................................................. 79

CERTIFICATE OF SERVICE ........................................................................................ 80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Anderson*,
2001-Ohio-131, 92 Ohio St. 3d 63, 748 N.E.2d 67 ....................................................12

*Baldwin v. Reese*,
541 U.S. 27, 29 (2004)..............................................................................................50

*Berger v. United States*,
295 U.S. 78 (1935)......................................................................................................1

*Berger v. United States*,
295 U.S. 78, 88 (1935)..............................................................................................61

*Berger v. United States*,
295 U.S. 78, 89 (1935)..............................................................................................50

*Byrd v. Collins*,
209 F.3d 486 (6th Cir. 2000) .....................................................................................66

*Caldwell v. Russell*,
181 F.3d 731, 736 (6th Cir.1999) ..............................................................................57

*Darden v. Wainwright*,
477 U.S. 168 (1986)........................................................................................3, 57, 66

*Donnelly v. DeChristoforo*,
416 U.S. 637 (1974)....................................................................................................3

*Donnelly v. DeChristoforo*,
416 U.S. 637, 643 (1974))). .......................................................................................51

*Douglas v. California*,
372 U.S. 353, 358 (1963)...........................................................................................70

*Duncan v. Henry*,
513 U.S. 364, 365 (1995)...........................................................................................50

*Evitts v. Lucey*,
469 U.S. 387 (1985)...................................................................................................70

*Farmer v. Hofbauer*,
1 Fed.Appx. 372 (6th Cir. 2001)................................................................................57

*Frazier v. Huffman*,
    343 F.3d 780 (6th Cir. 2003) ....................................................58

*Gilbert v. Homar*,
    520 U.S. 924 (1997)...............................................................71

*Granger v. Hurt*,
    215 Fed.Appx. 485 (6th Cir. 2007)........................................57

*Griffin v. Illinois*,
    351 U.S. 12, 18 (1956)...........................................................70

*Halbert v. Michigan*,
    545 U.S. 605 (2005)..............................................45, 69, 70, 74

*Henderson v. Collins*,
    262 F.3d 615 (2001)..........................................................71, 75

*Hunter v. Hamilton County Board of Elections*,
    635 F.3d 219 (6th Cir. 2011) ...................................................7

*Hunter v. Hamilton County Board of Elections*,
    850 F.Supp.2d 795 (S.D. Ohio 2012) .......................................7

*Johnson v. Williams*,
    133 S.Ct. 1088.........................................................6, 52, 53, 56

*Kennedy v. Cardwell*,
    487 F.2d 101 (6th Cir. 1973) .................................................72

*Lane v. Brown*,
    372 U.S. 477 (1963)..........................................................70, 74

*Langnes v. Green*,
    282 U.S. 531 (1931)...............................................................72

*Lundy v. Campbell*,
    888 F.2d 467 (6th Cir. 1989) .............................................32, 49

*McKane v. Durston*,
    153 U.S. 684 (1894)...............................................................69

*McKenzie v. Smith*,
    326 F.3d 721, 727 (6th Cir. 2003) .........................................57

*McMeans v. Brigano*,
    228 F.3d 674 (6th Cir. 2000) .................................................50

*Morrissey v. Brewer,*
408 U.S. 471 (1972).........................................................................................71

*O'Sullivan v. Boerckel,*
526 U.S. 838, 845 (1999)................................................................................50

*Ohio v. Hunter,*
Case No. B1400110 .........................................................................................35

*Ross v. Moffitt,*
417 U.S. 600 (1974).........................................................................................70

*Seymour v. Walker,*
224 F.3d 542 (6th Cir. 2000) ....................................................................75, 76

*Seymour v. Walker,*
224 F.3d at 541 ................................................................................................75

*Smith v. Caruso,*
53 Fed.Appx. 335 (6th Cir. 2002)..............................................................71, 75

*Smith v. Phillips,*
455 U.S. 209, 219 (1982)...........................................................................51, 57

*Specht v. Patterson,*
386 U.S. 605 (1967)....................................................................................70, 74

*State v. Freeman,*
138 Ohio App.3d 408, 741 N.E.2d 566 (1st Dist. 2000) .................................51

*State v. Hart,*
94 Ohio App.3d 665, 674, 641 N.E.2d 755 (1st Dist. 1994) ...........................51

*State v. Hunter,*
1st Dist. Nos. C-140684, C-140704, C-140717, 2016-Ohio-123 ("The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor'" (quoting *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *Smith v. Phillips*, 455 U.S. at 219)) ............................................................................................... *passim*

*State v. Smith,*
14 Ohio St.3d 13, 470 N.E.2d 883 (1984) ..............................................60, 61

*State v. Smith,*
87 Ohio St.3d 424, 721 N.E.2d 93, 2000-Ohio-450 (2000).................50, 51, 61

*Turner v. Bagley,*
401 F.3d 718 (2005)........................................................................................70

*United States v. Clark*,
    982 F.2d 965 (6th Cir. 1993) ...................................................66

*United States v. Lovasco*,
    431 U.S. 783, 797 (1977) ...................................................71

*United States v. Payne¸*
    2 F.3d 706 (6th Cir. 1993) .................................58, 59, 62, 64

*United States v. Signer*,
    482 F.2d 394 (6th Cir. 1973) ...................................................65

*United States v. Wiedyk*,
    71 F.3d 602, 610 (6th Cir. 1995...................................................66

*Weeks v. Angelone*,
    176 F.3d 249, 271 (4th Cir. 1999) ...............................75, 76

*Whipple v. Warden, S. Corr. Facility*,
    No. 1:14-cv-119, 2014 WL 5849066 (S.D. Ohio Nov. 12, 2014) .................73, 74, 75

*Whipple v. Warden, S. Corr. Facility,*
    No. 1:14-cv-119, 2014 WL 7228021 (S.D. Ohio Dec. 17, 2014)(Black, J.) .............74

*Wilson v. Workman*,
    577 F.3d 1284 (10th Cir. 2009) .............................53, 54, 55, 56

*Wolfe v. Randle*,
    267 F.Supp.2d 743 (S.D. Ohio 2003) ...................................................71

*Woolbright v. Crews*,
    791 F.3d 628 (6th Cir. 2015) ...................................................50

**Statutes**

28 U.S.C. § 2254(b)(1)(A)...................................................50

28 U.S.C. §2254(d) ................................................... *passim*

Ohio Rev. Code § 2913.31(A)(2) ...................................................10

Ohio Rev. Code § 2921.12(A)(2) ...................................................10

Ohio Rev. Code § 2921.42...................................................64

Ohio Rev. Code § 2921.42(A)(1) ...................................................13

**Other Authorities**

Okla. Ct. Crim. App. R. 3.11 ...........................................................................................54

Oklahoma Appellate Rule 3.11(B) ..................................................................................53

United States Constitution .......................................................................... *passim*

Fourteenth Amendments of the United States Constitution ..............................................51

# I. ARGUMENT SUMMARY

While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones," said the United States Supreme Court more than eighty years ago in *Berger v. United States*, 295 U.S. 78, 88 (1935). But striking foul blows is precisely what the prosecution did in Petitioner Tracie Hunter's trial. During its rebuttal closing, the prosecution unleashed a torrent of untrue, inflammatory, irrelevant and improper statements – fifty-one in all, the most prejudicial of which drew defense objections – statements that individually and cumulatively denied Judge Hunter her right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

The prosecutor's false and improper statements were no isolated slips of the tongue but were instead part of the prosecution's calculated and concerted effort to depict Judge Hunter as an unlikeable, renegade judge. Without any evidence to support their claims, the prosecutors told that jury that Judge Hunter undermined public safety through her rulings, implying that she deserved to be convicted irrespective of the evidence admitted at trial. In fact, just five days before the trial began, Hamilton County Prosecuting Attorney Joseph Deters, whose office handed off the case to special prosecutors, previewed this strategy when he issued a press release blaming Judge Hunter for the deaths of two young men.

During its opening statement, the prosecution built on Deters' pretrial effort to falsely tarnish Judge Hunter's reputation and image, and foreshadowed the character attack it would launch during its rebuttal closing despite absolutely no evidence of any of these statements ever being introduced at trial because it simply did not exist. For example, the special prosecutor compared Judge Hunter to a child, told the jury that she

had hired a bailiff who had allegedly physically abused a child, and endangered children by not timely ruling on cases.

As irrelevant and inflammatory and false as these character attacks were, the prosecution saved its most prejudicial and irrelevant material for its rebuttal closing, after which the defense would be unable to respond. During the rebuttal, the prosecution insinuated, without any proof to back it up, that Judge Hunter endangered the community.

Specifically, three times during his rebuttal closing, Special Prosecutor Scott Croswell referred, without any factual basis whatsoever, to children being sexually abused as a result of Judge Hunter's actions on the bench. Croswell also argued that Judge Hunter cared more about protecting the identities of six juveniles who severely beat a man because they were bored than she did about the victim. And Croswell reminded the jury that Judge Hunter had hired a bailiff "who had been terminated for beating children."

There was no reason for these especially inflammatory and false comments – all of which defense counsel objected to along with many others – other than to make the jury dislike Judge Hunter and increase the likelihood of a conviction in a case where the evidence against Judge Hunter was nonexistent. Indeed, the prosecution's misconduct turned the tide against Judge Hunter and resulted in her conviction of a single count of Having Unlawful Interest in a Public Contract.

However, in applying plain error review to Judge Hunter's prosecutorial misconduct argument and then rejecting the claim, the First District Court of Appeals concluded that in "[i]n almost all of the instances cited by Hunter there was no objection." This finding, however, was clearly erroneous and unreasonable. Not only

did defense counsel object to seventeen of the improper comments, he also objected to the most flagrant of the violations, including the remarks about children being sexually abused because of Judge Hunter's alleged delays in ruling on cases, her hiring a bailiff who had physically abused children and her caring more about protecting the identities of the juveniles who appeared before her than about the people they had severely victimized. And when defense counsel objected, the judge either told the jury, "Ladies and gentleman, closing arguments are not evidence," or "Same instruction as I have previously given you, referring to the instruction that what counsel say in argument is not evidence."

Moreover, at no time did the judge instruct the jury to disregard the prosecutor's improper arguments. Nor did the judge ever admonish the prosecutor for crossing the line. In fact, the trial judge's refusal to assert his authority during the rebuttal closing appeared to embolden the prosecutor, who at one point complained of defense counsel's objections and asked in front of the jury, "Judge, will you tell him to stop interrupting me?"

The prosecution's extensive misconduct during the rebuttal closing, which the trial court encouraged and the First District Court of Appeals brushed aside, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). This misconduct is the primary basis upon which Judge Hunter seeks habeas relief.

This Court should grant habeas relief for a second reason: the First District Court of Appeals violated Judge Hunter's federal due process right to a meaningful opportunity

to appeal and her right to the effective assistance of counsel by abusing the accelerated calendar, which is intended for straightforward appeals that do not require extensive briefing. As will be discussed in more detail below, the First District automatically places every appeal in Hamilton County on the accelerated calendar regardless of the complexity of the issues, and refuses to remove criminal appeals from that calendar unless the appeals involve first-degree felony convictions. And if the court places a case on the accelerated calendar, there is no opportunity for the appellant to submit a reply brief.

As a result of this practice, the First District denied Judge Hunter a full opportunity to discuss the fifty-one instances of misconduct and how their cumulative effect violated her right to a fair trial. Although Judge Hunter tendered a brief that was ten pages in excess of the court-imposed page limit, along with a motion seeking leave to file the longer brief, the First District denied the motion, struck the brief, and ordered that Judge Hunter file a brief that complied with the page limit. As a result, Judge Hunter had to reduce her fourteen-page argument discussing the prosecutor's fifty-one improper statements during the rebuttal closing down to a three-and-a-half-page argument discussing only five of the improper statements.

Adding insult to injury, the First District removed Judge Hunter's case from the accelerated calendar and placed it on the regular calendar for purposes of publishing its opinion – a decision that the First District issued eleven days after oral argument on the business day before Judge Hunter's re-trial on the deadlocked counts was set to begin, a retrial that never happened after the state dismissed the remaining charges. Had the First District placed Judge Hunter's appeal on the regular calendar from the outset, she would

have had ample opportunity to fully brief the three issues she raised on appeal, including all of her prosecutorial misconduct arguments.

Finally, this court owes no deference to the state appellate court in deciding whether to grant habeas relief. 28 U.S.C. §2254(d) prohibits a district court from granting habeas relief with respect to any claim the state court adjudicated on the merits, unless the claim's adjudication

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Regarding Judge Hunter's argument that the First District violated her due process right to a meaningful opportunity to appeal and her right to the effective assistance of counsel in presenting it, § 2254(d) clearly does not apply because the state courts did not issue a merits decision on those two issues. Judge Hunter's only opportunity to obtain a merits decision with respect to those claims would have been in the Ohio Supreme Court. Although Judge Hunter raised those issues in her memorandum in support of jurisdiction, the Ohio Supreme Court refused to hear her appeal by a vote of 4-3. Thus, there is no state court decision addressing the merits of this claim.

Additionally, contrary to Respondents' assertion, this Court owes no deference to the First District's resolution of Judge Hunter's prosecutorial misconduct argument. Although the court purported to decide the merits, it did not. As the United States Supreme Court has stated, "A judgment is normally said to have been rendered 'on the merits' only if it was 'delivered after the court . . . heard and *evaluated* the evidence and

the parties' substantive arguments.'" *Johnson v. Williams*, 133 S.Ct. 1088, 1097 (citing Black's Law Dictionary) (emphasis in *Johnson*). Here, the court never "heard and evaluated" Judge Hunter's argument because the court effectively deprived her of making them by requiring her to reduce a fourteen-page argument discussing fifty-one improper statements into a three-and-a-half page argument discussing five. To understand just how unfairly prejudicial the prosecution's rebuttal closing was, it was critical for the court of appeals to have considered the entirety of Judge Hunter's prosecutorial misconduct argument, not just a tiny fraction of it. Accordingly, this court should conclude that the court of appeals never decided the merits of Judge Hunter's prosecutorial misconduct claim because that court never heard and evaluated Judge Hunter's evidence and the substantive arguments on that issue, and therefore *de novo* review applies.

However, even if 28 U.S.C. § 2254(d) review applies to Judge Hunter's prosecutorial misconduct claim, she nonetheless prevails under subsection (2) of that standard. Here, the court of appeals' conclusion that "[i]n almost all of the instances cited by Hunter there was no objection," was clearly erroneous and unreasonable, and reveals that the court did not review the chart of the fifty-one improper statements Judge appended to her brief, let alone the transcript of the closing argument. Had the court done so, it would have realized that defense had objected to seventeen of the improper statements, including the most inflammatory and prejudicial ones, and it would not have reviewed only for plain error. Accordingly, this court owes no deference to the First District's clearly erroneous and unreasonable factual determination.

## II. STATEMENT OF FACTS

Judge Tracie Hunter was the first African American and first Democrat elected to the Hamilton County, Ohio Juvenile Court. As an African American woman, and a Democrat, who ran to reform the Juvenile Court and restore it to its historic roots in rehabilitation, she had to fight for eighteen months to have all the votes counted in her race[1] and then defend her every judicial action during the eighteen months she was on the bench.[2] Many diverse members of the community believe the prosecution of Judge Hunter was in retaliation for her successful election litigation and an attempt to remove her from the bench in order to restore the status quo.[3] This may explain the motivation behind the atypical prosecution of a first time judge after only 18 months on the bench who held clearly differing political and cultural views and the unbridled prosecutorial misconduct.

### A. The Tense Relationship Between the Hamilton County Prosecuting Attorney's Office and Judge Hunter Before Her Indictment.

The relationship between Prosecuting Attorney Joseph T. Deters' office and Judge Hunter before her indictment was acrimonious, to say the least. Their relationship was damaged beyond repair when she filed ethics complaints against him and two other prosecutors who had been representing her on litigation filed against her in her official capacity.

---

[1] *Hunter v. Hamilton County Board of Elections*, 635 F.3d 219 (6th Cir. 2011) (Hunter I); *Hunter v. Hamilton County Board of Elections*, 850 F.Supp.2d 795 (S.D. Ohio 2012) (Hunter II).

[2] The prosecutor, media outlets, and public defender filed in all 26 writs of prohibition and procedendo against Judge Hunter during her short tenure on the court. See NAACP Amici Brief, Exhibit B to Notice of Supplemental Record, Doc. 28-1, PAGEID# 5072-5073.

[3] See NAACP Amici Brief, Exhibit B to Notice of Supplemental Record, Doc. 28-1, PAGEID# 5066, submitted by Amici Curiae the Cincinnati Branch of the National Association for the Advancement of Colored People ("NAACP"), Greater Cincinnati Chapter of the National Action Network ("GCCNAN"), the Urban League of Greater Cincinnati, Coalition For a Just Hamilton County, other civil rights organizations, civic organizations, child-advocate organizations, Jewish, Muslim, Catholic, Ecumenical and

Two lawyers from Deters' office, Christian Schaefer and James Harper, represented Judge Hunter in actions the Cincinnati Enquirer and WCPO filed against her seeking to publish the names of certain juvenile respondents appearing before her in a high profile case. (Tr. Vol. 14, Sep. 11, 2014, at 1016-17, Doc. 13-14, PAGEID# 1719-1720). Judge Hunter told them that they could not represent her because of a conflict of interest stemming from the 2010 litigation involving the Hamilton County Board of Elections which was still being ongoing at the time they sought to represent her and were in effect suing her and representing her at the same time. (*Id.* at 1023, PAGEID# 1726).

That earlier litigation involved Judge Hunter's effort to win a court order requiring the Board of Elections to count certain votes. (*Id.* at 1002, PAGEID# 1705). The Board of Elections had declared John Williams, Judge Hunter's opponent in her election to become a Juvenile Court judge, the winner by a few votes. (*Id.* at 1004, PAGEID# 1707). Judge Hunter brought suit in federal district court contending that the Board of Elections had failed to count all of the votes. (*Id.*). Prosecutor Harper served as lead counsel for the Board of Elections in the federal litigation. (*Id.* at 1002, PAGEID# 1705). Ultimately as a result of the protracted litigation – which "was appealed to the Sixth Circuit on two or three occasions and to the United States Supreme Court on two occasions" – the federal courts ordered the Board of Elections to count the disputed votes and Judge Hunter emerged the winner. (*Id.* at 1004-5, PAGEID# 1707-1708). The elections litigation did not conclude until November of 2013 a year after they began representing her as judge, presenting a clear dual agency precluded by law and ethics.

---

Faith-Based organizations, and individuals who are leaders in the African-American community, advocates for justice, and/or persons of faith.

With respect to the Cincinnati Enquirer and WCPO litigation, Harper and his colleague refused to stop representing Judge Hunter, claiming that their office had a statutory duty to represent her in her official capacity. (*Id.* at 1023, PAGEID# 1726). Eventually, Judge Hunter filed grievances in the Ohio Supreme Court against Deters, Harper, and Schaefer "making allegations of wrongdoing in [Deters' office's] representation of her," when they failed to answer eighteen writs filed against her. (*Id.* at 1081, PAGEID# 1784). Harper and Schaefer then removed themselves from Judge Hunter's case. Four of the criminal charges arose from their failure to answer those lawsuits.

The grievances Judge Hunter filed struck a nerve, at least as far as Harper was concerned. Asked how he felt about having Judge Hunter file a grievance against him, Harper answered: "Well, it is a direct challenge upon your reputation. It is probably the worst thing other than disbarment that can happen to an attorney." (*Id.* at 1085, PAGEID# 1788). Later Harper added, "A reputation is an important thing developed over many years, not to be played with." (Tr. Vol. 15, Sep. 12, 2014, at 1240, Doc. 13-15, PAGEID# 1943). Asked later whether there should be consequences for the person who "play[s] with" a lawyer's representation by filing an ethics complaint, Harper responded, "There sure should be." (*Id.*). Regardless of their actual motivation, Judge Hunter would soon face charges in criminal court.

### B. The Criminal Charges Judge Hunter Faced and Their Resolution.

Two special prosecutors convened a grand jury to investigate Judge Hunter, and obtained an eight count indictment charging various offenses in Case No. B1400110. (Exhibit 2, Doc. 12-1, PAGEID# 113-117). Shortly thereafter, the grand jury returned an additional indictment charging Judge Hunter with a ninth offense in Case No. B 1400199.

(Exhibit 3, Doc. 12-1, PAGEID# 119-120). As the following discussion will show, the charges against Judge Hunter were unfounded, and the case against Judge Hunter, including the one count the jury convicted her of, was not supported by the evidence at trial.

### 1. The So-Called "Backdating" Charges.

Counts One and Three of the original indictment charged Judge Hunter with Tampering with Evidence in violation of Ohio Rev. Code § 2921.12(A)(2), and Counts Two and Four charged her with Forgery in violation of Ohio Rev. Code § 2913.31(A)(2). With respect to these four counts, the state's theory, as it would later tell the jury in opening statement, was that Judge Hunter committed these offenses when she backdated entries to deprive the prosecutor's office of its opportunity to appeal rulings in two cases. (Tr. Vol. 13, Sep. 10, 2014, at 820-830, Doc. 13-13, PAGEID# 1523-1533).

According to the special prosecutors, Judge Hunter did not want those rulings appealed because the prosecutors "had been appealing her regularly and the Court of Appeals had been overturning her appeals," and "she was upset with the Court of Appeals because the Court of Appeals had found her in contempt." (*Id.* at 824, PAGEID# 1527). Thus, according to the special prosecutors, Judge Hunter in one of the cases signed, journalized and entered an entry on August 22 but made it appear on the journal "as if it was signed on July 23 and slipped in . . . chronological order between a lot of other cases showing, or appearing to show, it had been there since July 23." (*Id.* at 822-23, PAGEID# 1525-1526). In the other case, the special prosecutors told the jury in opening that Judge Hunter signed and journalized an entry dated August 12th that was actually created on August 19th. (*Id.* at 828, PAGEID# 1531).

But there were problems with the prosecution's theory, as would become evident later in the trial. First, what the prosecution did not tell the jury in opening was that the practice of juvenile court judges, preceding Judge Hunter's tenure, was to match the date of an entry to the earlier date of the particular hearing at issue. Lisa Miller, who worked as Judge Hunter's case manager (Tr. Vol. 24, Sep. 26, 2014, at 2485, Doc. 13-24, PAGEID# 3188) and was responsible for creating the judge's entries, and who was trained to do entries by Juvenile Court employee Connie Murdock (*Id.* at 2507, PAGEID# 3210), told the jury that she "understood it to be" the norm to put the hearing date on an entry created after the hearing." (*Id.* at 2506, PAGEID# 3209). To underscore the point, defense counsel then showed Miller dozens of entries in Judge Hunter's cases which Miller, Murdock, and another case manager named Kathy Dykes had date-matched to reflect the earlier hearing date. (*Id.* at 2513-2585, PAGEID# 3216-3288; Tr. Vol. 25, Sep. 29, 2014, at 2644-2664, Doc. 13-25, PAGEID# 3347-3367; 2667-2691, PAGEID# 3370-3394; 2693-2707, PAGEID# 3396-3410).

Second, as a matter of law, neither Judge Hunter nor any other Juvenile Court judge could have deprived the state of the right to appeal by date-matching the entry to the earlier hearing date. Margie Slagle, an appellate attorney with the Hamilton County Public Defender's Office (Tr. Vol. 26, Sep. 20, 2014, at 2918, Doc. 13-26, PAGEID# 3621), explained to the jury that because juvenile cases are civil, not criminal matters, the clerk of courts has to journalize the entry and then serve it on the parties before the time for appeal starts to run. (*Id.* at 2930-2933, PAGEID# 3633-3636). In support of her

opinion, Slagle referenced Ohio Civil Rule 58,[4] which is entitled "Entry of Judgment." (*Id.*at 2937, PAGEID# 3640). Slagle testified:

> Well, what it says under [Rule 58](A) is that a judgment is effective only when entered by the clerk upon the journal. And then it also says it is subject to Rule 54(B). So then [you have] to look at Rule 54(B) and that says: when the court signs a judgment, the Court shall endorse thereon a direction to the clerk to serve upon all parties notice of the judgment and its date of entry upon the journal. Within three days of entering the judgment upon the manner prescribed by Civil Rule [58] and note the service in the appearance docket. * * *

Slagle also discussed Ohio Supreme Court cases that made clear that an entry in Juvenile Court did not become a final appealable order until the clerk journalizes it and serves the entry upon the parties. (*Id.* at 2941-43, 2947-48, PAGEID# 3644-3646, 3650-3651).

Third, the prosecution filed its appeals on time in both cases.

Ultimately, the state was unable to obtain any convictions on the Tampering with Evidence and Forgery Counts, as the jury deadlocked on those counts.[5]

## 2. The Theft in Office and Misuse of Credit Card Counts.

Judge Hunter also faced charges involving her use of her county issued credit card to pay certain Ohio Supreme Court filing fees. In its opening, the prosecution told the jury that Judge Hunter sought to appeal eleven writs issued against her by the First

---

[4] Juvenile Courts in Ohio following the Ohio Rules of Civil Procedure. In *In re Anderson*, 2001-Ohio-131, 92 Ohio St. 3d 63, 67, 748 N.E.2d 67, 70, the Ohio Supreme Court held "that a juvenile court proceeding is a civil action*.*"

[5] Inexplicably and erroneously, Respondent Dinkelacker, who has inserted himself into this case to defend Judge Hunter's conviction, claims at pages 13 and 15 of his answer that the jury acquitted Judge Hunter of all charges with the exception of one count of Having Unlawful Interest in a Public Contract. Respondent Dinkelacker should know better. Although he did not preside over Judge Hunter's trial, he did preside over the retrial and later dismissal of the deadlocked charges. Nonetheless, based on this belief that the jury acquitted Judge Hunter of eight of the nine counts, Respondent Dinkelacker contends that the special prosecutor's rebuttal closing did not prejudice Judge Hunter.

District Court of Appeals requiring her to issue rulings in those eleven cases. (Tr. Vol. 13 at 854-55, Doc. 13-13, PAGEID# 1557-1558). Although the writs were issued against Judge Hunter in her official capacity, the prosecutor asked rhetorically, "You know what Judge Hunter did?" He then answered his own question, "[She] filed *pro se* on behalf of the county government [and] appeals to the Supreme Court [of Ohio] taking over the representation of the county government." (*Id.* at 855, PAGEID#1588). According to the prosecution, using her county-issued credit card was not merely a violation of the rules but a violation of the law because "[s]he took $1100 from the county to pay her filing fees, which is theft. No different than if she had taken $1100 from the county to buy a pair of shoes, to buy a dog or cat." (*Id.* at 856, PAGEID# 1559).

The jurors, however, could not agree on a verdict with respect to the theft and credit card counts. Accordingly the trial judge declared a mistrial on those charges.

### 3. The Having Unlawful Interest in a Public Contract Counts.

Two counts of the indictment charged Judge Hunter with Having Unlawful Interest in a Public Contract, in violation of Ohio Rev. Code § 2921.42(A)(1). Both counts involved Judge Hunter's brother Steven.

### a. Steven Hunter's accumulation of four hours compensatory time for providing security outside Hunter's courtroom.

In its opening, the prosecution told the jury that one of the counts charged Judge Hunter with using her position to obtain overtime payment for her brother Steven, who was employed by Juvenile Court as a correctional officer: "Judge Hunter asked her bailiff, Avery Corbin, to call the jail and have the jail arrange for her brother to come work in her courtroom. It resulted in him being paid six and a half hours of overtime,"

(Tr. Vol. 13 at 845, Doc. 13-13, PAGEID# 1578), a charge the special prosecutor conceded was "frankly, in and of itself, not significant." (*Id.*).

However, Avery Corbin would eventually testify that he was the one who arranged for Judge Hunter's brother to work a security detail in her courtroom. (Tr. Vol. 29, Oct. 3, 2014, at 3326-29, Doc. 13-29, PAGEID# 4029-4032). Corbin explained that he had not spoken with Judge Hunter before calling to arrange for her brother to work security because "she hadn't arrived yet." (*Id.* at 3327, PAGEID# 4030).

The jury also deadlocked on this count.

### b. Steven Hunter's Termination Hearing.

The state's theory of prosecution for this count was that Judge Hunter used the power of her office to try to help her brother Steven Hunter fend off termination from his position as a juvenile correctional officer for allegedly striking a youth.[6] (Tr. Vol. 13, Sep. 10, 2014, at 834–42, Doc. 13-13, PAGEID# 1537-1545). The state claimed that Judge Hunter did so by using her office to obtain certain documents that she then gave to her brother before his hearing, documents he was not entitled to receive in advance of the hearing. (*Id.* at 834–42, PAGEID# 1537-1545). Despite the implication of the state's theory, Steven was, in fact, successfully terminated. (Tr. Vol . 21, Sep. 23, 2014, at 2173, Doc. 13-21, PAGEID# 2876; Tr. Vol. 28, Oct. 2, 2014, at 3167, Doc. 13-28, PAGEID# 3870). The prosecution never identified or introduced a single document allegedly given by Judge Hunter to her brother.

The prosecution called Dwayne Bowman, the superintendent of the Youth

---

[6] In January 2012, Judge Williams hired Steven Hunter to work at Juvenile Court. (Tr. Vol. 22, at 2328, Doc. 13-22, PAGEID# 3031). Thus, Judge Hunter had nothing to do with her brother's hiring or firing. Indeed, as defense counsel argued in his oral Rule 29 motion for judgment of acquittal, the evidence

Detention Center, who testified that Judge Hunter had requested certain documents concerning the youth whom her brother was accused of assaulting: the documents regarding the incident involving her brother, and the youth's drug test results. (Tr. Vol. 21, Sep. 23, 2014, at 2142–44, Doc. 13-21, PAGEID# 2845-2847).

The state also called Steven Hunter, who testified that the night before his termination hearing, he met his lawyer Janaya Trotter, at a gas station to pay her retainer. (Tr. Vol. 22, Sep. 24, 2014, at 2329, Doc. 13-22, PAGEID# 3032). Steven told the jury that he had documents with him, which he had obtained from Judge Hunter, and that he gave those documents to Trotter. (*Id.* at 2330, PAGEID# 3033). Steven *never* told the jury what documents his sister gave him, and the special prosecutors *never* asked him to describe the documents, nor introduced them as evidence. (*See id.* at 2326-31).

Called by the defense, Trotter testified that that Judge Hunter did not contact her about representing Steven and did not help with the representation. (Tr. Vol. 28, at 3155-56, Doc. 13-28, PAGEID# 3858-3859). She testified that Judge Hunter did nothing unethical. (Tr. Vol. 28, Doc. 13-28, PAGEID# 3888). Trotter acknowledged that Steven gave her some documents, three of which she took. (*Id.* at 3162, 3171, PAGEID# 3865, 3874). Trotter told the jury that Steven had received documents from various sources, but she did not know from what source the documents had come. (*Id.* at PAGEID# 3890). Trotter never testified at trial that she believed Judge Hunter had given Steven documents, and the prosecution never asked Trotter whether she so believed. (*See Id.* at 3151-3193).[7]

---

"doesn't even begin to prove that Judge Hunter went out and tried to secure employment for Steven." (Tr. Vol. 23 at 2430, Doc. 13-23, PAGEID# 3133).

[7] Trotter did testify that at some point "Steven started reaching out to a juvenile who he knew" to obtain documents, but that she was "not sure what documents he obtained." (Tr. Vol. *28.* at 3186, Doc. 13-28,

In sum, no witness identified the document(s) that Judge Hunter gave Steven, or which documents Steven presented to Trotter. While Bowman says he gave Judge Hunter drug-test results and other documents Steven was not entitled to receive, (Tr. Vol. 21 at 2153, Doc 13-21, PAGEID# 2856), there was no testimony that Judge Hunter gave those to Steven. And while Trotter declined some document(s) from Steven, she never identified the document(s) she declined, (Tr. Vol. 28. at 3151-3193, Doc. 13-28, PAGEID# 3854-3896), and made clear that she may have declined them because she "had already made arrangements to get what [she] needed prior to that." (*Id.* at 3174, PAGEID# 3877). Without knowing the identity of the documents Judge Hunter gave her brother, it is impossible to know whether she used the power of her office to try to interfere with her brother's termination hearing by giving him documents he would not otherwise be able to access before his hearing.[8]

Nevertheless, the jury convicted Judge Hunter of this one count. The fact that three jurors submitted affidavits within days after the trial concluded indicating that guilty was not their true verdict (Exhibit 2, Doc. 12-1, PAGEID# 118-120) underscores that the evidence for and against conviction on this count was not even close to being unanimous.

---

PAGEID# 3889). She also testified that she believed the television station WCPO to have "received documents that [she] was not able to receive in representing [Steven]" prior to the day of the hearing. (*Id.* at PAGEID# 3189.

[8] As will be discussed below, the state's failure to prove the identity of the documents Judge Hunter gave her brother is one of the grounds she argued in her appellate brief that the evidence was insufficient to sustain her conviction. Additionally, as will be discussed below, Judge Hunter argued that the Having Unlawful Interest in a Public Contract statute required the state to prove that she "secured authorization of any public contract," and that the phrase did not apply to what the state accused her of doing. These arguments comprised a substantial portion of her brief to the First District Court of Appeals.

**C. The Prosecution's Calculated Effort to Destroy Judge Hunter's Character and Tarnish Her Image before Its Rebuttal Closing.**

The prosecution's litany of improper remarks during its rebuttal closing included a number of highly inflammatory remarks that claimed and/or implied that Judge Hunter was a renegade judge who endangered the community through her rulings. This attempt to inflame the jurors' passion and turn them against Judge Hunter based not on the evidence but on the prosecutors' attack of her character, were not isolated slips of the tongue but part of an effort to destroy Judge Hunter's character – even before the trial started.

**1. Joe Deters' press release blaming Judge Hunter for the deaths of two young men.**

Five days before jury selection began, Hamilton County Prosecuting Attorney Joseph Deters issued a press release blaming Judge Hunter for the deaths of two young men, one of whom alleged that she did not commit to the Department of Youth Services ("DYS") (Attached to Defendant's Supplemental Motion for Change of Venue, which is attached as Exhibit F to Notice of Supplemental Record, Doc. 28-1, PAGEID# 5315). Dated September 3, 2014, the press release, begins: "Today, Hamilton County Prosecutor Joseph T. Deters announced that he requested the First District Court of Appeals to dismiss Case No. C-130728 in Re: T.D.T. due to the homicide of the appellee, (T.D.T./Tywaune Thomas)." (*Id.*). The press release alleged that Thomas had appeared before Judge Hunter for disposition on a charge involving heroin trafficking, and that the probation department had recommended that Judge Hunter commit Thomas to DYS in light of his thirty-six prior adjudications and "history of running from unsecured placements and violating the Electronic Monitoring Unit (EMU)." (*Id.*). Instead of

committing Thomas to DYS, explained Deters' press release, Judge Hunter placed Thomas on EMU and "made orders regarding attending out-patient treatment, school and work." (*Id.*). Deters indicated in his press release that his office disagreed with Judge Hunter's decision and appealed. (*Id.*).

On August 19, 2014, according to Deters' press release, Thomas shot and killed another man before he himself was shot to death. (*Id.*). The release then attributes the following quote to Deters: "This is the unfortunate sort of scenario we envisioned when we wanted Judge Hunter to commit Thomas to DYS. He clearly needed the structured setting of DYS if he were to have any chance of changing his life for the better." (*Id.*). Then Deters blamed Judge Hunter for the two young men's deaths: "Had Thomas been at DYS, both he and Ward might still be alive today." (*Id.*). And Deters took one final shot at Judge Hunter: "Judge Hunter has consistently said that she is doing this, 'for the children.' Well now we have a dead one." (*Id.*).

Local media ran with the story. In Defendant's Supplemental Motion for Change of Venue based on Deters' press release, defense counsel referenced stories appearing in or broadcast by the Cincinnati Enquirer ("Deters: Tracie Hunter Rulings Resulted in Death"); WCPO ("Deters: Judge Tracie Hunter Ruling Played Role in Deaths of Two Men"); WLWT ("Prosecutor Says Judge Tracie Hunter's Decision Led to 2 Deaths"); WXIX ("Prosecutor Blames Judge for Juveniles Death"); and WKRC ("Prosecutor Blames Judge Tracie Hunter for 2 Deaths"). (Ex. F Defendants Supplemental Motion for Change of Venue, Doc. 28-1, PAGEID# 5317-5318, 5319-5321, 5322-5323, 5316.)

Deters' press release was only the beginning of the prosecution's campaign to depict Judge Hunter as a danger to the community – an unfounded accusation that had

nothing to do with her guilt or innocence on the charged offenses. The prosecution would next build on this theme in its opening statement.

### 2. The prosecution's attempt in opening statement to smear Judge Hunter with irrelevant and false accusations of endangering children.

A significant portion of the prosecution's opening statement focused on destroying Judge Hunter's character. Comparing Judge Hunter to a "child [who] cannot be told no," (Tr. Vol. 13 at 805-06, Doc. 13-13, PAGEID# 1508-1509), the special prosecutor made several statements that unfairly attacked her character. For example, the special prosecutor suggested that Judge Hunter did not care about protecting children because she hired a bailiff who had been fired for physically abusing children:

> She noted to people that she wanted to hire her own bailiff, which was her right to do, and she indicated that she wanted to hire Mr. Avery Corbin, which was her right to do. People from the juvenile court were concerned and indicated to her that she might want to rethink that. And the reason that she might want to rethink hiring Avery Corbin as her bailiff is because he had been terminated from juvenile court some 20 years earlier, I believe, for physically abusing a child. They also indicated to her that they were concerned that if this became public it could snap back adversely, not just on her, but more importantly snap back adversely on the court and the community that you're hiring people as bailiffs that had been terminated for physically abusing children. His personnel file contained a notation, not eligible for rehire because of physical abuse. Judge Hunter, as was her right, persisted in hiring Avery Corbin.

(*Id*. at 795-96, PAGEID# 1498-1499).

The special prosecutor then told the jury that Judge Hunter actually put children at risk by not timely ruling on her cases:

> When Judge Hunter took the bench in May of 2011 -- pardon me-- in May of 2012, she had no cases which were out of time. Judge Tom Lipps had managed her docket. She had no cases out of time. Over a period of time, her docket started to back up and she had cases that were out of time. And you will hear testimony from people that will say they were concerned that these cases were languishing because they were juveniles that were suffering as a result of it. Perhaps there was an adoption waiting to be

> done. Maybe there were services that should be given to a child. Maybe
> it was a permanent custody issue. But these children were all in limbo,
> and it was taking forever to rule on the cases. This became a public
> concern.

(*Id.* at 847, PAGEID# 1550). This remark, made without support in the record, foreshadowed even more inflammatory statements to come in the special prosecutor's rebuttal closing.

### D. The Prosecution's Calculated Effort to Destroy Judge Hunter's Character With False Statements During Its Rebuttal Closing.

Contrary to the First District Court of Appeal's finding that "[i]n almost all of the instances cited by Hunter [of alleged prosecutorial misconduct], there was no objection," defense counsel objected seventeen times to statements he believed crossed the line from permissible argument into prosecutorial misconduct. Although Judge Hunter's appellate counsel identified fifty-one instances of alleged prosecutorial misconduct during the rebuttal closing, which appear in the chart attached as Exhibit B to Judge Hunter's court of appeals brief, (Doc. 28-1, PAGEID# 5066-5270), the following discussion will focus on the most egregious examples, beginning with statements that drew defense objections.

#### 1. Examples of prosecutorial misconduct to which the defense objected.

During the special prosecutor's rebuttal closing, defense counsel objected to seventeen statements that (a) were inflammatory and irrelevant; (b) enlisted unsworn statements as evidence; or (c) improperly shifted the burden of proof from the prosecution to the defense.

##### a. Statements that were inflammatory and irrelevant because they implied that Judge Hunter posed a danger to the community.

During his rebuttal closing, Special Prosecutor Croswell sought to portray Judge Hunter as jeopardizing community safety, a theme Hamilton County Prosecuting

Attorney Joe Deters laid the groundwork for in his eve-of-trial press release, and which Croswell himself further developed in opening.

### i. Example 1

The special prosecutor began this line of attack by portraying Judge Hunter as being more concerned with safeguarding the identities of the children who appeared before her than with protecting the community:

> Now [defense counsel] says she didn't want juveniles identified by their names under any circumstances and guess who had a problem immediately?
>
> Well, of course, these juveniles just happen to be the six kids who beat up some guy . . . and hospitalized him in North College Hill because they were bored. It just so happens that those kids – "

(Tr. Vol. 31 at 3810, Doc. 13-31,PAGEID# 4513). After defense counsel objected on relevance grounds, (*Id.* at 3810-11, PAGEID# 4513-4514), the following exchange occurred:

> MR. CROSWELL: Are you going to let me make my argument?
>
> THE COURT: That's enough out of both of you. That's enough. Same instruction, ladies and gentleman. You may proceed Mr. Croswell.
>
> MR. CROSWELL: Your Honor, not one word was said while he made his argument here. Apparently, he didn't like what I have got to say.
>
> THE COURT: All right. Let's just proceed with the argument.

(*Id.* at 3811, PAGEID# 4514).[9]

---

[9] By "same instruction," the trial court was referring to the instruction that he had given earlier to the effect that what the lawyers say in closing argument is not evidence." (*See*, e.g., *id*. at 3810, PAGEID# 4513).

### ii. Example 2

Later in the rebuttal closing the special prosecutor ramped up the inflammatory rhetoric by arguing that children were being sexually abused on Judge Hunter's watch. Referring to Judge Hunter's alleged delays in deciding cases, and why public officials were upset, the special prosecutor asked and then answered the following rhetorical question:

> Why can't you get this case resolved?
>
> Maybe that is what Deters has to listen to. Maybe what Deters has to listen to is the social worker who says this child is being sexually abused and we can't get this child out of the home because we can't get Judge Hunter to rule on the case.

*Id*. 3816 (PAGEID# 4519. Defense counsel objected to this remark and stated: "There was no evidence of any child being sexually abused." (*Id.*).

Rather than admonish the special prosecutor for making an inflammatory, untruthful, and irrelevant statement, and instructing the jury to disregard the comment, the trial court repeated an instruction it had previously given and would continue to give during the remainder of the rebuttal closing when the defense objected:

> Again, the same instruction that I previously have given to you: what they say in final argument is not evidence. The evidence [upon] which you will make your decision is what you heard from the witness stand, plus the exhibits. You are the sole determiner of the evidence. I will let you make that determination.

(*Id.*). The last sentence of this instruction – "I will let you make that determination" – may have suggested to the jury that perhaps there had been evidence of children being sexually abused as a result of alleged delays in Judge Hunter deciding case, when in fact there had been no such evidence admitted at any time during the six week trial.

### iii. Example 3

Undeterred by defense counsel's objection and the court's repetition of the phrase "same instruction," the special prosecutor returned to the subject of sexual abuse:

> Ray Faller, as he told you, we have got children waiting to be adopted. We have got children waiting to go get services. We have got children waiting to be taken out of homes or placed in homes. We have got people who want finality and we can't get her to rule on it.
>
> And the people that are adversely affected can't appeal it because she won't put on the final appealable order, so the child who is still stuck in the home where there is sexual abuse until she –

(Tr. Vol. 31 at 3857, Doc. 13-31, PAGEID# 4560). Defense counsel interrupted to object and then stated, "No evidence of sexual abuse." (*Id.* 3858, PAGEID# 4561). But the trial court simply referred to its early instruction: "Again, ladies and gentleman, the same instruction that I previously gave to you." (*Id.*). The judge did not instruct the jury to disregard the statement.

### iv. Example 4

In his very next sentence, the special prosecutor went right back to his unproven accusation that children were being abused because of Judge Hunter, stating: "The child that is stuck in the home that is being abused –." (*Id.*). Again, defense counsel interrupted and told the court, "There is no evidence of abuse." (*Id.*). The trial court gave no instruction and instead said, "Okay, Mr. Bennett." (*Id.*). The special prosecutor then completed the point he was making before defense counsel interrupted him, stating: "[c]annot appeal that decision until there is a final appealable order." (*Id.*).

### v. Example 5

The special prosecutor then reminded the jury of something he had mentioned in opening statement, but never submitted evidence of, that Judge Hunter had hired a bailiff who had been fired for abusing children:

> July was not a very good month for Tracie Hunter because on July 9th her brother had beat up an inmate at the detention center. And of course, it's awfully coincidental when people look at whether Hunter cares if a juvenile gets beat up in the detention center and how much she cares about everybody and her first hire was the bailiff who had been terminated for beating children.

(Tr. Vol. 13 at 3861, Doc. 13-31, PAGEID# 4564). After defense counsel objected, the court said: "Okay. The same instruction, ladies and gentlemen, that I have previously [given] you. What counsel says in closing argument is not evidence. The evidence . . . is what you heard from the mouths of the witnesses on the witness stand, plus the exhibits." (*Id*. 3861-62, PAGEID# 4564-4565). Again, by not admonishing the prosecutor for arguing irrelevant facts not in evidence, the Court implied there was evidence of her bailiff beating a child when there was no such testimony.

### b. Treating defense counsel's unsworn statements in opening as evidence.

Twice during its rebuttal closing, the prosecution used unsworn statements of defense counsel as evidence against Judge Hunter. Defense counsel objected each time the prosecution did so.

### i. Example 1

Addressing the issue of whether Joe Deters had a vendetta against Judge Hunter, the special prosecutor asked rhetorically, "Do you have any evidence that [Deters] was so upset about the Board of Elections' litigation that he had it in for her? Do you have any evidence at all that he is even a poor loser? You see the reality is Deters isn't a poor loser.

She is a poor winner . . ." (Tr. Vol. 31 at 3806, Doc. 13-31, PAGEID # 4509). As support for the proposition that Judge Hunter was a "poor winner," the prosecutor enlisted defense counsel's opening statement: "And you know that to be true because [defense counsel] told you that. Here's what he told you in his opening statement. When you listen to all of the evidence in this case it will be clear that the charges – ." (*Id.*). After defense counsel objected on the grounds that "[t]he lawyers' statements are not evidence," the trial court instructed the jury to that effect.

Although, the defense objection prevented the prosecutor from reading the relevant portion of defense counsel's statement, the implication of the prosecutor's remark was clear: defense counsel believed Judge Hunter to be a "poor winner."

### ii. Example 2

The prosecution also tried to use defense counsel's opening to paint Judge Hunter as a difficult person with whom to get along, the type of woman "who always insist[s] on getting even." (Tr. Vol. 31 at 3865, Doc. 13-31, PAGEID# 4568). Specifically, the prosecutor said:

> Well, here's what I would submit to you all. What I would submit to you all is that by January 25th, 2013 Tracie Hunter had established a reputation in this community, not just in juvenile court, but in this community of exactly what [defense counsel] says she was in his opening statement, which was a judge who won't be controlled by --

(*Id.*). Once again, defense counsel objected on the grounds that "[t]he lawyer's statement is not evidence," (*Id.* at 3865-66, PAGEID # 4568-4569), and the trial court replied: "Just a moment, both of you. We have properly instructed the jury, so you may proceed. The same instructions that I have given to you several times at least." (*Id.* at 3866, PAGEID# 4569).

Receiving the trial court's blessing to continue, the special prosecutor concluded:

> Well, without reading it I think you heard the testimony. Clyde has simply endorsed it that she was confrontational, aggressive, argumentative, that she defied authority. She had already defied the Court of Appeals and been held in contempt two days earlier. She had already defied and was sued. She had already defied the Board of County Commissioners and been sued. She already tried to hire her own court administrator and then stopped.
>
> So it's in that backdrop that she looks at the two people who are going to hear and process the grievance against her brother . . . .

(*Id.*). Thus, the prosecutor, over defense objection, effectively enlisted defense counsel's unsworn statements as evidence against Judge Hunter with respect to the lone count of conviction, the one involving her brother's termination hearing.

### c. Statements that improperly shifted the burden of proof from the prosecution to the defense.

The defense objected nine times during the rebuttal closing to statements that improperly shifted the burden of proof to the defense.

### i. Example 1

Referring to defense counsel's contention that the charges against Judge Hunter were politically motivated, the Special Prosecutor Croswell stated:

> Do you think in your wildest dreams that [Special Prosecutor Shiverdecker] and I could possibly care about the politics of this thing?
>
> And the case we presented to you all proves that we're not involved in the politics because we have not put the politics into play here and we have not put the people to come in here to bad mouth her and we have not brought the people from Juvenile Court that [defense counsel] is anxious to get in here. If he wanted all those people in here to tell you what they knew about it why didn't he bring them?

(Tr. Vol. 31 at 3809, Doc. 13-31, PAGEID # 4512). After defense counsel stated, "Objection. Judge, objection," the trial court said: "Same instruction, ladies and

gentlemen, that I have given to you at least four or five times.  You may proceed." (*Id.*).

The following exchange then occurred:

> MR. CROSWELL:  He has no burden of proof.
>
> THE COURT:  Go ahead with your argument.
>
> MR. CROSWELL:  He has no burden of proof, but he claims to you that he has proven things he has to prove them.  Whether he has got a burden of proof or not, he just can't stand up here and throw it up against the wall and then it splatters well, he says I don't have the burden of proof.  No.
>
> If he wants to be critical of why we didn't do what we would do, he had all opportunity to call anybody he wanted.
>
> MR. BENNETT:  Same objection, Your Honor.
>
> THE COURT:  Same instruction to the jury.  What they say to you in closing argument again is not evidence and it's not the law either.  You may proceed.

(*Id.* at 3809-10, PAGEID # 4512-4513).

### ii.  Examples 2 and 3

Shortly after he brought up the prospect that children were being sexually abused as a result of alleged delays in Judge Hunter deciding case, the special prosecutor sought to contrast Joe Deters as a hero, crime fighting prosecutor.  But in the process, the special prosecutor again shifted the burden of proof to the defense.  The special prosecutor stated:

> So do you want a prosecutor that is hard on crime or soft on crime?
>
> You want one that takes his responsibility to protect victims and to see that victims get recompensed and take that responsibility seriously or shirks it?
>
> Do you want a prosecutor who tries to take violent criminals off the street for the protection of society?

27

Do you want one who tries to protect children or doesn't care?

What type do you all want?

And the thanks he gets for trying to fight for the community is he's accused of being in a conspiracy with us to get Judge Hunter.

Well, you know, he – [defense counsel] keeps wanting to know why I didn't call Deters. Why didn't he call Joe Deters and ask him about the conspiracy?

Why didn't he call Joe Deters and ask [why] Joe Deters was so upset?

(Tr. 3816-17, Vol. 31, Doc. 13-31, PAGEID# 4519-4520). After defense counsel objected contemporaneously and stated, "The defense has no burden of proof," (*Id.* at 3817, PAGEID# 4520), the trial court responded: "Again, same instruction. Let's proceed." (*Id.*).

The special prosecutor then continued:

The reason he didn't call him is because he didn't want to hear what he had to say. More importantly, he didn't want you to hear what he had to say. And it's the reason he didn't call any of the other witnesses that he criticized us for not calling because he didn't want you to hear what they had to say.

(*Id.* at 3818, PAGEID# 4521). Again, defense counsel objected contemporaneously on the basis that the prosecution was shifting the burden of proof. And yet again, the trial court responded: "Okay. Same instruction that I previously gave to you, ladies and gentlemen. You may proceed." (*Id.*).

### iii. Example 4

Later in his rebuttal closing, the special prosecutor suggested that the defense had the burden to put on evidence:

Judge Hunter has had as fair a trial as any human being has ever had in this community. Judge Nadel has bent over backwards to see that

that's the case. She has been entitled to question and challenge any witness that she wanted. She has been entitled to put any document in the record that she wanted. She has been entitled, and she didn't have to, but she was entitled to put any witness on.

(Tr. Vol. 32 3917, Doc. 13-32, PAGEID # 4621). After the defense objected again on

burden-shifting grounds, the following exchange occurred:

MR. CROSWELL: Judge, will you tell him to stop interrupting me.

MR. BENNETT: We don't have the burden of proof.

THE COURT: That's enough out of both of you. Just let's continue, Mr. Croswell.

Ladies and gentlemen, the same instruction that I previously gave to you.

By the way, let me give you another instruction: This has been a long trial and tempers get heated. Don't hold that against one side or the other. * * * That's normal. Both sides are representing their clients and they're great advocates. Don't hold that against one side or the other. You may proceed.

MR. CROSWELL: May I continue?

THE COURT: Yes Sir.

MR. CROSWELL: Thank you, Judge. He has been given the opportunity to bring in any witness –

MR. BENNETT: Same objection, Your Honor.

THE COURT: Okay. Same instruction that I previously gave. You may continue.

MR. CROSWELL: He has or not been [*sic*] given the opportunity to bring anybody he wants.

MR. BENNETT: I don't have to bring in anybody.

THE COURT: That is enough out of you. Mr. Croswell, you may continue.

(Tr. Vol. 32 at 3917-19, Doc. 13-32, PAGEID# 4621-4623). Thus, not only did the trial judge fail to give a specific instruction to the jury on the burden of proof, but he also chastised defense counsel, in front of the jury, for objecting.

### iv. Example 5

The special prosecutor more directly shifted the burden of proof to the defense by telling the jury that the defense had a duty to call witnesses whom the defense "bad mouthed":

> Now they are the ones and I'm not the ones [*sic*] who bad mouthed Deters. I didn't bad mouth all these people, Connie Murdock and all these people. But I am the one that could tell you, and he could object to it, that if he has got that much for them and these people know that much and these people had this case so much he had a duty to call them and he should have proven it to you.

(Tr. Vol. 32 at 3922, Doc. 13-32, PAGEID# 4626). After defense counsel objected and stated, "We do not have the burden of proof," the trial court told the jury, "Same instruction."

### v. Examples 6 and 7

Finally, during the rebuttal closing, the special prosecutor made statements that, while not directly relevant to Judge Hunter's single conviction count, nevertheless implied generally that the defense bore the burden of proof in a criminal case.

Specifically, the following exchange occurred as the prosecutor addressed the tangential issue of whether Judge Hunter was entitled to choose the lawyers who represented her in the writ cases filed against her:

> [MR. CROSWELL:] She doesn't care whether it's Deters that is representing her. She doesn't care whether it's Firooz Namei representing her. She wants her own lawyers and the reason she wants her own lawyers is that so she could control the litigation, so

that she could control the litigation on behalf [of] Hamilton County and bind Judge Nadel and every judge in this county by what she thinks should be happening in this court system.

Now what do you think the other judges in this county think about that? I didn't see any of them come to her defense and let her pick her own lawyers.

MR. BENNETT: Objection, Judge. We have no burden.

MR. CROSWELL: That's three more minutes.

(Tr. Vol. 32 at 3890, Doc. 13-32, PAGEID# 4594). The court gave the same instruction it had previously given, explaining that "[w]hat counsel says to you in final argument is not evidence." It then added, "[y]ou are the sole determiner of the evidence," and reiterated that what the lawyers "say about the law is not necessarily the law." (Tr. Vol. 32 at 3891, Doc. 13-32, PAGEID # 4595). The judge gave no immediate instruction informing the jury that the defense did not have the burden of proof.

Later in addressing the so-called "backdating" charges, the prosecutor not only shifted the burden of proof but also made clear that his earlier remark, "That's three more minutes," was an expression of his disdain for being interrupted during closing:

[MR. CROSWELL:] Do not believe that if there was anyone anyplace that would say . . . judge I could put any date on there that they would not be here?

MR. BENNETT: Objection, Judge. We have no burden of proof. The State has the burden of proof.

MR. CROSWELL: Again, he interrupts.

THE COURT: Please.

MR. BENNETT: We do not have the burden of proof.

THE COURT: Same instruction that I previously gave to you, ladies and gentlemen.

Mr. Croswell, you may proceed.

(Tr. Vol. 32 at 3907-08, Doc. 13-32, PAGEID # 4611-4612).

### 2. Further examples of prosecutorial misconduct that had the cumulative effect of rendering the trial fundamentally unfair.

As will be discussed later in this reply, whether a prosecutor's statements were so egregious as to render the trial fundamentally unfair must be determined in light of the "totality of the circumstances surrounding each individual case." *Lundy v. Campbell*, 888 F.2d 467, 474-75 (6th Cir. 1989). Accordingly, the totality of the circumstances in Judge Hunter's case include examples of egregious statements in the rebuttal closing to which the defense did not object. All of these statements, which spanned a number of categories of prosecutorial misconduct, including making inflammatory and irrelevant statements, stating personal opinion, and impugning the defense, are listed in the chart attached as Exhibit B to Judge Hunter's court of appeals brief and in Exhibit A to Petition, Doc. 1, PAGEID# 16-24.

Below is a discussion by category of the most egregious of the unobjected-to statements:

### a. Statements that were inflammatory.

The special prosecutor made several inflammatory statements to which the defense did not object. Three particularly egregious examples follow.

### i. Example 1

The prosecution contrasted Joe Deters, whom it depicted as the protector of the community, with Judge Hunter, whom it insinuated endangered the community:

They talk about Deters being so upset * * *

32

He has an obligation to see that the children who are being sexually abused in homes are removed from the homes.  He has an obligation to see the children who are being physically abused are removed from the homes.

He has an obligation to see the children that are in drug-infested homes, who are not being treated properly, who are not nourished to remove them from homes.  That's what he has an obligation to do, to see that children are protected, that victims get recompense, and that violent offenders are taken off the street so that they can't reoffend and commit other crimes.

And you know that if you look at this case, the ironies […][a]bound.  [*sic*]  In this case this [juvenile] that everybody is talking about pulled a strong-armed robbery where he stuck a gun in somebody's face and robbed them.  He then skips court, they then drag him back to court.

The thing drags out for so long with Judge Hunter horsing around with it that he has time to beat somebody senseless over in the jail and get sentenced on a felonious assault himself.  * * *

(Vol. 31 Tr. 3813-15, Doc. 13-31, PAGEID# 4516-4518).

### ii.  Example 2

Early during his rebuttal closing, the prosecutor told the jury that "The very first decision she made as a juvenile court judge . . . was to hire as her bailiff someone who had been terminated for beating up a child." (Tr. Vol. 31, 3812-13, Doc. 13-31, PAGEID# 4515-4516).[10]

### iii.  Example 3

During a particularly low moment of the rebuttal closing, the special prosecutor called Judge Hunter "dumb":

Now ask yourself this:  What are the probabilities that a woman who says in an e-mail to [a Juvenile Court employee], I am a stickler for detail, everything has to be perfect.  That's what she says.

---

[10] Although defense counsel did not object to this particular statement, he did later when the prosecutor made the same point a second time.

Now not only that, but throughout the course of this trial you have seen document after document after document where she said I am the smartest human being that the good Lord ever put on this Earth. I know everything. There is nothing I don't know. There is nothing I could be wrong with that [*sic*].

Well let me ask you this: How come she could be so smart about everything else, but so dumb that she doesn't understand what the law is as a judge?

(Tr. Vol. 32, at 3902, Doc. 13-32, PAGEID# 4606).

### b. Statements that injected the prosecutor's personal opinion into the trial.

Below are two examples of the numerous times the special prosecutor injected his person opinion into the trial during his rebuttal closing.

### i. Example 1

Special Prosecutor Croswell emphasized that he and his co-counsel had practiced as criminal defense lawyers for decades, implying they would be the last ones to prosecute Judge Hunter if they did not believe she was in fact guilty.

And I have been practicing criminal law for 40 years. I have never prosecuted a case. Frankly, the thought never crossed my mind that I would ever prosecute a criminal case. Mr. Shiverdecker has been practicing law because he is a lot older than I am, 42 years. And he has practiced criminal law for the last 30, 31, 32 years. Do you believe that what we would do is trample on every belief we have ever held, on every argument we ever made that defendants are entitled to a fair trial, that defendants are entitled to have cases proven against them beyond a reasonable doubt, that the evidence should be competent from the witness stand and it should not be coached? Do you think that we as the people would argue that all day long [*sic*] would trample on someone's rights and then go back to the defense bar as co-conspirators with the prosecutors for goodness sake?

(Vol. 31 Tr. 3795-96, Doc. 13-31, PAGEID# 4498-4499).

### ii. Example 2

The special prosecutor also injected his personal opinion into the case in a way

that diminished the consequences in the jurors' mind of voting to convict:

> Clyde keeps talking about prison, his client going to prison. Well, let me all surprise you about something. I hold absolutely no ill towards Judge Hunter, none whatsoever.
>
> And I could tell you and I could give you my solemn oath and my word as a professional that if, if she is convicted of these charges I would be the last person to ask anyone to incarcerate her. That's not where I come from and that's not what it's about. Not to me. But in the final analysis that's not my responsibility.

(Vol. 31 Tr. 3799-3800, Doc. 13-31, PAGEID # 4502-4503). To add insult to injury, the

special prosecutor would break his promise to the jury by later urging the trial court to

impose "a substantial prison sentence." *Ohio v. Hunter*, Case No. B1400110,

prosecutor's sentencing memorandum filed Dec. 4 2014, attached to Second Notice of

Supplemental Record, Doc. 29-1, PAGEID# 5333-5342.

### c. Statements that impugned the defense.

The special prosecutor appeared to relish in ridiculing the defense:

### i. Example 1

Early in the rebuttal closing the special prosecutor used his own personal

experience as a criminal defense lawyer to suggest that defense counsel was trying to

confuse and trick the jury:

> Let's talk about defense tactics. And you know why I tell that I can't criticize Clyde, he told you his client did nothing wrong. He has known me a long time. The truth of the matter is when Clyde was in high school I was trying cases and he use to come and watch me try cases.
>
> So 99 percent of what he is doing here is what I have done many times, what [Special Prosecutor Shiverdecker] has done many times, that's what every criminal defense lawyer has done.

The first thing you do if you're a criminal defense lawyer is if you got the law, you talk about the law. Have you heard him talk about the law?

If you've got the facts, you talk about the facts. Have you heard him talk about the facts?

Now if you don't have the law or the facts you drop back to your defensive position and the first thing you do is you start talking about the prosecutor. You criticize the prosecutor, you criticize the police, you criticize the system, you criticize anything you could criticize.

And then the next thing you do is you blame others. It's somebody else's fault. That's the next move.

Then what you do is obfuscate all the issues and try to make it as confusing as you possibly can so you can stand up in front of a jury and say, I have confused you, that's reasonable doubt.

Because I have confused you about a bunch of things that has got nothing to do with anything, got nothing to do with the charges, nothing to do with the proof, got nothing to do with the law but you're confused and, therefore, that's reasonable doubt.

[Special Prosecutor Shiverdecker] talks about wheat versus chafe. Well, what I will talk about is fact versus fiction. And what I will tell you is, is that what the next move for a criminal defense lawyer is, and I am one, is to try to supplement fact with fiction and that's what has happened here today, very masterfully and very convincing, but certainly he has tried.

Now as I've said to you, I understand what he is doing. I don't have any problem with that, but I would be remiss in my duties . . . if I accept it. When I accepted the appointment to be the prosecutor in this case, I would be remiss in my duties if I did not point that out to you.

(Tr. Vol. 31 at 3800-02, Doc. 13-31, PAGEID# 4503-4505).

ii.     **Example 2**

Later during the rebuttal closing, the special prosecutor suggested that defense counsel was attempting to sell the jury a fabricated story through a technique they called the "nuclear bomb option":

But the big danger in cases like this when you get real good lawyers, and Clyde is a really good lawyer, they could confuse the issue.

*     *     *

Well, when all else fails, Clyde has a defense.  He has a defense mechanism and he calls it the nuclear bomb.  So, what he does basically is he will have somebody come to him that gets charged with shoplifting in K-Mart and they look up and he says what happened?  They say well, I stole a pad of paper and I stole a box of pencils and I got caught and they have got me on videotape and I confessed.  What are we going to do?  Clyde looks at him and I mean they have got him on videotape, he confessed, they have got witnesses.  I know.  We are going to go with the nuclear bomb option.

So what he does he looks up and puts a witness on the stand.  The first witness looks up and says I'm a security guard there.  I saw this man come in.  He stole a box of pencils and he stole a pad of paper and here's the pictures and here's his confession.  Clyde goes, okay, fine.

Well, let me ask you question:  If I told you he was a nuclear physicist what would you say?  He says well, I don't know what I would say.  Clyde says well, if I told you he was a nuclear physicist could you tell me that he is not a nuclear physicist?  The guy says no.  Clyde says is a nuclear physicist. [*sic*] Then he looks up says what if I also told you he works for the CIA, he is a spy for the CIA, could you prove he wasn't?  He says I couldn't prove he wasn't.  Clyde goes he's a spy for the CIA.

Then he looks up and says now, if the Russians have a bomb here in the United States and it's going to blow up in two days, if this man is an [*sic*] CIA agent goes to the defuse it [*sic*], could you prove that's wrong?  Well, I don't know if it's right or wrong.  There is a bomb in America.

Then he looks up and he says, if I told that you in order to defuse that bomb he needs a pad and paper, could you prove he didn't need a pad and paper to work the formulas?  I couldn't disprove it.  He needs papers and pencils.

Now let me ask you something:  If I told you he had [a] 6-year-old child [who] was in kindergarten who stole his pencil and paper at home, could you dispute that?  I can't dispute it.  Well, his 6-year-old stole a pencil and paper.

Clyde looks up, yeah, he did.  The guy had to steal his pencil and paper to save the world and that's essentially what he is going on here because what he ha[s] done he has continually and repeatedly asked

questions, people told him they didn't know the answer, he then assumed when they tell him that he can't disprove it he assumes that it's fact and that's what he is arguing with on all of these things that he is talking about. Whether it's time or whatever, that is what he has done here.

(Tr. Vol. 31 at 3823-26, Doc. 13-31, PAGEID# 4526-4529).

### iii.    Example 3

The special prosecutor impugned the defense by calling it "childish": You know Clyde has presented three basic lines of defense here and they really – two of them remind me kind of the being [*sic*] rather childish." (Tr. Vol. 31 at 3819, Doc. 13-31, PAGEID# 4522).

### iv. Examples 4 and 5

Far worse than calling the defense "childish," the special prosecutor twice impugned defense counsel's integrity by accusing him of suborning perjury: "Our case is based upon documents that cannot be refuted. And they presented what I would say to you, what I would say to you without hesitation was perjured testimony. That is what these people tried to do. They tried to play games with you." (Tr. Vol. 32 at 3920, Doc. 13-32, PAGEID# 4624).

Later, the special prosecutor repeated his accusation that defense counsel suborned perjury:

> I'm not the one who put on the people who perjured themselves. I'm not the one who put Avery Corbin in here who came in and perjured himself and said I never told Judge Hunter what I was doing. She had no idea until he got this jammed down his throat.

(Tr. Vol. 32 at 3919-20, Doc. 13-32, PAGEID# 4623-4624).

### v.    Example 6 and 7

The special prosecutor also impugned the defense by criticizing Judge Hunter's attorney for objecting: "If I repeat myself, it's only because I can't remember where I am when I get interrupted." (Tr. 3916). A short time later the special prosecutor admonished defense counsel for objecting, asking the court: "Judge, will you tell him to stop interrupting me? (Tr. Vol. 32 at 3917-18, Doc. 13-32, PAGEID # 4621-4622).

### E. The Trial Judge's refusal to give limiting instructions encouraged the prosecutorial misconduct.

When the trial judge responded to defense counsel's objections, for the most part he said either "Ladies and gentleman, closing arguments are not evidence," or "Same instruction as I have previously given you, referring to the instruction that what counsel say in argument is not evidence." The judge never gave a limiting instruction such as instructing the jury to disregard the argument. He did not admonish the prosecutor or instruct him to stop making irrelevant, inappropriate, inflammatory statements that were not based in the record. The trial judge's permissiveness emboldened the prosecutor to embellish his inappropriate attacks on Judge Hunter's character. As a result, the jury was improperly influenced.

### F. Judge Hunter's State Court Appeals.

Judge Hunter experienced a number of obstacles in the First District Court of Appeals that prevented the court from fully considering Judge Hunter's prosecutorial misconduct argument.

#### 1. The First District's placement of Judge Hunter's appeal on the accelerated calendar.

Under Local Rule 11.1.1., the First District assigned Judge Hunter's case to the accelerated calendar. (Ex. 35 Accelerated Calendar Scheduling Order, Doc. 12-1, PAGEID# 324). Under that rule, briefs shall not exceed fifteen pages. Additionally, the

appellant is not afforded an opportunity to submit a reply brief.  By contrast, pursuant to Ohio App.R. 19(A) and Local Rule 19.1, regular calendar appeals have a thirty-five-page briefing limit, and the appellant is allowed to reply to the appellee's brief.

The First District places all criminal appeals on the accelerated calendar as a matter of course.   (Amicus Curiae The Office of the Ohio Public Defender's Memorandum In Support of Defendant-Appellant's Memorandum in Support of Jurisdiction, at 2, attached to Notice of Supplemental Record, Doc 28-1, PAGEID# 5271-5284).   Under Local Rule 11.1.1(C), the First District may remove a case from the accelerated calendar for good cause shown, which includes the "unique, complex, or precedential nature of the issues presented."   However, the First District rarely removes cases from the accelerated calendar.   Indeed, a review of publicly available data "revealed that from 2013-2015, over 1,200 criminal, non-writ cases were filed in the First District, with about 250 resulting in a published opinion.  Of those, the research revealed that none were taken off the accelerated calendar *sua sponte* before briefing."   (*Id.*).  Moreover, the First District removed less than one dozen cases from the accelerated calendar at the litigant's request, "with only about half of such requests being granted.  All of the cases in which successful removal requests were made involved first-degree felonies." (*Id.* at 2-3, PAGEID# 5275).

Soon after receiving the accelerated calendar assignment, Judge Hunter moved to have her case reassigned to the regular calendar.  (Ex. 35 Motion to Remove Case from Accelerated Calendar, Doc. 12-1, PAGEID # 326).   As grounds for removing the case, Judge Hunter's appellate counsel pointed out that the trial was a lengthy one with over 4,000 pages of transcripts.  (*Id.* at PAGEID# 327).   Additionally, counsel indicated that

Judge Hunter would be raising several issues on appeal, "including a jury polling issue that has the potential to establish precedent." (*Id.*). Counsel also indicated that other issues to be raised included whether the trial judge erred in denying Judge Hunter's Rule 29 motion for judgment of acquittal, and whether the trial judge should have granted Judge Hunter a new trial based on a juror's failure to disclose certain information that could have prejudiced that juror against Judge Hunter. (*Id.* at PAGEID# 329). In light of these and other possible issues, counsel argued that "a fifteen-page page limit would be insufficient." (*Id.*).

The First District overruled Judge Hunter's motion but increased the page limit from fifteen to twenty-five pages. (Ex. 36 Entry Overruling Motion to Remove Case from Accelerated Calendar and Granting Leave for Parties to File Briefs Not to Exceed 25 Pages, at Doc. 12-1, PAGEID# 331). At the time he received the court's order, Judge Hunter's counsel had not yet read the transcripts and believed that the twenty-five page limit would be sufficient "to raise the two strongest issues counsel anticipated raising at that time: the jury-poll issue and denial of Judge Hunter's Rule 29 motion, which involve[d] a complex statutory interpretation argument." (Ex. 40 Motion to Allow Brief in Excess of Twenty-Five Pages, at Doc. 12-2, PAGEID# 446). But after reading the prosecution's rebuttal closing argument, counsel realized that he would need to file a motion seeking leave to file a brief in excess of twenty-five pages due to the large number of instances of alleged prosecutorial misconduct he identified. (*Id.*).

### 2. Judge Hunter's first brief.

Along with a motion seeking leave to file a brief in excess of twenty-five pages, (Doc. 12-2, PAGEID# 445), Judge Hunter filed a thirty-five page brief raising three

issues: (1) whether the trial court should have granted Judge Hunter's Rule 29 motion for judgment of acquittal; (2) whether the trial judge erred as a matter of law when he refused to poll the jury after the clerk announced the verdict in open court and where the trial judge purported to poll the jury the previous day upon its return of a partial verdict without disclosing to counsel what the verdict was; (3) whether the prosecution's extensive misconduct during its rebuttal closing violated Judge Hunter's constitutional right to a fair trial. (Ex. 39 Brief of Defendant-Appellant Tracie Hunter, Doc. 12-1, PAGEID # 384).

The statement of the case through the first two assignments of error consumed twenty-one pages, leaving just four pages for the prosecutorial misconduct issue. (*Id.*). Due to the number of alleged instances of prosecutorial misconduct to be discussed, that portion of the brief was fourteen pages long. (*Id.*).

Judge Hunter sought leave to file a brief in excess of twenty-five pages. (Ex. 40 Motion to Allow Brief in Excess of Twenty-Five Pages, Doc. 12-2, PAGEID #446). One day later, she also filed a supplemental memorandum in support of her motion, which attached a chart of the fifty-one alleged instances of prosecutorial misconduct. (Ex. 41 Supplemental Memorandum in Support of Motion to Allow Brief in Excess of Twenty-Five Pages, Doc. 12-2, PAGEID# 450). However, the First District denied the motion, struck Judge Hunter's brief and ordered her to file a brief in compliance with the twenty-five page limit. (Ex. 42 Entry Overruling Motion to Allow Brief in Excess of 25 Pages, Striking Brief, and Extending Time to File Compliant Brief, Doc. 12-2, PAGEID# 461).[11]

---

[11] Through counsel, Judge Hunter then sought a writ of mandamus in the Ohio Supreme Court seeking an order compelling the First District to accept Judge Hunter's brief as originally filed. (Ex. 43 Emergency

### 3. Judge Hunter's amended brief.

Judge Hunter filed an amended brief that was twenty-five pages long. (Ex. 49 Amended Brief of Defendant-Appellant Tracie Hunter, Doc. 12-2, PAGEID# 519). To comply with the page limit, Judge Hunter's brief included only the first four pages of the prosecutorial misconduct argument and omitted the rest. (*See id.* at PAGEID# 545-548). The brief concluded the prosecutorial misconduct argument with the following text:

> Due to this Court's denial of Judge Hunter's motion to extend the page limit, Judge Hunter is unable to set forth in detail the remainder of her arguments about prosecutorial misconduct. Judge Hunter further alleges that reversal is in order due to the prosecutor's reliance on extra-record evidence and unsworn testimony, absent witness burden-shifting, interjection of personal opinion about guilt and sentencing, and statements that defense counsel believed Judge Hunter guilty. This litany of prosecutorial misconduct in a close case was not cured by the trial court's general curative instruction. Because Judge Hunter has not been given the opportunity to fully brief these issues, her due process rights to a meaningful direct appeal and effective assistance of counsel are being violated. The briefing limitations combined with extensive prosecutorial misconduct lead to the unjust result of shielding from review the very actions that prejudiced Judge Hunter at trial.

(*Id.* at PAGEID# 548-49) (internal citations and italics omitted).[12] However, Judge Hunter attached to her brief the chart detailing fifty-one alleged instances of prosecutorial misconduct. (*Id.*, Appendix B, at PAGEID# 556-64).

### 4. Judge Hunter's unsuccessful motion seeking leave to file a reply.

After reading the state's response brief, Judge Hunter filed a motion seeking permission to file a reply. (Ex. 51 Motion for Leave to File Reply Brief, Doc. 12-2, PAGEID# 595). In support of the motion, Judge Hunter's counsel explained that not

---

Complaint for Writs of Mandamus, Doc. 12-2, PAGEID# 462). The Ohio Supreme Court ultimately dismissed the complaint. (Entry, at Doc. 12-2, PAGEID# 518).

[12] In the PDF version of this brief submitted for electronic filing to the First District Court of Appeals, all of this quoted text was in italics. However, perhaps because of a formatting issue, this language is only partially in italics on the Clerk of Court's website.

only did the case involve "two issues of first impression in the First District regarding statutory interpretation and jury polling" but it also involved a claim of "extensive prosecutorial misconduct." (*Id.* at PAGEID# 597).

Counsel also argued that because "it is likely that this Court will issue an opinion in this case . . . it is important that this Court receive full briefing on the issues presented." (*Id.*). Finally, counsel contended that "[t]he importance of a reply brief [was] heightened because the page limitations on Appellant's opening brief did not allow her to fully argue her prosecutorial misconduct claim." (*Id.*). The First District, however, denied Judge Hunter the opportunity to reply to the state's brief. (Ex. 52 Entry Overruling Motion for Leave to File a Reply Brief, Doc. 12-2, PAGEID# 600).

### 5. The First District's decision.

The First District affirmed Judge Hunter's conviction on January 15, 2016 (Judgment Entry, Doc. 12-2, PAGEID# 611), only eleven days after oral argument, (*see* Notification of Oral Argument Date of January 4, 2016, Doc. 12-2, PAGEID# 642), and just one business day before Judge Hunter's retrial on the mistried counts was set to begin. (*See* Entry of Continuance attached to Notice of Supplemental Record, Doc. 28-1, PAGEID# 5324 (setting trial date of January 19, 2016)).[13]

Regarding Judge Hunter's prosecutorial misconduct claim, the First District indicated that it had reviewed not only the abbreviated argument contained in Judge Hunter's brief but also the chart of fifty-one alleged incidents of prosecutorial misconduct. (Opinion, Doc. 12-2, at PAGEID# 624). The court applied plain error review after concluding that "[i]n almost all of the instances cited by Hunter, there was

no objection." (*Id.*). Reviewing only for plain error, the court ultimately held that "the record does not support the conclusion that the arguments of the state deprived Hunter of a fair trial." (*Id.*).

### 6. The Ohio Supreme Court's refusal to hear Judge Hunter's discretionary appeal.

Judge Hunter sought discretionary review from the Ohio Supreme Court. (Notice of Appeal of Appellant Tracie M. Hunter, Doc. 12-2, PAGEID# 629; Memorandum in Support of Jurisdiction of Appellant Tracie M. Hunter, Doc. 12-2, PAGEID# 632). In her Memorandum in Support of Jurisdiction, Judge Hunter raised the three issues the First District rejected, plus a fourth issue: whether the First District had denied Judge Hunter due process and equal protection of the law under both the state and federal constitutions by refusing to allow additional briefing, including the filing of a reply, in complicated cases. (Memorandum in Support of Jurisdiction, Doc. 12-2, PAGEID# 637-38, 645-47).[14]

Judge Hunter connected the accelerated calendar and prosecutorial misconduct issues, explaining that

> the court of appeals did not fully appreciate the gravity of the special prosecutor's misconduct because of a systematic, district-wide error: the court automatically places every appeal in Hamilton County on the accelerated calendar regardless of the complexity of the issues, and refuses to remove criminal appeals from that calendar unless the appeals involve first degree felony convictions.

(*Id.* at PAGEID# 637).

---

[13] January 15, 2016 was a Friday. Monday, January 18, 2016 was Martin Luther King, Jr. Day. Thus, there was one business day between the First District's decision affirming her conviction and her scheduled trial date.

[14] The briefing issue was actually her Third Proposition of Law, which read: *"The First District Court of Appeals denies appellants due process and equal protection of the law by placing cases on the accelerated calendar by default and refusing to allow full briefing in complicated cases."* (*Id.* at 633) (italics in

Citing *Halbert v. Michigan*, 545 U.S. 605 (2005), Judge Hunter argued that "the First District's accelerated calendar procedures violated [her] due process rights by denying her the effective assistance of counsel and the ability to present a meaningful direct appeal." (Memorandum in Support of Jurisdiction, at Doc. 12-2, at PAGEID# 646). Additionally, Judge Hunter claimed that the First District's accelerated calendar practices denied her right to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution because of "the differences between the treatment of cases in the First District . . . and the other districts." (*Id.*).

By a 4-3 vote, the Ohio Supreme Court refused to accept jurisdiction of Judge Hunter's appeal. (*See* Case Announcements, May 18, 2016, Appeals Not Accepted for Review, *State v. Hunter*, attached to Notice of Supplemental Record, Doc. 28-1, PAGEID# 5303).

## III. CONSTITUTIONAL CLAIMS

### <u>FIRST GROUND FOR RELIEF</u>

**THE PROSECUTION VIOLATED JUDGE HUNTER'S RIGHTS TO A FAIR TRIAL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY ENGAGING IN EXTENSIVE MISCONDUCT THAT FUNDAMENTALLY INFECTED HER TRIAL WITH UNFAIRNESS.**

**A. Introduction.**

In its rebuttal closing, the state, without any factual basis whatsoever, told the jury repeatedly that Judge Hunter, as a result of alleged delays in deciding cases, was responsible for the sexual abuse of children, statements the defense objected to three out of the four times the special prosecutor made them. The state also told the jury that Judge

---

original). Judge Hunter also raised a fifth issue stemming from the denial of her Rule 29 motion (*see id.*, Proposition of Law No. 5), which has no relevance here.

Hunter cared more about protecting the identities of the children who appeared before her than the crimes victims they had assaulted, referencing a case where six children brutally beat a homeless man because they were bored, a statement to which defense counsel also objected. And the state took pains to remind the jury – not once, but twice – that Judge Hunter was the same judge who had hired a bailiff who had previously been fired for allegedly beating a child more than twenty years ago, a statement defense counsel objected to the second time it was made.

The inference the state wanted the jury to draw from these remarks was clear: Judge Hunter was unfit to serve as a judge, posed a danger to the community, and deserved to be removed from the bench. And as a result of these improper comments, the state made a dangerous – and unconstitutional – invitation to the jury: find Judge Hunter guilty of at least one offense, irrespective of the evidence.

Nevertheless, both respondents contend that the state's rebuttal closing did not violate Judge Hunter's right to a fair trial. The Attorney General argues that it is "well established that prosecutorial comments that do not render a trial fundamentally unfair when evaluated in context, cannot serve as the basis for reversal of a conviction," (Respondent Attorney General's Answer/Return of Writ ("Respondent Attorney General's ROW"), Doc. 12, PAGEID# 95), which suggests that Judge Hunter, in arguing that the state's rebuttal closing violated her right to a fair trial, has taken the special prosecutor's comments out of context. Additionally, Respondent Dinkelacker claims that the special prosecutor's comments did not deny Judge Hunter a fair trial because they "were well within the wide latitude afforded during closing argument . . . and were responsive to the defense's theory of the case and, more specifically, to defense counsel's

repeated attacks during closing arguments." (Respondent Dinkelacker's Return of Writ ("Respondent Dinkelacker's ROW"), Doc. 27, PAGEID# 5049). Respondents' arguments are wrong and share three flaws.

First, both respondents ignore the entire context in which the special prosecutor made the most prejudicial of the remarks to which the defense objected. A review of the whole record, not just the closings, indicates that the state's strategy from the start was to smear Judge Hunter with allegations that she was not only unfit to be a judge, but also that she actually posed a danger to the community. This strategy began with the press release Hamilton County Prosecuting Attorney Joe Deters issued two business days before trial which accused Judge Hunter of bearing responsibility for the murders of two people, one of whom she refused to commit to secure detention. Prosecutor Deters then passed the baton to Special Prosecutor Scott Croswell, who told the jury in opening, before defense counsel could have invited any remarks, that Judge Hunter had hired a bailiff that had beaten a child and that children on her docket "were suffering" because of her alleged delays in deciding cases. Given this context, the special prosecutor's rebuttal closing should be seen for what it was: an effort to build upon the earlier attempts to destroy Judge Hunter's character and gain a conviction regardless of the evidence of guilt.

Second, both respondents ignore the cumulative impact of the misconduct Special Prosecutor Croswell committed during his rebuttal closing. Although Judge Hunter contends that Croswell's statements implying she posed a danger to the community generally, and to children specifically, in and of themselves rendered her trial fundamentally unfair, the additional misconduct to which the defense objected –

repeatedly shifting the burden of proof and enlisting defense unsworn statements as evidence – establish that Judge Hunter suffered overwhelming harm as a result of the state's rebuttal closing.

Third, while both respondents correctly point out that defense counsel did not object to all of the fifty-one examples of prosecutorial misconduct Judge Hunter alleged, (Respondent Attorney General's ROW, Doc. 12, at PAGEID# 99; Respondent Dinkelacker's ROW, at PAGEID # 5046), they are wrong in assuming that the unobjected comments – which include the special prosecutor calling Judge Hunter "dumb" for not knowing the law and telling the jury twice that defense counsel had suborned perjury – have no bearing on this court's review. To the contrary, whether a prosecutor's statements were so egregious in order to render the trial fundamentally unfair must be determined in light of the "totality of the circumstances surrounding each individual case." *Lundy v. Campbell*, 888 F.2d 467, 474-75 (6th Cir. 1989). Here, the totality of the circumstances include the objected to as well as the unobjected-to remarks.

Finally, Respondent Dinkelacker's response suffers from an additional flaw. Trying to explain why the rebuttal closing did not harm Judge Hunter, he writes: "Finally – and critically – Hunter's having been acquitted of all but one charge clearly demonstrated the thoughtfulness and independence brought by the jurors to their deliberations, and most especially, that they were not simply swayed by the special prosecutor's arguments." (Respondent Dinkelacker's ROW, Doc. 27, PAGEID# 5049). Respondent Dinkelacker then claims that "[i]n that light," Judge Hunter's argument that the rebuttal closing made her trial fundamentally unfair, "exposes its own absurdity." (*Id.*). The problem with his argument, is that ***the jury did not acquit Judge Hunter of***

***any charges***.  Rather, the court declared a mistrial after the jury could not unanimously agree on those counts.

Because the evidence against Judge Hunter on her lone conviction count was nonexistent, and because the trial judge's repeated – but ineffective – statement to the jury that "closing arguments are not evidence" was insufficient to cure the harm, this Court should conclude that the state violated Judge Hunter's fundamental federal constitutional rights to a fair trial.

## B. Procedural Posture.

### 1. Judge Hunter fairly presented her prosecutorial misconduct claim to the state courts.

Judge Hunter raised her prosecutorial misconduct claim in the First District Court of Appeals.  When she lost there, she sought discretionary review by the Ohio Supreme Court, which was denied.  In litigating this issue in the state courts, Judge Hunter fairly presented the federal nature of her claim, a point neither respondent disputes.

"A federal court may not entertain a habeas claim unless the petitioner has first exhausted his state court remedies."  *Woolbright v. Crews*, 791 F.3d 628, 631 (6th Cir. 2015) (citing 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999)).  To exhaust a claim, "the petitioner 'must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.'"  *Id.* (quoting *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).  In the Sixth Circuit, a petitioner can satisfy the exhaustion requirement in one of four ways:

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

Here, Judge Hunter fairly presented the substance of her federal claim by citing *Berger v. United States*, 295 U.S. 78, 89 (1935), which reversed a conviction because the prosecutor engaged in misconduct which "was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." Additionally, Judge Hunter cited two state cases – *State v. Smith*, 87 Ohio St.3d 424, 721 N.E.2d 93, 2000-Ohio-450 (2000), and *State v. Freeman*, 138 Ohio App.3d 408, 741 N.E.2d 566 (1st Dist. 2000) – each of which relied upon two United States Supreme cases which employed federal constitutional analysis.

Specifically, *State v. Smith*, 87 Ohio St. 3d at 442, states: "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.*, (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Thus, *State v. Smith*, by quoting United States Supreme Court case law, incorporated federal due process analysis in deciding the question of whether the prosecutor's remarks at issue there denied Smith a fair trial.

Additionally, *Freeman* recites the familiar federal standard in determining whether prosecutorial misconduct in closing requires reversal, stating that reversal is required only where the comments "'must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."'" *Freeman*, 138 Ohio App.3d 408, 419, 741 N.E.2d 566 (quoting *State v. Hart*, 94 Ohio App.3d 665, 674, 641 N.E.2d 755 (1st Dist. 1994) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974))).

Moreover, the fact that the First District understood the federal nature of Judge Hunter's prosecutorial misconduct argument is indicated by its reliance on *Smith v. Phillip's* standard in its opinion. *See State v. Hunter*, 1st Dist. Nos. C-140684, C-140704, C-140717, 2016-Ohio-123, ¶ 34 ("The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor'" (quoting *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *Smith v. Phillips*, 455 U.S. at 219)).[15] Thus, Judge Hunter fairly presented to the state courts the substance of her federal prosecutorial misconduct claim.

## 2. This Court should decide the merits of Judge Hunter's prosecutorial misconduct claim.

Both respondents urge the Court to defer to the First District's decision and deny relief under § 2254(d). *See* Respondent Attorney General's ROW, Doc. 12, PAGEID# 99 ("The Ohio Court of Appeals did not unreasonably apply clearly established federal law when it found that Hunter was not denied a fair trial."); Respondent Dinkelacker's ROW, Doc. 27, PAGEID# 5061 ("Hunter fails even to try to support her allegation that the appellate court unreasonably applied clearly established federal law when it rejected her prosecutorial misconduct claim because it is unsupportable."). However, contrary to respondents' suggestion, § 2254(d) does not prohibit the court from granting relief.

A threshold question for a habeas court in determining whether to defer to the state court's decision is whether the "federal claim was 'adjudicated on the merits in State court.'" *Johnson v. Williams*, 133 S.Ct. 1088, 1091 (2013) (quoting 28 U.S.C. § 2254(d)).

---

[15] In her Memorandum in Support of Jurisdiction to the Ohio Supreme Court, Judge Hunter alleged that "[t]his appeal involves several errors that individually, and collectively, denied Judge Hunter due process of law under Section 10, Article 1 of the Ohio Constitution, and the Fifth and Fourteenth Amendments of the United States Constitution," which included prosecutorial misconduct during the rebuttal closing. (Memorandum in Support of Jurisdiction, Doc. 12-2, PAGEID# 634-35, 645).

If the claim was adjudicated on the merits, then the habeas court may not grant relief unless the decision: "(1) resulted in a decision that was contrary to . . . clearly established federal law . . . or, (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Not every state court decision that purports to address the merits of a claim should be deemed "adjudicated on the merits" for § 2254 purposes. Citing Black's Law Dictionary 1199 (9th ed. 2009), *Johnson* defined "on the merits" as "'delivered after the court . . . heard and *evaluated* the evidence and the parties' substantive arguments,'" which in context refers to "'[t]he intrinsic rights and wrongs of a case as determined by *matters of substance*, in distinction from matters of form.'" *Johnson*, 133 S.Ct. at 1097 (emphasis in original). Although the Court ultimately held that the petitioner did not rebut the presumption that the state court had adjudicated the federal claims on the merits, *id.* at 1098, the Court left open the possibility that there would be cases where a petitioner could rebut the presumption that the state court decided the federal claim on the merits by showing that the state court did not evaluate the petitioner's argument.

Indeed, before the Supreme Court decided *Johnson*, the Tenth Circuit decided *Wilson v. Workman*, 577 F.3d 1284, 1292 (10th Cir. 2009), which is instructive here. There, the issue was whether the habeas court owed AEDPA deference to the state court's determination of an ineffective assistance of counsel claims, where the state court refused to allow the petitioners to supplement the factual record with evidence relevant to their claims. In *Wilson*, two prisoners challenged their convictions of first-degree murder in the state court and raised ineffective assistance of counsel claims on appeal. *Id.* at

1287-1288. To support these claims they proffered affidavits and other evidence that was never presented to the jury or was prepared after judgment had been rendered at trial. *Id.*

The Oklahoma Court of Criminal Appeals (OCCA) denied one of the prisoner's (Wilson's) claim in a single paragraph, referencing only the trial record without any mention of evidence proffered post-trial. *Id.* at 1288. The court also declined to supplement the record with the proffered evidence through an evidentiary hearing, pursuant to Oklahoma Appellate Rule 3.11(B). Under this rule, a defendant may offer non-record evidence in support of an ineffective assistance claim on direct appeal; if the court finds "by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence" it may remand to the trial court for an evidentiary hearing. *Id.* at 1297, quoting Okla. Ct. Crim. App. R. 3.11. The trial court then makes written findings of fact and law, and the record from the evidentiary hearing supplements the trial record on appeal. *Id.*

The federal district court initially denied Wilson's habeas petition after applying AEDPA deference, finding that OCCA's denial of the ineffective assistance claim was not unreasonable. *Wilson,* 577 F.3d at 1288. However on review, a panel of the Tenth Circuit held that rather than AEDPA deference, Wilson's claim deserved *de novo* review. *Id.* at 1289. The panel reasoned that the ineffective assistance claim was based on an incomplete factual record because the OCCA did not consider the proffered non-record evidence. The panel stated "when a state court's disposition of a mixed question of law and fact, including an ineffective assistance claim, is based on an incomplete factual record, through no fault of the defendant, and the complete factual record has since been developed and is before this court, we apply *de novo* review to our evaluation of the

underlying claim." *Id.* (citation omitted). The panel further stated the OCCA did not consider the claim on the merits. *Id.*

The full court then granted rehearing en banc for Wilson's case and an initial hearing in his co-defendant's case, which raised similar claims, and concluded that the panel was correct in holding that AEDPA deference did not apply. *Id.* at 1290. The court first cited *Black's Law Dictionary* to define "on the merits" as a judgment "delivered after the court has heard and evaluated the evidence and the parties' substantive arguments." *Id.* at 1291 (citing *Black's Law Dictionary* (8th ed. 2004)). It then stated, "when a state court relies solely upon the record evidence" without hearing any proffered non-record evidence and denying an evidentiary hearing on the basis of this non-record evidence, "there is no adjudication on the merits that would warrant deferential review. A merits adjudication requires the court to consider the 'substance' of the defendant's claim . . . and when the claim involves a mixed question of law and fact but a procedural rule prevents the state court from even considering the factual grounds, the court has failed to do so." *Id.* at 1292 (citations omitted).

Here, as in *Wilson*, a procedural rule – specifically, the First District Court of Appeals' briefing limitations and its refusal to deviate from them to allow Judge Hunter to file a brief ten pages in excess of the limit and a reply brief– prevented the court from fully evaluating Judge Hunter's prosecutorial misconduct argument. Rather than consider Judge Hunter's fourteen page prosecutorial argument which addressed fifty-one alleged instances of prosecutorial misconduct in her original brief, the court only considered the less than four-page argument she presented in her amended brief, which only discussed four of the fifty-one improper arguments.

To be fair, the First District Court of Appeals stated "We have reviewed Hunter's argument, and the chart of 51 specific instances of alleged improper comment . . . ." *State v. Hunter,* 2016-Ohio-123, ¶ 36. However, even assuming the court reviewed the chart, that was no substitute for ***reading*** the rebuttal closing in context and Judge Hunter's arguments explaining why the comments listed in the chart were improper under case law and how the cumulative effect of those remarks denied her a fair trial. In contrast to the brief, the chart mentioned no case law, did not compare the statements at issue in Judge Hunter's case to similar statements made in cases where courts found misconduct, and did not explain how the statements have tipped the balance in favor of the state in a case where the prosecution's evidence was weak and fell far short of overwhelming proof of guilt. Therefore, as in *Wilson*, a procedural rule prevented the court from considering and evaluating Judge Hunter's arguments.

Additionally, the court's decision to review Judge Hunter's prosecutorial misconduct claim for only plain error rebuts the court's assertion that it considered Judge Hunter's four-page prosecutorial misconduct argument and chart. *See Johnson v. Williams*, 133 S.Ct. at 1091 (presumption that state court reached the merits of a habeas claim is subject to rebuttal). The court decided to review for plain error only because "[i]n almost all of the instances cited by Hunter, there was no objection." *Id.* This finding was an unreasonable one and indicates that the court failed to review either the four-page prosecutorial misconduct argument in Judge Hunter's brief, or the chart attached to it.

With respect to the brief, Judge Hunter was only able to describe four of the alleged fifty-one errors because of the briefing limits. Defense counsel objected to all

four of those remarks discussed in the truncated brief. With regard to all fifty-one improper statements listed in the chart, defense counsel objected to seventeen of them, or one-third of the total number of alleged improper comments. In fact, the court's conclusion that Judge Hunter had "waived all but plain error," means that the court applied the standard of review that would have been appropriate if defense counsel did not object to *any* of the challenged statements. Accordingly, this erroneous conclusion rebuts the court's contention that it "reviewed Hunter's argument, and the chart of 51 specific instances of alleged improper comment . . . ." *Hunter,* 2016-Ohio-123, ¶ 36. Therefore, § 2254(d) does not require this Court to defer to the First District Court of Appeals' decision because that decision was not on the merits.

Moreover, even if the First District adjudicated Judge Hunter's prosecutorial misconduct claim on the merits, § 2254(d) does not prohibit this Court from granting relief. As discussed above, the First District's finding that "[i]n almost all instances [of alleged prosecutorial misconduct], there was no objection," *Hunter,* 2016-Ohio-123, ¶ 36, was an unreasonable determination of the facts. Thus, Judge Hunter's claim falls within § 22549d)(2)'s exception to AEDPA's bar on federal courts granting habeas relief on claims a state court has adjudicated on the merits. *See Granger v. Hurt,* 215 Fed.Appx. 485, 489 (6th Cir. 2007), citing *McKenzie v. Smith,* 326 F.3d 721, 727 (6th Cir. 2003) ("[I]f the state court decision [. . .] was based on an unreasonable determination of the facts in light of the evidence presented, then this court exercises its independent judgment and reviews the claim *de novo.*").

**C. The Merits of Judge Hunter's Prosecutorial Misconduct Claim.**

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Thus, the relevant question is whether the prosecutor's remarks "so infected the trial with unfairness so as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 171 (1986). *See Farmer v. Hofbauer,* 1 Fed.Appx. 372, 377 (6th Cir. 2001), quoting *Caldwell v. Russell,* 181 F.3d 731, 736 (6th Cir.1999) (For a petitioner to obtain habeas relief on the grounds of prosecutorial misconduct in closing argument, "the prosecutor's statements must be 'so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation.'").

Under well-established Sixth Circuit case law, a habeas court must weigh the following four factors in determining whether a prosecutor's improper statements require reversal of the conviction:

> (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Frazier v. Huffman,* 343 F.3d 780, 791 (6th Cir. 2003) (internal quotation marks and citation omitted). The weighing of these four factors yields only one reasonable conclusion: the special prosecutor's comments during the rebuttal denied Judge Hunter due process.

### 1. The remarks both misled the jury and prejudiced Judge Hunter.

The most prejudicial of the prosecutor's remarks, which defense counsel objected to, falsely and inflammatorily depicted Judge Hunter as posing a danger to the

community, especially to the children who appeared before her.  Defense counsel objected three times to remarks by the prosecutor blaming Judge Hunter for allowing children to be sexually abused because of her alleged delays in deciding cases.  The prosecutor's insinuation that Judge Hunter bore responsibility for the sexual abuse of children was false, irrelevant, unsubstantiated, and inflammatory bombshell that carried with it the danger of turning the jurors against Judge Hunter irrespective of the strength of the relevant evidence in the case.  *United States v. Payne¸* 2 F.3d 706 (6th Cir. 1993), is instructive.

In *Payne*, a federal jury convicted postal carrier Payne of obstruction and desertion of the mail.  In closing argument, the prosecutor in explaining the possible harm suffered by people whose mail Payne deserted referred to the "plight of poor children, to Christmastime, and to the then-recent announcement by General Motors ("GM") of a 75,000-person layoff."  *Id.* at 711.  Payne argued that these statements "intentionally placed before the jury facts not in evidence that were inflammatory and prejudicial."  *Id.* In response, the prosecutor argued that the defense had invited the remarks by, among other things, describing in opening the "seediness" and low economic status of the victims who complained of not getting their mail.

The Sixth Circuit, which reversed Payne's conviction on the grounds of prosecutorial misconduct, found that "the comments had the ability to mislead the jury as well as ignite strong sympathetic passions for the victims and against Payne."  *Id.* at 712.  Specifically, the court observed that "[o]ccurrences like Christmas and major employee layoffs, because they affect or potentially affect such a broad scale of people, are going to invoke emotions which may cloud the jury's determination of Payne's guilt."  *Id.*  The

court also noted that while the prosecution did not call any children as witnesses, it nonetheless claimed "that Payne took advantage of children. We find this statement somewhat misleading because there was no direct evidence that Payne actually affected the welfare of any particular children." *Id.*

Here, as in *Payne,* the special prosecutor invoked emotions which very likely clouded the jury's determination of guilt. The prosecution did so in Judge Hunter's case by arguing that she 1) was allowing children to be sexually abused; (2) had hired a bailiff who had been fired for beating a child; and (3) cared more about protecting the identities of juvenile respondents who had brutally beaten a homeless man because they were bored than she did about the homeless victim. Each of these statements – all of which drew defense objections – were precisely the kinds of comments that, as in *Payne*, likely risked igniting strong passions for the victims (here, the hypothetical child victims of sexual abuse, the child whom Judge Hunter's bailiff was fired for beating, and the homeless man whom six juvenile respondents had brutally beaten) and against Judge Hunter.

Additionally, as in *Payne,* the special prosecutor's comments were misleading to the extent there was no evidence to support them. In fact, defense counsel objected repeatedly to the special prosecutor's contention that Judge Hunter was permitting children to be sexually abused, telling the judge each time that there was no evidence of sexual abuse.

Although both respondents correctly point out that the trial judge instructed the jury that what the lawyers say in closing is not evidence after defense counsel objected to these remarks (Respondent Attorney General's ROW, Doc. 12, PAGEID# 99; Respondent Dinkelacker's ROW, Doc. 27, PAGEID# 5059), that instruction was

insufficient to cure the harm.

The Ohio Supreme Court has explicitly recognized the ineffectiveness of the what-the-lawyers-say-in-closing-is-not-evidence instruction where repeated and serious misconduct has occurred: "To begin with, in cases of such flagrant misconduct on the part of the prosecution as was present here, the general instruction that arguments of counsel are not to be considered as evidence was insufficient to correct the error." *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984). Because "improper insinuations [. . .] by the prosecution are apt to carry great weight against the accused when they should properly carry none," the Ohio Supreme Court concluded that "some more definite guidance from the court was required." *Id.*, citing *Berger v. United States*, 295 U.S. 78, 88 (1935).

Here, the trial judge's instruction that closing arguments are not evidence was insufficient to cure the prosecution's flagrant and repeated misconduct. The improper insinuations – particularly that Judge Hunter was responsible for the sexual abuse of children and that she did not care about protecting crime victims – were apt to carry great weight against her. Accordingly, as in *State v. Smith*, the trial judge needed to do more than tell the jury that what the lawyers say in closing is not evidence.

Finally, Respondent Dinkelacker is just plain wrong when he claims that Judge Hunter suffered no prejudice as evidenced by "Hunter's having been acquitted of all but one charge," which Respondent Dinkelacker claims shows that the jurors "were not simply swayed by the special prosecutors' arguments." The jury did not acquit Judge Hunter on any charge, but rather, hung on eight of the nine counts. Thus, Respondent Dinkelacker's argument that the special prosecutor's rebuttal closing did not prejudice

Judge Hunter has no merit.

In sum, the most flagrant and inflammatory of the special prosecutor's remarks both misled the jury and prejudiced Judge Hunter.  This first factor, thus weighs heavily in Judge Hunter's favor.

### 2.  & 3. The special prosecutor's prejudicial comments were extensive and were made deliberately, not accidentally.

The worst of the special prosecutor's statements – the ones that repeatedly blamed Judge Hunter for the sexual abuse of children and insinuated that she did not care about community safety – were not accidental missteps made in the heat of a passionate argument but were instead part of calculated plan to destroy Judge Hunter's character. *Payne*, 2 F.3d 706, is instructive yet again.

There, the Sixth Circuit looked at the entirety of Payne's trial to determine whether the misconduct during closing arguments was isolated or extensive.  *Id.* at 712. Finding that the prosecution's remarks were "not isolated to the closing and rebuttal arguments of the prosecution," the court noted that "[f]rom the government's opening statement right up to its closing arguments, the government used other opportunities to characterize Payne as a bad individual who would take advantage of poor, pregnant women, and helpless children."  *Id.*  In light of the misconduct it found in other parts of the trial, the court concluded that "[a]ll the remarks were deliberate. They were part of a calculated effort used to evoke strong sympathetic emotions for Christmas-time activity, the poor, pregnant women, diaperless children and laid-off employees."  *Id.* at 714.

Here, as in *Payne*, the record demonstrates that the prosecution's remarks during the rebuttal closing were part of a calculated effort to evoke strong emotions – emotions the prosecution used to turn the jury against Judge Hunter.  Specifically, two business

days before the trial began, Hamilton County Prosecuting Attorney Joe Deters issued a press release blaming Judge Hunter for the murders of two young men, one of whom she had refused to incarcerate. Then in opening, the special prosecutor, among other things, told the jury that children were being abused because of Judge Hunter's alleged delays in deciding cases, and that she had hired a bailiff who had been previously fired from juvenile court for beating a child. Additionally, the extensive misconduct that defense counsel failed to object to – including the special prosecutor's statement calling Judge Hunter "dumb" – is also compelling evidence of the state's motive to turn the jury against her.

Thus, as in *Payne,* the record shows that the special prosecutor's rebuttal closing was the culmination of a plan executed throughout the trial to demean Judge Hunter's character unfairly.

Analysis of the entire record is also helpful in answering a charge both respondents, as well as the First District, have made: that defense counsel invited the prosecutor's remarks. *See* Respondent Attorney General's ROW, Doc. 12, PAGEID# 99 ("Hunter opened the door to many of the comments of which she now complains") Respondent Dinkelacker's ROW, Doc. 27, PAGEID# 5049 ("the special prosecutor's comments were responsive to the defense's theory of the case, and more specifically, to defense counsel's repeated attacks during closing arguments."); *State v. Hunter*, 2016-Ohio-123, ¶ 36 ("In many of the instances, Hunter's counsel opened the door to comments made by the state in rebuttal with his own closing remarks."). In particular, Respondent Dinkelacker asserts that the special prosecutor's "references to hypothetical situations involving sexual abuse of minors . . . [was] relevant to the kinds of problems

caused by Hunter, and therefore responsive to Hunter's argument that her prosecution was politically motivated." Respondent Dinkelacker's ROW Doc. 27, at PAGEID# 5051. It is astounding that a sitting trial judge and former appellate judge would consider such outrageous arguments admissible in a closing argument.

Had Respondent Dinkelacker actually reviewed the entire record, and not just defense counsel's closing, he would have seen that the first time the special prosecutor blamed Judge Hunter for child abuse was not in the rebuttal closing but in opening statement, *before* defense counsel uttered a single word about Judge Hunter's theory of defense. In any event, the so-called "kinds of problems caused by Hunter" were not relevant to the charges she actually faced and had no place in her trial other than to smear her.

In sum, a review of the entire record indicates that the special prosecutor's repeated claims that children were being sexually abused because of Judge Hunter and that she did not care about community safety were part of the prosecution's larger plan of turning the jury against her. The special prosecutor did not make these comments accidentally, but deliberately. Thus, the second and third factors weigh heavily in Judge Hunter's favor.

### 4. There was no evidence to support the charges against Judge Hunter.

In *Payne*, the Sixth Circuit concluded that although "there was some proof" of guilt, "the proof was not overwhelming." *Payne*, 2 F.3d at 714. Considering this fourth factor in conjunction with the other three, the Sixth Circuit concluded that the prosecutor's statements rose to the level of being misconduct," and reversed Payne's conviction. *Id*. at 715-16. Here, this Court should do the same.

Far from being overwhelming, the evidence against Judge Hunter was thin and arguably should have resulted in acquittal. To convict Judge Hunter of Having Unlawful Interest in a Public Contract, the state had to prove that she, as (1) a public official; (2) knowingly authorized or employed the authority of her office; (3) *to secure authorization for a public contract*; (4) in which a member of her family had an interest. *See* Ohio Rev. Code § 2921.42. Putting aside the question of whether this statute even applies to the conduct that the state alleged Judge Hunter had committed – allegedly interfering with her brother's termination hearing – and assuming that it does, the evidence on this count was weak, if not non-existent.

In particular, the state did not produce any alleged document Judge Hunter gave her brother before his termination hearing, nor did it elicit testimony describing such document's contents. Without this evidence, the jury could not have concluded beyond a reasonable doubt that Judge Hunter "employed the authority or influence of [her] office" to obtain the document. For instance, if the document was a public record, or was not obtained via Judge Hunter's authority or influence, then there was no basis for the jury to convict her. Additionally, without evidence of the document's contents, the jury could not have known whether the document "secured authorization" of her brother's employment contract. Indeed, if the document was a public record or irrelevant to the determination of his appeal, then Judge Hunter could not have used the authority of her office to interfere with the termination proceeding—assuming for argument's sake, that the document's use in the termination proceeding constituted "securing a public contract."

The fact that three of the jurors who voted to convict Judge Hunter swore in

affidavits immediately post-trial that guilty was not their true verdict, indicates that this was not even a close case. Ultimately, the prosecutor's inflammatory statements, especially the ones referencing sexually abused children, may very well have persuaded the jury to convict despite the lack of proof of her guilt.

The foregoing analysis has focused on the most egregious of the special prosecutor's misconduct. These remarks, alone, were prejudicial enough to warrant reversal of Judge Hunter's conviction. Indeed, the Sixth Circuit has reversed convictions based on less serious instances of prosecutorial misconduct. *See*, *e.g.*, *United States v. Signer*, 482 F.2d 394, (6th Cir. 1973) (reversing tax evasion conviction on prosecutorial misconduct grounds where the prosecutor (1) compared Signer to bank robber and to a fox in the chicken coop during opening; (2) in closing showed the jury a cartoon of "Boss Tweed Tammany Ring" showing disreputable people pointing the finger at each when asked who stole a ring; and (3) asked the jury, "Was it Signer?").

But there is more. As discussed earlier in the statement of the facts, the special prosecutor also committed other misconduct to which defense counsel objected. This misconduct included referring to facts not in evidence, (*see Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000), quoting *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995 ("It is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial.'")), and shifting the burden of proof to the defense (*see United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993) (noting "it would be improper for the prosecutor to suggest that the defendant had the burden of proof or any obligation to produce evidence to prove his innocence, but holding that no misconduct occurred in light of the circumstances of the

case, including the fact that the trial court gave an immediate instruction to the jury stating that the defense would not normally call a government witness and had no duty to do so)).

The cumulative effect of the special prosecutor's misconduct created prejudice that the trial judge's instruction that closing arguments are not evidence could not cure. Because the prosecutorial misconduct in this case "so infected the trial with unfairness so as to make the resulting conviction a denial of due process," *Darden v. Wainwright,* 477 U.S. at 171, reversal of Judge Hunter's conviction is warranted. Accordingly, this court should grant her habeas petition.

## SECOND GROUND FOR RELIEF

**THE FIRST DISTRICT COURT OF APPEALS DENIED JUDGE HUNTER HER DUE PROCESS RIGHT TO A MEANINGFUL APPEAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY UNREASONABLY DENYING HER THE ADDITIONAL BRIEFING SHE NEEDED TO FULLY PRESENT HER PROSECUTORIAL MISCONDUCT ARGUMENT.**

**A. Introduction.**

Respondents re-characterize Judge Hunter's second ground for relief as arguing for a federal constitutional right to exceed state court briefing page limits. *See* Respondent Attorney General's ROW, Doc. 12, PAGEID# 101; Respondent Dinkelacker's ROW, Doc. 27, PAGEID# 5042). They then contend that because there is no such federal constitutional right, Judge Hunter's second ground for relief lacks merit. *Id.*

However, while there is no constitutional right to unlimited briefing, there is, as will be discussed below, a federal due process right to a meaningful appeal. The First District Court of Appeals rendered Judge Hunter's appeal on prosecutorial misconduct

grounds meaningless when it inflexibly and unreasonably refused to deviate from the page limits it had previously imposed despite learning from Judge Hunter's counsel that additional pages were needed due to the rampant prosecutorial misconduct the special prosecutor committed during the 126 page rebuttal closing.

As a result of the court's refusal to allow additional briefing, Judge Hunter faced the Hobson's choice of substantially reducing the briefing allocated to the Rule 29 argument, which raised a complicated statutory construction argument of first impression, or the briefing on the jury poll issue, which also required extensive briefing, or jettisoning the prosecutorial misconduct argument almost in its entirety. Judge Hunter chose the third option, reducing her fourteen page argument discussing fifty-one instances of prosecutorial misconduct down to four pages discussing just four examples.

Had the special prosecutor not engaged in such extensive misconduct, Judge Hunter would not have needed to ask the court for additional briefing. Accordingly, it is unfair and disingenuous for respondents to mischaracterize Judge Hunter's argument in an attempt to defeat her second ground for relief where it was the special prosecutor whose repeated and flagrant misconduct made more briefing necessary.

Finally, it was fundamentally unfair and the height of injustice for the First District to refuse to assign Judge Hunter's case to the regular calendar, which would have allowed her to fully brief the three issues she raised. The unfairness was even clearer when the First District removed the case from the accelerated calendar and placed it on the regular calendar solely for purpose of publishing its opinion. The court's abuse of the accelerated calendar in this case belies the notion that Judge Hunter had a meaningful opportunity to appeal her conviction.

### B. Procedural Posture.

**1. Judge Hunter fairly presented her due process denial of a meaningful appeal claim to the state courts.**

After the First District denied Judge Hunter's motion for leave to file her thirty-five page brief, would have complied with the regular calendar,[16] she filed a twenty-five page brief with a truncated prosecutorial misconduct argument. At the conclusion of that argument, Judge Hunter's counsel added a statement explaining, among other things, that "[b]ecause Judge Hunter has not been given the opportunity to fully brief these issues, her due process rights to a meaningful direct appeal and effective assistance of counsel are being violated." Doc. 12-2, Exhibit 49, PAGEID# 548.

After the First District affirmed Judge Hunter's conviction, she sought discretionary review from the Ohio Supreme Court. In her Memorandum in Support of Jurisdiction, she cited *Halbert v. Michigan*, 545 U.S. 605 (2005), in support of her claim that the First District's practices denied her due process right to a meaningful appeal. The Ohio Supreme Court, however, denied discretionary review. Accordingly, Judge Hunter has fairly presented the substance of this federal claim to the state courts.

**2. This Court should decide the merits of Judge Hunter's claim that the First District denied her federal due process right to a meaningful appeal.**

Neither the First District Court of Appeals nor the Ohio Supreme Court reached the merits of Judge Hunter's claim that the First District denied her due process right to a meaningful appeal. Although Judge Hunter preserved this issue for review by the Ohio Supreme Court, she had no opportunity to present that claim to the First District as an assignment of error in her merits brief. Ultimately, the Ohio Supreme Court decided not to hear Judge Hunter's discretionary appeal.

Thus, no state court has adjudicated this claim on the merits. Therefore, § 2254(d) does not apply. Accordingly, this Court should review *de novo* Judge Hunter's claim that the First District denied her a meaningful appeal.

### C. The Merits of Judge Hunter's Claim that the First District Denied Her Due Process Right to a Meaningful Appeal.

Nothing in the United States Constitution requires the states to provide appellate review of criminal convictions. *McKane v. Durston,* 153 U.S. 684, 687 (1894). However, if a state creates appellate review "as 'an integral part of the. . . system for finally adjudicating the guilt or innocence of a defendant,' . . . the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (quoting *Griffin v. Illinois*, 351 U.S. 12, 18 (1956)).

Cases analyzing the federal due process right to a meaningful appeal have often arisen in the context of state court procedures that deny an opportunity for indigent people to appeal their criminal convictions. *See*, *e.g.*, *Halbert v. Michigan*, 545 U.S. at 616-17, 624 n.8 (holding that due process and equal protection require the appointment of counsel for an indigent defendant convicted by plea who pursues an appeal as a matter of right; "the State must affirmatively ensure that poor defendants receive the legal assistance necessary to provide meaningful access to the judicial system."); *Ross v. Moffitt*, 417 U.S. 600, 612 (1974), quoting *Douglas v. California,* 372 U.S. 353, 358 (1963) ("The State cannot adopt procedures which . . . extend to . . . indigent defendants merely a 'meaningless ritual' while others in better economic circumstances have a 'meaningful appeal.'"); *Lane v. Brown,* 372 U.S. 477, 484-85 (1963) (striking down

---

[16] 1st Dist. Loc. R. 19.1(A)(1) (establishing thirty-five page briefing limit for regular calendar cases).

procedure under which a meaningful appeal was possible only if public defender requested a transcript).

However, the due process right to a meaningful appeal is not limited only to ensuring that the doors to the appellate court are open to the poor as well as the rich but also extends to other issues that impact the opportunity for a meaningful appeal. *See Specht v. Patterson*, 386 U.S. 605, 610 (1967) (Due process requires that "there must be [trial court] findings adequate to make meaningful any appeal that is allowed."); *Turner v. Bagley*, 401 F.3d 718, 727 (2005) ("Because the ineffective assistance rendered by Turner's attorneys in state court deprived him of an opportunity to pursue a meaningful direct appeal from his conviction, we hold that law and justice require that Turner's petition for *habeas corpus* be unconditionally granted."); *Wolfe v. Randle*, 267 F.Supp.2d 743, 746 (S.D. Ohio 2003) (holding that "due process is offended when a defendant who pled guilty is kept completely ignorant of his appellate rights").

The question, therefore, is whether due process as a concept is broad enough to encompass the claim that Judge Hunter makes here: that the First District denied her a meaningful opportunity to appeal where it unreasonably refused to allow her the same number of pages to brief her arguments that she would have received had it placed her case on the regular, rather than the accelerated, calendar. The answer is yes.

"It is by now well established that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (internal quotation marks and citation omitted). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481

(1972). Thus, the due process inquiry turns on the specific facts and circumstances of the particular case at issue. *See*, *e.g.*, *Smith v. Caruso*, 53 Fed.Appx. 335, 337 (6th Cir. 2002) (quoting *United States v. Lovasco*, 431 U.S. 783, 797 (1977))("In any due process inquiry based upon pre-arrest delay, 'the particular circumstances of individual cases' must be evaluated."); *Henderson v. Collins*, 262 F.3d 615, 619 (2001) (noting that "the due process inquiry associated with an *Allen* charge focuses on the circumstances that triggered the charge, as well as the language of the charge itself"); *Kennedy v. Cardwell*, 487 F.2d 101, 111 (6th Cir. 1973) (because of a criminal defendant's due process right to a fair trial, the state cannot shackle him in a jury trial absent circumstances demonstrating a clear necessity for shackles).

Here, the particular circumstances of Judge Hunter's case demonstrate that the First District denied her due process right to a meaningful appeal. First, the court, as it does automatically with every criminal case, placed Judge Hunter's appeal on the accelerated calendar, which limits briefs to fifteen pages with no opportunity for the appellant to reply, as opposed to the regular calendar, which permits thirty-five page briefs and allows appellants to reply. Although appellants can move to have their criminal appeals removed from the accelerated calendar, doing so is futile unless the appeal involves a first-degree felony conviction.

Indeed, from 2013 to 2015, appellants filed 1,200 criminal appeals in the First District. The court removed less than a dozen of those appeals from the accelerated calendar and all of those cases involved first-degree felonies. The First District's hard and fast rule of removing from the accelerated calendar only those cases involving first-degree felonies ignores the reality that complicated issues arise in less serious cases, and

is therefore inconsistent with the flexible approach due process demands. *Cf. Langnes v. Green*, 282 U.S. 531, 541 (1931) ("The term 'discretion' denotes the absence of a hard and fast rule."); *Kennedy v. Cardwell*, 487 F.2d at 110 (same).

Second, although the First District did increase the page limit to twenty-five pages when it denied Judge Hunter's motion to be placed on the regular calendar, it inflexibly refused to allow ten additional pages – the regular calendar briefing limit – when apprised of new information bearing on the inappropriateness of keeping Judge Hunter's case on the accelerated calendar. Specifically, Judge Hunter's appellate counsel informed the court that while he initially believed twenty-five pages would be sufficient to raise the first two assignments of error, counsel realized after reading the state's rebuttal closing that a third issue had to be raised: prosecutorial misconduct. Counsel explained that because the special prosecutor's misconduct was so extensive – fifty-one instances by counsel's count – discussion of that issue and the other two assignments of error could not be completed in twenty-five pages. Thus, Judge Hunter sought permission to file her thirty-five page brief – the same length brief she would have been permitted to file if the court had placed her case on the regular calendar from the start. The First District refused, however, striking her brief and ordering her to file a compliant shorter brief. Judge Hunter complied, filing a brief that barely discussed the extensive prosecutorial misconduct the special prosecutor committed during the rebuttal closing.

Third, and perhaps most unfairly, the First District, when it issued its decision, removed the case from the accelerated calendar and placed it on the regular calendar so that it could issue a published opinion. Thus, Judge Hunter's appeal ultimately wound up on the regular calendar – which allows a thirty-five page brief with the opportunity for a

reply – but at a time when the increased page limits and the availability of a reply could not benefit her. The First District's abuse of the accelerated calendar in this way fundamentally conflicts with the fairness, flexibility, and opportunity to be heard that due process demands.

Nevertheless, both respondents cite *Whipple v. Warden, S. Corr. Facility*, No. 1:14-cv-119, 2014 WL 5849066 (S.D. Ohio Nov. 12, 2014), report and recommendation adopted, 2014 WL 7228021 (S.D. Ohio Dec. 17, 2014) (Black, J.), in support of their argument that the First District did not violate Judge Hunter's constitutional rights by refusing to allow her to file a thirty-five page brief. (Respondent Attorney General's ROW Doc. 12 at PAGEID# 101; Respondent Dinkelacker's ROW Doc. 27 at PAGEID# 5043). *Whipple*, however, is distinguishable.

There, Whipple claimed, among other things, that the First District Court of Appeals denied him due process by limiting his brief to fifteen pages. *Whipple,* 2014 WL 5849066, at *4. In analyzing Whipple's due process habeas claim, this court applied AEDPA's deferential standard of review, which as the court noted, required Whipple to show "violations of federal constitutional rights as recognized by the Supreme Court." *Id*. In addition to finding that Whipple had procedurally defaulted the claim, the court also addressed the merits, concluding that "Whipple . . . does not cite any purportedly relevant Supreme Court decisions, but is content to rely on the asserted unfairness of a fifteen-page limit with a twelve day trial and a 2,813 page transcript." *Id.*

Here, Judge Hunter's claim differs from Whipple's in four respects. First, unlike Whipple*,* Judge Hunter did not procedurally default her due process claim but preserved it. Second, unlike in *Whipple*, Judge Hunter's claim is not subject to AEDPA's

74

deferential standard of review, since no state court adjudicated her claim on the merits. Accordingly, she is entitled to *de novo* review and need not point to Supreme Court case law that specifically holds that a fifteen-page briefing limit is unconstitutional.

Third, Judge Hunter has cited Supreme Court and Sixth Circuit precedent that stand for the following propositions: (1) there is a due process right to a meaningful appeal where a state provides appellate review (*see, e.g.*, *Halbert v. Michigan*, 545 U.S. 605; *Specht v. Patterson*, 386 U.S. 605; *Lane v. Brown,* 372 U.S. 477); (2) "due process is flexible and calls for such procedural protections as the particular situation demands," and is therefore a case specific inquiry. (*See*, *e.g.*, *Smith v. Caruso*, 53 Fed.Appx. at 337; *Henderson v. Collins*, 262 F.3d at 619).

Fourth, Judge Hunter has done more than rely on the asserted unfairness of her briefing limit in light of the length of her trial and the number of pages of transcripts. She has explained how the First District (1) places every criminal appeal on the accelerated calendar without regard to the complexity of the issues likely to be raised as indicated on the docket sheet; (2) removes almost none of them to the regular calendar unless they involve first-degree felonies; and (3) routinely removes cases from the accelerated calendar and places them on the regular calendar for purposes of publishing an opinion, as it did in Judge Hunter's case. All of these facts and circumstances, as well as the case law Judge Hunter presented make clear what Whipple apparently did not: The First District denied Judge Hunter a meaningful opportunity to appeal her conviction based on the flagrant and extensive prosecutorial misconduct that occurred.

Lastly, relying on *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000), Respondent Dinkelacker argues that "[t]he First District's page limitation did not wholly prevent

Hunter's counsel from presenting her arguments, but rather 'merely limited the manner in which [Hunter] could present her arguments.'"  Respondent Dinkelacker's ROW, Doc. 27, PAGEID# 5043 (quoting *Seymour v. Walker*, 224 F.3d at 541 (citing *Weeks v. Angelone*, 176 F.3d 249, 271 (4th Cir. 1999)).  *Seymour* and the case it cites, *Weeks,* are also distinguishable.

Seymour, a habeas petitioner, complained that Ohio's thirty-five page briefing limit prevented her from raising a number of issues on appeal to the state courts. *Seymour*, 224 F.3d at 550.  The Sixth Circuit rejected that argument noting that in addition to the brief that Seymour's counsel filed, Seymour was allowed to file a *pro se* brief which, combined with her counsel's brief, raised all fifteen of her claims.  *Id.* at 551.  Significantly, the Sixth Circuit added:  "Nor has Seymour made any showing that the page limit should not have been enforced in her case in particular[.]"  *Id.*

Weeks filed a ninety page brief, forty pages longer than Virginia's fifty page briefing limit.  *Weeks,* 176 F.3d at 270-71.  The state court struck the brief, requiring Weeks to file a compliant brief.  *Id* at 271.  As a result, Weeks had to delete ten arguments which he later tried to raise in federal habeas.  *Id.*  The Fourth Circuit concluded that Virginia's rule limiting briefs to fifty pages was "reasonable." *Id.* at 272.

Judge Hunter's circumstances are a far cry from those in *Seymour* and *Weeks*. Seymour was allowed to file a *pro se* brief in addition to her lawyer's brief.  Judge Hunter was not.  Seymour's counsel was allowed to file a thirty-five page brief.  Judge Hunter's counsel was not.  Thus, through the combination of Seymour's *pro se* brief and her counsel's brief, Seymour had the opportunity to fully raise her claims.  Judge Hunter did not.  Not satisfied with the opportunity she had to raise her issues, Seymour claimed

that her lawyer should have been allowed to file a brief longer than thirty-five pages. Judge Hunter does not argue that she should have been allowed to file a brief longer than thirty-five pages. Rather, Judge Hunter contends that the thirty-five page limit applicable to regular calendar cases, along with a reply brief, would have been sufficient to address the issues she raised on appeal. Finally, Judge Hunter made a particularized showing of the need to file a thirty-five page brief, explaining that the magnitude of the special prosecutor's misconduct during the rebuttal closing required additional briefing. Seymour made no such showing.

Additionally, unlike Weeks, Judge Hunter has not sought to file a brief forty pages longer than what the rules allowed. Judge Hunter simply sought to file a brief that was ten pages longer than what the First District permitted her to file on the accelerated calendar but would not have exceeded the regular calendar briefing requirement of thirty-five pages.

Petitioner wishes she could have filed a fifty page brief, for she would have raised additional issues had she had the opportunity.[17] But she does not argue in this habeas case that she needed more than thirty-five pages – the regular calendar briefing limit – to argue the three issues she raised in her brief. What Judge Hunter does argue, however, is that the First District denied her due process right to a meaningful appeal when it refused to allow full regular calendar briefing after her lawyer indicated that the twenty-five limit

---

[17] The issues Judge Hunter could have raised include jury misconduct (given that the Jury knew that Judge Hunter is also a pastor, it was misconduct for a juror to hide her bias against pastors due to having been sexually abused by a pastor); venue (Judge Hunter filed 1,500 pages of newspaper, television and radio reports with reader comments, blogs and twitter posts in support of her motion to change venue before the re-trial, see NAACP Brief, Doc. 28-1, PAGEID# 5079); *Batson* challenge (prosecution struck several African American jurors to which Judge Hunter challenged as racially discriminatory);jury bias (whites on jury said they could not be fair and an employee of WCPO, who sued Judge Hunter, was bias but not struck; due process violations (defendant request for continuance after prosecutor dumped 800 documents on the eve of trial was denied).

the court imposed was insufficient in light of the extensive prosecutorial misconduct that needed to be brief.[18]  Judge Hunter is right.

### **THIRD GROUND FOR RELIEF**

**THE TRIAL JUDGE DENIED JUDGE HUNTER HER SIXTH AMENDMENT RIGHT TO TRIAL BY JURY BY REFUSING TO POLL THE JURY IN OPEN COURT AFTER THE VERDICT WAS ANNOUNCED.**

Judge Hunter incorporates here the arguments she made in her habeas petition as to how the trial judge denied her right to a jury trial under the Sixth and Fourteenth Amendments to the United States Constitution by failing to poll the jury upon defense counsel's request after the court announced the verdict in open court.

### IV. CONCLUSION

Due process required that Judge Hunter receive a fair trial, free of flagrant prosecutorial abuses.  Instead, Judge Hunter received a trial marred by extensive, serious and intentional misconduct that was part of the prosecution's calculated plan to destroy her character and push the jury to convict, irrespective of the evidence of her guilt or innocence.  Because the state's evidence was weak, the special prosecutor's misconduct was likely the decisive factor in persuading the jury to convict Judge Hunter of an offense she did not commit.

Due process also required that the First District Court of Appeals afford Judge Hunter a meaningful opportunity to present her arguments on appeal, including her claim

---

[18] Pursuant to Rule 6(a) of the Special Rules Governing § 2254 Cases, Judge Hunter would like the opportunity to conduct discovery from the First District Court of Appeals in order to develop further the factual record with respect to this claim.  Specifically, Judge Hunter seeks additional information that would illuminate the court's systemic use of the accelerated calendar, including but not limited to data confirming undersigned counsel's review of the court's records from 2013-2015, as well as any internal memoranda explaining the court's calendaring process.  Rather than engage in this discovery now, which

that the special prosecutor's misconduct denied her a fair trial. Instead of giving Judge Hunter's case the careful consideration it deserved, the First District refused to place her appeal on the regular calendar, where she would have been able to fully brief the three issues she raised, and strictly enforced its twenty-five page briefing limit. As a result, Judge Hunter had to reduce her fourteen-page prosecutorial misconduct argument down to four pages. Aggravating the due process violation, the First District ultimately removed Judge Hunter's case from the accelerated calendar and placed it on the regular calendar in order to publish its opinion only eleven days after oral argument, the day before her re-trial. Had the First District put Judge Hunter's case on the regular calendar from the beginning, she would have had the meaningful appeal due process demands.

## V. REQUESTED RELIEF

Accordingly, Judge Hunter seeks the following habeas relief:

(1) an order vacating her conviction on the grounds that the special prosecutor's misconduct denied her a fair trial in violation of her Fifth and Fourteenth Amendment rights, and remanding the case for further proceedings; and if the Court does not grant relief on this ground,

(2) an order permitting Judge Hunter to conduct discovery on her Second Ground for Relief, and allowing her to supplement the record with additional facts relevant to that claim.

---

would not be necessary if this Court grants relief on prosecutorial misconduct grounds, Judge Hunter would seek to conduct this discovery at a later date should the Court deny relief on her first ground.

Respectfully submitted,

/s/ David A. Singleton
David A. Singleton #0074556
Counsel for Petitioner Tracie M. Hunter
Ohio Justice & Policy Center
215 E. 9thStreet, Suite 601
Cincinnati, OH 45202
(513) 421-1108
(513) 562-3200 – fax
dsingleton@ohiojpc.org

/s/Jennifer L. Branch
Jennifer L. Branch # 0038893
*Co-counsel for Petitioner Tracie M. Hunter*
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
(513) 621-9100
(513) 345-5543 (fax)
jbranch@gbfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2016, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically.

/s/ David A. Singleton
Attorney for Petitioner