**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TRACIE M. HUNTER,                                Case No. 1:16-cv-561
        Petitioner,                              Black, J.
                                                 Litkovitz, M.J.
        vs.

OHIO ATTORNEY GENERAL, et al.,                   **REPORT AND**
        Respondents.                             **RECOMMENDATION**

        Petitioner, Tracie M. Hunter, a former judge on the Hamilton County, Ohio, Juvenile

Court, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 with the

assistance of counsel.  In the petition, petitioner challenges her conviction and sentence for

"Having An Unlawful Interest in a Public Contract" as charged in Count 6 of the indictment

returned in Hamilton County Court of Common Pleas Case No. B-1400110.[1]  (Doc. 1; *see also*

Doc. 12, Exs. 25-26).  Respondents are the Ohio Attorney General, the Hamilton County Court

of Common Pleas, and Hamilton County Common Pleas Court Judge Patrick Dinkelacker.  (*See*

Doc. 8 n.1, at PAGEID#: 60; Doc. 21).  This matter is before the Court on the petition; the Ohio

Attorney General's return of writ with exhibits; the return of writ filed by the Hamilton County

Court of Common Pleas and the Honorable Patrick Dinkelacker; petitioner's brief in reply to the

respondents' returns of writ; the sur-reply brief filed by the Hamilton County Court of Common

Pleas and the Honorable Patrick Dinkelacker; and petitioner's sur-rebuttal brief.  (Docs. 1, 12,

27, 32, 39, 40).[2]

---

[1] Petitioner, who was sentenced to a six-month jail term and one year of community control (*see* Doc. 12, Exs. 25-26), has not yet begun to serve her sentence.  Execution of sentence was stayed during the pendency of petitioner's state appeal and is now stayed during the pendency of the instant habeas corpus proceeding.  (*See* Doc. 1, at PAGEID#: 1-2; Doc. 4).

[2] In addition, the Ohio Attorney General has separately filed the trial transcript, and petitioner has filed

# I.  PROCEDURAL BACKGROUND

## State Trial Proceeding

In January 2014, the Hamilton County grand jury returned an eight-count indictment in Case No. B-1400110 charging the petitioner with two counts of tampering with evidence in violation of  Ohio Rev. Code § 2921.12(A)(2) (Counts 1 and 3); two counts of forgery in violation of Ohio Rev. Code § 2913.31(A)(2) (Counts 2 and 4); two counts of having an unlawful interest in a public contract in violation of Ohio Rev. Code § 2921.42(A)(1) (Counts 5-6); and two counts of theft in office in violation of Ohio Rev. Code § 2921.41(A)(2) (Counts 7-8).  (Doc. 12, Ex. 1).  The grand jury issued a second indictment in Case No. B-1400199 charging petitioner with the additional offense of misuse of credit cards in violation of Ohio Rev. Code § 2913.21(B)(2).  (*Id.*, Ex. 2).  The two indictments were consolidated.  (*See id.*, Ex. 12).

The matter proceeded to trial before a jury, which was unable to reach a verdict on eight of the nine criminal charges.[3]  Petitioner was convicted only of the offense charged in Count 6 of the indictment in Case No. B-1400110.  That count charged that "from on or about [July 25, 2013] to on or about [August 30, 2013]," petitioner, "a public official, knowingly authorized, or employed the authority or influence of her office to secure the authorization of any public contract, to wit: AN EMPLOYMENT CONTRACT, in which [petitioner], a member of her family, or any of her business associates had an interest."  (*Id.*, Ex. 1, at PAGEID#: 115-16) (emphasis in original omitted).  The Ohio Court of Appeals, First Appellate District, provided the following summary of the trial proceedings leading to petitioner's conviction on Count 6, which includes a summary of the evidence presented at trial to establish petitioner's guilt on that

---

exhibits to supplement the record provided as part of the Ohio Attorney General's return of writ.  (*See* Docs. 13, 28-29).

[3] Those eight charges were eventually dismissed by the State, with leave of the trial court, on January 19, 2016.  (*See* Doc. 12, Exs. 28-29).

charge, the proceedings that were held after the verdict on Count 6 was returned, and the

sentence that was ultimately imposed:[4]

> In 2010, Hunter ran for a judgeship in the Hamilton County Juvenile Court. Following litigation over the counting of provisional ballots, she was determined to have won the election and was sworn in on May 25, 2012.
>
> Over time, employees in the prosecutor's office noticed what they believed to be a pattern of Hunter backdating certain entries. These employees suspected that Hunter was backdating the documents with the specific intention of depriving their office of the ability to timely appeal the decisions. After an internal investigation concluded, the Hamilton County prosecuting attorney asked the common pleas court to appoint special prosecutors to investigate the activity. The common pleas court appointed two special prosecutors, who conducted their own investigation and eventually convened a special grand jury to assist them. At the conclusion of the investigation, the grand jury indicted Hunter on nine counts involving several alleged instances of illegal conduct while in office.

### The Termination Proceedings against Steven Hunter

> The sixth count of the indictment alleged that Hunter had an unlawful interest in a public contract. . . . According to the testimony presented during trial, the charge stemmed from the termination proceedings against Steven Hunter, an employee of the Hamilton County Juvenile Court's Youth Center ("Youth Center") and Hunter's brother.
>
> Steven Hunter was employed as a juvenile corrections officer. On July 7, 2013, Steven Hunter was involved in an incident in which he was alleged to have hit a youth in the intake department of the detention center. As a result of that incident, Dwayne Bowman, the superintendent of the Youth Center, recommended that the court terminate Steven Hunter and that a hearing be scheduled for that purpose.
>
> Steven Hunter was informed of the decision on July 25, 2013. Shortly after 10:30 that evening, Hunter sent an email to all employees of the Youth Center in which she identified a number of safety concerns, which she said had been brought to her attention as a result of an email she had sent out previously. She said that she would schedule a closed meeting to discuss the issues with the corrections

---

[4] The Ohio appellate court summarized the facts in its direct appeal decision issued January 15, 2016. (*See* Doc. 12, Ex. 56). 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless the petitioner rebuts the presumption by "clear and convincing evidence." In the absence of clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted below, the appellate court's findings are presumed to be correct. *See McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir. 2004).

officers.

Bowman testified that the email was troubling. He said that he was concerned that the email "would cause confusion with the staff at the youth center. Mr. Hunter's termination process was still occurring and I believe that it could jeopardize that process." Bowman noted that many of the items on Hunter's list echoed the main explanations that Steven Hunter had given for his actions during the July 7 incident, suggesting that the email was Hunter's way of inserting herself into the proceedings. Brian Bell, assistant superintendent of the Youth Center, had similar concerns, testifying that he felt that "she was going to speak to the residents about it to conduct basically her own investigation."

On July 29, 2013, Hunter sent an email to Bowman in which she requested that he send her a number of documents. The email demanded

> copies of all incident reports related to [the youth] and any and all JCOs involving [the youth] and other staff, prior or subsequent to alleged incident with JCO Hunter. All incidents reported during any time frame that [the youth] was detained at the Youth Center, shall be included.
>
> Please provide copies of all drug tests performed of [the youth] during all times at Youth Center. Medical reports of any positive drug tests shall also be included, including the substance detected.
>
> Please forward all copies of all incidents reported involving [the youth] with police.

Bowman replied by asking Hunter if she wanted only the incident reports, or if she also wanted "other documents related to our investigation." Bowman testified that he had asked that clarifying question because Hunter was requesting documentation that was "above and beyond the information that we would normally provide to someone not directly involved in the investigation or someone from the investigative team." He was concerned at that point and was "trying to protect the integrity of the disciplinary process, of the investigation, *** and also to give the judge the opportunity to clarify that she was not asking for that kind of information, but just the information of the incident." Rather than restraining her query, Hunter replied that she wanted "all documentation of every incident and every employee pertaining to [the youth] during his stay at the Youth Center ***."

Bowman testified that this exchange was very stressful for him. He said that he was greatly concerned because "[i]t was something that I had not experienced before for a judge to be directly involved in an incident here at the Youth Center. Certainly the fact that this was the brother of the judge." Likewise, Bell testified that he had never seen a judge directly involved in the disciplinary process of a

Youth Center employee. According to Bell, the types of documents provided to Hunter would not have been provided to an employee under any circumstances.

Bowman provided the documents to Hunter that day. Steven Hunter testified that Hunter then provided the documents to him, which he in turn brought to his attorney that evening. His attorney testified that she only accepted some of the documents. His attorney testified that she refused to accept some of the documents because it would have been "unethical" for her to take them and that she was "concerned that [she] might have to make an ethical report to the Supreme Court about the person that gave him" the documents.

The next morning, Steven Hunter appeared with his attorney for the hearing. Bell testified that, under normal circumstances, the first hearing is continued because the employee receives his discovery packet at the first hearing and usually requires time to review the documents. Steven Hunter's counsel was able to proceed with the hearing that day, which concluded after several hours. Steven Hunter was eventually terminated.

### The Trial and Verdict Return

After Hunter's indictment, the case proceeded to a lengthy jury trial. After five weeks of testimony, the jury received the case. Jury deliberations began the afternoon of Wednesday, October 8, 2014. On Friday at 4 p.m., the jurors said that they had reached a verdict on Count 6, but were unable to reach a verdict on the other counts. The foreperson gave the completed verdict form to the trial court. In open court, the trial court reviewed the document and ordered the jury to be polled as to whether the verdict was theirs. Each member of the jury answered affirmatively without equivocation. The trial court then said:

> I'm going to - - I have indicated that this verdict will be in. We are not indicating what the verdict is, but this verdict will be entered. And I'm going to hand this verdict to the court reporter, . . . and I'm going to ask him if he would seal this verdict.

Defense counsel entered no objection to the procedure employed by the trial court. The jury then received the *Howard* charge—a supplemental instruction for the court to give a deadlocked jury designed to encourage the jurors to reach a verdict. *See State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989). The trial court dismissed the jury for the holiday weekend.

The jury returned Tuesday morning and resumed deliberations. Shortly after noon, the jury returned to the courtroom and the foreperson informed the trial court that the jurors could not reach a verdict on the remaining counts. Once the trial court was satisfied that further deliberations would be fruitless, the clerk read the verdict for Count 6 in open court. After the trial court thanked the jury for its service, but before the jurors were excused, counsel for Hunter asked that the jury

be polled as to Count 6.

> THE COURT: The jury has been polled. They were previously polled and that's it. They were polled. They were polled.

> [DEFENSE COUNSEL]: I thought until the verdict was published.

> THE COURT: They were polled and they were asked whether Count 6 was their true verdict and they indicated yes and so it's over. I indicated that.

The matter was continued to allow for a presentence investigation, after which Hunter was placed on community control for one year, and was ordered to serve 180 days in the Hamilton County Justice Center.

(*Id.*, Ex. 56, pp. 2-6, at PAGEID#: 613-17).

Petitioner was sentenced on December 5, 2014. (*See id.*, Exs. 25-26). Prior to the imposition of sentence, petitioner's counsel filed a post-conviction motion for judgment of acquittal and two motions for a new trial, which were denied by the trial court in entries filed on November 20 and December 3, 2014. (*See id.*, Exs. 15, 19, 20, 21, 23). In one of the motions for new trial, petitioner contended that "the court denied her a fair trial by refusing to poll the jury, at defense counsel's request, after the jury's verdict on Count 6 of the indictment was announced in open court." (*Id.*, Ex. 15). The trial court denied that motion for the following stated reasons:

1. Once a Jury has returned a verdict and that Jury has been polled, a juror may not later rescind the verdict.

2. To rule otherwise would cause chaos by jeopardizing the integrity of jury deliberations and the finality of jury verdicts.

(*Id.*, Ex. 20).

### State Appeal Proceedings

Petitioner's trial counsel filed notices of appeal to the Ohio Court of Appeals, First Appellate District, from the trial court's entries filed on November 20 and December 3, 2014

denying petitioner's post-conviction motions for judgment of acquittal and new trial, and new counsel for appeal purposes filed a third notice of appeal from the trial court's December 5, 2014 final judgment entry. (*See* Doc. 12, Exs. 30-32). The appeals were consolidated and placed on the court's accelerated calendar. (*See id.*, Exs. 33-34).

Petitioner's new appellate counsel filed a motion to remove the case from the accelerated calendar and place it on the appellate court's regular calendar. (*Id.*, Ex. 35). Counsel contended that given the number and importance of the issues to be raised on appeal, the parties and court would "benefit from a full briefing" of the issues and that "a fifteen-page page limit would be insufficient" to address them. (*See id.*). The court overruled petitioner's motion, but granted "leave for the parties to file briefs not to exceed 25 pages." (*Id.*, Ex. 36).[5]

Thereafter, petitioner's counsel filed a 35-page brief on petitioner's behalf, in which three assignments of error were asserted challenging the trial court's (1) denial of petitioner's motion for judgment of acquittal, (2) refusal to poll the jury after the verdict was unsealed and announced in open court, and (3) failure "to meaningfully cure the prosecution's pervasive misconduct during its rebuttal closing argument." (*See id.*, Ex. 39). Because the appellate brief exceeded 25 pages, counsel also filed a motion requesting "the court to accept [petitioner's] brief." (*Id.*, Ex. 40). The court of appeals overruled the motion, struck the appellate brief that had been filed by counsel, and ordered petitioner to file another brief that complied with the 25-page limit. (*Id.*, Ex. 42).

On July 24, 2015, petitioner's counsel complied with the appellate court's order by filing

---

[5] Petitioner's appellate counsel also filed a motion requesting disqualification of the First District Court of Appeals and to have the Ohio Supreme Court assign an appellate court panel from outside Hamilton County to hear petitioner's appeal. (*See* Doc. 12, Ex. 37). The court denied counsel's affidavit of disqualification and allowed the case to "proceed before the judges of the First District Court of Appeals." (*Id.*, Ex. 38).

an amended appellate brief limited to 25 pages,[6] raising the same assignments of error that had been presented in the stricken brief. (*See id.*, Ex. 49). However, counsel also filed an "Emergency Complaint for Writs of Mandamus" with the Ohio Supreme Court. (*Id.*, Ex. 43). Petitioner complained in that matter that her constitutional rights to due process, equal protection and effective assistance of counsel were violated by the 25-page limit set by the Ohio Court of Appeals. (*See id.*, p. 9, at PAGEID#: 470). As relief, she requested the issuance of a writ of mandamus compelling the court of appeals "to allow Judge Hunter to file her brief as originally submitted, or in the alternative an edited brief of thirty pages." (*Id.*, p. 10, at PAGEID#: 471). The State responded by filing a motion to dismiss on the grounds that (1) mandamus was "not warranted" given that "page limits are procedural matters that fall within the sound discretion of the court and mandamus may not be used to control judicial discretion"; and (2) petitioner "ha[d] a remedy by way of an appeal." (*Id.*, Ex. 45). On January 20, 2016, the Ohio Supreme Court granted the State's motion to dismiss without opinion. (*Id.*, Ex. 48).

In the meantime, the State filed a brief responding to petitioner's amended appellate brief. (*Id.*, Ex. 50). Petitioner filed a motion for leave to file a reply to the State's responsive pleading, which was overruled on October 30, 2015. (*Id.*, Exs. 51-52). Thereafter, on December 23, 2015 and January 3 and 13, 2016, petitioner filed three notices of additional authority. (*Id.*, Exs. 53-55). On January 15, 2016, the Ohio Court of Appeals issued a Judgment Entry and Opinion overruling petitioner's assignments of error and affirming the trial court's judgment. (*See id.*, Ex. 56).

Petitioner's appellate counsel next timely appealed on petitioner's behalf to the Ohio Supreme Court. (*See id.*, Ex. 58). In the memorandum in support of jurisdiction, counsel

---

[6] It is noted, however, that although the appellate brief was 25 pages in length, an appendix was attached to the brief, which included a chart detailing the 51 instances of alleged prosecutorial misconduct in the State's rebuttal closing argument. (*See* Doc. 12, Ex. 49).

presented five propositions of law, which included the following three claims for the court's consideration:

1. A criminal defendant has a statutory and constitutional right to poll the jury after the court has unsealed a verdict and announced it in open court.

2. A criminal defendant is entitled to a new trial when the prosecution's rebuttal closing argument contains extensive improper comments—including making inflammatory remarks, interjecting personal opinion, citing unsworn testimony, asking the jury to draw negative inferences from uncalled witnesses, and impugning the defense.

3. The First District Court of Appeals denies appellants due process and equal protection of the law by placing cases on the accelerated calendar by default and refusing to allow full briefing in complicated cases.

(*Id.*, Ex. 60, at PAGEID#: 633). On May 18, 2016, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (*Id.*, Ex. 62).

### Federal Habeas Corpus Petition

In May 2016, petitioner commenced the instant federal habeas corpus action with the assistance of counsel who had represented her in the state appeal proceedings, as well as new counsel. (*See* Doc. 1). In her petition, petitioner presents three grounds for relief:

**Ground One:** Denial of the Fifth and Fourteenth Amendment[] right to due process resulting from extensive prosecutorial misconduct.

**Ground Two:** Denial of the right to due process under the Fourteenth Amendment to the United States Constitution as a result of the state court of appeals' abuse of its accelerated calendar to restrict briefing in complicated cases.

**Ground Three:** Denial of the right to a jury trial under the Sixth and Fourteenth Amendments because of the trial court's failure to poll the jury upon announcement of the verdict in open court.

(*Id.*, at PAGEID#: 3, 5, 7).

The respondents—the Ohio Attorney General, the Hamilton County Court of Common Pleas, and the Honorable Patrick Dinkelacker—have filed returns of writ in response to the

petition. (Docs. 12, 27). Petitioner has filed a brief in reply to the returns of writ. (Doc. 32). In addition, the Hamilton County Court of Common Pleas and the Honorable Patrick Dinkelacker were permitted to file a "sur-reply" in response to petitioner's reply brief, and petitioner was permitted to file a "sur-rebuttal" brief. (Docs. 39-40; *see also* Docs. 33-36).

## II.  OPINION

### A.  Petitioner Is Not Entitled To Relief Based On The Claim In Ground One That She Was Denied A Fair Trial As A Result Of Prosecutorial Misconduct

In Ground One of the petition, petitioner alleges that she was denied a fair trial when the "special prosecutor engaged in fifty-one instances of prosecutorial misconduct" during the State's rebuttal closing argument. (Doc. 1, at PAGEID#: 10). Respondents contend that (1) petitioner procedurally defaulted and has waived most of the allegations of misconduct because she "failed to contemporaneously object at trial," and (2) petitioner's remaining allegations of misconduct "are without merit." (Doc. 12, p. 12, at PAGEID#: 82; *see also* Doc. 27, pp. 8-10, at PAGEID#: 5044-46).

The Ohio Court of Appeals, First Appellate District, was the only state court to issue a reasoned decision addressing the claim of prosecutorial misconduct that was presented by petitioner as an assignment of error on direct appeal. In overruling the assignment of error, the court reasoned in pertinent part as follows:

> In her third assignment of error, Hunter claims that numerous instances of prosecutorial misconduct occurred during the state's closing argument that deprived her of a fair trial. We disagree.
>
> Generally, prosecutorial misconduct will not provide a basis for overturning a criminal conviction, unless, on the record as a whole, the misconduct can be said to have deprived the appellant of a fair trial. . . .  "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'"  *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).  The test is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. . . .

A prosecuting attorney has wide latitude to summarize the evidence and zealously advocate the state's position during closing argument. . . . The propriety of a specific remark by a prosecutor must not be judged in isolation, but in light of the tenor and context of the entire closing argument. . . . In almost all of the instances cited by Hunter, there was no objection. She, therefore, has waived all but plain error. . . .

We have reviewed Hunter's argument, and the chart of 51 specific instances of alleged improper comment, from the perspective of not just the lengthy closing arguments presented by both sides, but also in light of the lengthy trial that preceded them. In many of the instances, Hunter's counsel opened the door to comments made by the state in rebuttal with his own closing remarks. . . . Further, the trial court repeatedly admonished the jury that closing arguments are not evidence. . . .

The trial in this case was long and intense. The closing arguments of both sides were equally intense. And while some of the comments may have stretched the bounds of what is acceptable in closing arguments, the record does not support the conclusion that the arguments of the state deprived Hunter of a fair trial.

(Doc. 12, Ex. 56, pp. 12-13, at PAGEID#: 623-24) (most Ohio case citations omitted).

### 1. Petitioner Procedurally Defaulted And Has Waived Most Of The Allegations Of Prosecutorial Misconduct Because She Did Not Object To Those Specific Instances of Alleged Impropriety That Occurred During Rebuttal Closing Argument

As an initial matter, as respondents have argued and the Ohio Court of Appeals found, petitioner procedurally defaulted most of her allegations of prosecutorial misconduct because she failed to object to the majority of the special prosecutor's allegedly improper remarks at the time they were made. The chart detailing the 51 specific instances of misconduct, which is attached as "Exhibit A" to petitioner's habeas petition and which was also attached as "Appendix B" to petitioner's state appellate brief, reflects that only sixteen of the special prosecutor's challenged comments were objected to by the defense at trial. (*See* Doc. 1, Ex. A; Doc. 12, Ex. 49, Appendix B, at PAGEID#: 556-64).

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal

courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). If the petitioner fails to fairly present her constitutional claims through the requisite levels of state appellate review to the state's highest court, or commits some other procedural default that prevents a merit-based review of the federal claims by the state's highest court, she may have waived the claims for purposes of federal habeas review. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 847-48 (1999); *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

It is well-settled under the procedural default doctrine that the federal habeas court may be barred from considering an issue of federal law from a judgment of a state court if the judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision. *See Harris,* 489 U.S. at 260-62. The Supreme Court has stated:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Such a default may occur if the state prisoner fails to comply with a state procedural rule that required her to have done something to preserve the issue for appellate review. *United States v. Frady*, 456 U.S. 152, 167-69 (1982); *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir. 1996).

The Sixth Circuit employs a three-prong test, which was initially established in *Maupin v.*

*Smith*, 785 F.3d 135, 138 (6th Cir. 1986), to determine if a claim is procedurally defaulted under the adequate and independent state ground doctrine:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010) (quoting *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (in turn quoting *Maupin*)); *see also Johnson v. Bradshaw*, 493 F. App'x 666, 669 (6th Cir. 2012). Under *Maupin* and as discussed above, if the three prerequisites are met for finding a claim is procedurally defaulted under the adequate and independent state ground doctrine, federal habeas corpus review of the defaulted claim is precluded unless the petitioner can demonstrate cause for and prejudice from her procedural default or that failure to consider the defaulted claim will result in a "fundamental miscarriage of justice." *Hoffner*, 622 F.3d at 495 (citing *Maupin*, 785 F.2d at 138); *Johnson,* 493 F. App'x at 669. *See also Coleman*, 501 U.S. at 750; *Harris,* 489 U.S. at 262; *Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, petitioner committed a procedural default when she failed to object to most of the remarks cited as examples of misconduct at the time those comments were made. Ohio's contemporaneous objection rule is a firmly-established, adequate and independent state procedural rule, which serves to foreclose federal habeas review when relied on by the state courts as a basis for denying relief. *See, e.g., Goodwin v. Johnson,* 632 F.3d 301, 315 (6th Cir. 2011) (citing *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001)); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005) (citing *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003)); *see also State v. Murphy*, 747 N.E.2d 765, 788 (Ohio 2001) (pointing out that Ohio's "waiver rule,"

which "requires that a party make a contemporaneous objection to alleged trial error in order to preserve that error for appellate review," is "of long standing" and "goes to the heart of the adversary system of justice"). The Sixth Circuit has repeatedly held that plain-error review by the state appellate court "constitutes enforcement of Ohio's contemporaneous objection rule." *See, e.g., Williams v. Bagley,* 380 F.3d 932, 968-69 (6th Cir. 2004) (and Sixth Circuit cases cited therein); *see also Goodwin*, 632 F.3d at 315.

In this case, the Ohio Court of Appeals clearly and expressly enforced the state procedural bar to review when it concluded that because petitioner did not object to "almost all of the [cited] instances" of prosecutorial misconduct, she "waived all but plain error." (*See* Doc. 12, Ex. 56, p. 13, at PAGEID#: 624). Under well-settled Sixth Circuit precedents, the state appellate court's plain-error review did "not constitute a waiver of state procedural default rules." *See, e.g., Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (citing *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989)); *see also Goodwin*, 632 F.3d at 315. *Cf. Buchanan v. Bunting*, No. 5:14cv1656, 2015 WL 12803743, at *8 (N.D. Ohio Sept. 8, 2015) (Report & Recommendation) (and numerous cases cited therein) (holding that the habeas petitioner waived his claim of prosecutorial misconduct, which was reviewed for plain error by the Ohio Court of Appeals, because the petitioner "never objected to the prosecution's statements during closing arguments"), *adopted*, 2016 WL 6995343, *4 (N.D. Ohio Nov. 30, 2016), *appeal filed*, No. 16-4726 (6th Cir. Dec. 15, 2016). Although the Ohio Court of Appeals also arguably alternatively reached the merits of the federal claim in this case when it found that the record did not support petitioner's claim that she was deprived of a fair trial, the Supreme Court has made it clear that "the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also

relies on federal law." *See Harris*, 489 U.S. at 264 n.10; *see also Sochor v. Florida,* 504 U.S. 527, 533-34 (1992). *Cf. Wilkins v. Warden, Chillicothe Corr. Inst.*, No. 1:09cv781, 2010 WL 5795505, at *9 (S.D. Ohio Sept. 2, 2010) (Report & Recommendation) (citing *Harris*, *Sochor*, and *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998)) ("If the state court clearly and expressly relies on a procedural bar as an adequate and independent state ground for its decision, federal habeas review is foreclosed even if the state court alternatively rules on the merits of the federal claim."), *adopted*, 2011 WL 549916 (S.D. Ohio Feb. 8, 2011). Therefore, the allegations of misconduct that were not preserved for appeal by way of objection are waived and barred from review unless petitioner has demonstrated cause for and prejudice from her default of those specific claims or that a fundamental miscarriage of justice will occur if such claims are not considered herein. *See Hoffner*, 622 F.3d at 497 (quoting *Coleman*, 501 U.S. at 750).

Petitioner has not demonstrated cause for her default in this case. She is unable to prevail on any argument that her trial counsel's failure to object at trial constitutes cause, because the claim of ineffectiveness of counsel was itself defaulted by petitioner, who never raised such a claim in the state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 450-54 (2000).

Finally, petitioner has not demonstrated that failure to consider the defaulted claims of misconduct will result in a "fundamental miscarriage of justice," or in other words, that the alleged errors "probably resulted in the conviction of one who is actually innocent." *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995). Actual innocence in this context requires a showing of factual innocence, not mere legal insufficiency. *See House v. Bell,* 547 U.S. 518, 538 (2006); *Carter v. Mitchell,* 443 F.3d 517, 538 (6th Cir. 2006) (citing *Bousley v. United States,* 523 U.S. 614, 623 (1998)); *see also Vanwinkle v. United States,* 645 F.3d 365, 369 (6th Cir. 2011). Furthermore, the Supreme Court has stated that

"tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of . . . new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, _ U.S. _, 133 S.Ct. 1924, 1928 (2013) (quoting *Schlup,* 513 U.S. 298, 329 (1995)); *see also House*, 547 U.S. at 538 (pointing out that the *Schlup* actual-innocence standard is "demanding and permits review only in the extraordinary case") (internal citation and quotation marks omitted). To establish a credible gateway claim of actual innocence, the petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also Connolly v. Howes*, 304 F. App'x 412, 417 (6th Cir. 2008). No such showing has been made in this case.

Accordingly, in sum, to the extent petitioner bases her claim of prosecutorial misconduct on specific remarks by the special prosecutor that were not preserved for appeal by way of objection, those particular allegations of misconduct are barred from review by this Court. The defaulted instances of alleged misconduct may be considered only in evaluating whether any improper, objected-to comments, when viewed in the context of the entire record, deprived petitioner of a fair trial.

## 2. Petitioner Is Not Entitled To Relief Based On The Merits Of The Remaining Non-Defaulted Allegations Of Prosecutorial Misconduct

Before the merits of petitioner's remaining claims of prosecutorial misconduct may be addressed, the Court must first determine the applicable standard of review. Petitioner has asserted two arguments in support of her position that the claims are subject to de novo review and are not governed by the deferential standard of review set forth in 28 U.S.C. § 2254(d), which is applicable to claims that are adjudicated on the merits by the state courts. First,

petitioner contends that the Ohio Court of Appeals did not adjudicate any of her prosecutorial misconduct claims on the merits because she was "forced to reduce her original fourteen-page argument addressing fifty-one alleged instances of prosecutorial misconduct into fewer than four pages in order to comply with the court's accelerated calendar limiting her brief to twenty-five pages." (Doc. 40, p. 2, at PAGEID#: 5477; *see also* Doc. 32, pp. 55-56, at PAGEID#: 5409-10). The undersigned is not persuaded by that argument. As discussed below in greater detail in addressing petitioner's corollary claim in Ground Two that she was denied a meaningful appeal, it appears from the record that petitioner was able to present most, if not all, of her arguments in the 25-page brief that she was permitted to file with the court and that the Ohio Court of Appeals considered those arguments, as well as the 51 instances of alleged misconduct, in rejecting the assignment of error. (*See* Doc. 12, Ex. 49, pp. 21-24, at PAGEID#: 545-48 & Appendix B; Doc. 12, Ex. 56, p. 13, at PAGEID#: 624). The fact that petitioner was limited in the presentation of her arguments does not mean that the Ohio Court of Appeals did not adjudicate the claims of error as argued in the brief and presented in the attached chart.

Second, petitioner contends that "even if the First District's rejection of her prosecutorial misconduct argument constitutes an adjudication on the merits," the remaining claims are subject to de novo review because the Ohio Court of Appeals made an "unreasonable determination" under 28 U.S.C. § 2254(d)(2) by "treat[ing] the record as if defense counsel had made <u>no</u> objections to any of the alleged instances of misconduct" and applying "plain error review even for the sixteen instances of misconduct defense counsel preserved for appellate review by objecting." (*See* Doc. 40, p. 3, at PAGEID#: 5478 (emphasis in original); *see also* Doc. 32, pp. 56-57, at PAGEID#: 5410-11). As petitioner has pointed out, the Ohio Court of Appeals did not separately address the merits of the instances of prosecutorial misconduct that were

contemporaneously objected to by defense counsel; nor did the court even attempt to distinguish those non-defaulted claims of misconduct from the other claims of error discussed above, which this Court has concluded were procedurally defaulted by petitioner and are barred from review as waived.  (*See* Doc. 12, Ex. 56, pp. 12-13, at PAGEID#: 623-24).  However, contrary to petitioner's contention, § 2254(d)(2) applies only when the state court's ruling involves an unreasonable determination of the *facts* based on the evidence presented at trial.  In this case, however, the state court's error arises from the court's application of the same *legal* standard of review to both the non-defaulted and defaulted allegations of misconduct.  Therefore, the remaining non-defaulted claims are not subject to de novo review under § 2254(d)(2).

The closer question, which respondents have raised, is whether the Ohio Court of Appeals' plain-error review amounted to an adjudication "on the merits" of petitioner's federal claim for the purpose of triggering deferential review under the standard set forth in 28 U.S.C. § 2254(d), which was established by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  In *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009), a Sixth Circuit panel applied the deferential AEDPA standard in ruling on a Fifth Amendment claim that was erroneously reviewed by the state court of appeals for plain error only.  *See Fleming*, 556 F.3d at 530-32.  However, the panel was split on the issue, as the dissenting judge argued that the state court's decision was not entitled to deference and that the claim was subject to de novo review because "the controlling rule in this circuit is that no deference is due under AEDPA where a state court reviews a claim for plain error only, regardless of whether the court's plain-error inquiry may have delved into the merits of the claim."  *Id.* at 538-44 (Clay, J., concurring in part and dissenting part) (citing numerous Sixth Circuit decisions).  In rejecting the dissent's position, the majority of the court reasoned in pertinent part:

First, none of the cases cited by the dissent decide the question of whether a claim reviewed for plain error by a state court dispenses with our obligation to apply AEDPA deference to the merits of the decision reached by that court. They instead discuss the analytically prior question of whether a federal court is permitted to hear an issue in the first place under the doctrine of procedural default. . . . We of course agree with these cases to the extent that they stand for the well-established rule that a state court's application of plain-error review does not revive a habeas petitioner's otherwise procedurally defaulted claim on collateral review. But we disagree with our colleague's view that they control not only this court's ability to address a habeas petitioner's claim, but also the appropriate standard of review to apply once we have determined that the claim is reviewable on the merits.

Second, the question of whether a claim should be addressed on collateral review under the judicially created doctrine of procedural default is independent of the question of whether Congress requires deference pursuant to AEDPA. This court declines to review procedurally defaulted claims out of respect for state-court enforcement of state procedural rules. . . . Similarly, Congress enacted AEDPA "to further principles of comity, finality, and federalism.". . . But the fact that similar concerns motivate both the procedural-default doctrine and the AEDPA does not permit us to ignore the latter simply because the former doctrine is deemed inapplicable. Instead, we believe that this court's jurisprudence is reasonably clear about when a state-court's consideration of a claim is to be considered "adjudicated on the merits" for the purpose of triggering our review under AEDPA.

*Id.* at 530-31 (case citations omitted). The court further found that, as distinguished from other prior Sixth Circuit precedents, the state court did not "bypass the merits" of the federal claim when reviewing it for plain error. *See id.* at 531-32. While acknowledging that "there is no authority squarely on point that decides this key issue," the court stated:

We are persuaded . . . that we would be acting contrary to Congress's intent to have AEDPA "further the principles of comity, finality, and federalism" . . . if we simply ignored the [state] Court of Appeals' evaluation of [the petitioner's] Fifth Amendment claim by reconsidering the issue de novo. In sum, we see no inherent contradiction in applying AEDPA deference to the [state] Court of Appeals' reasoning on the merits of [the petitioner's] claim despite our disagreement with its ruling that the issue was procedurally defaulted. The state court's substantive reasoning does not simply vanish along with its erroneous procedural-default determination. Nor does AEDPA.

*Id.* at 532.

In a subsequent case, a different Sixth Circuit panel, which was also split on the issue, stated in a footnote that "[w]e have repeatedly held that plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference." *Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014), *cert. denied*, 135 S.Ct. 2859 (2015).[7] Since *Frazier*, Sixth Circuit panels confronted with the issue have recognized that because of the conflicting panel decisions "there is some ambiguity over whether we apply AEDPA deference" to claims reviewed for plain error by the state courts. *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 851 (6th Cir. 2017); *see also Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015), *cert. denied*, 137 S.Ct. 41 (2016). The conflict in the Sixth Circuit case law has yet to be resolved. Therefore, as the *Leonard* and *Trimble* panels did in the face of the prior conflicting decisions, the undersigned will assume, without deciding, that petitioner's remaining non-defaulted claims were not addressed on the merits and are subject to de novo review in this proceeding. *Cf. Leonard*, 846 F.3d at 851; *Trimble*, 804 F.3d at 777.

As the Ohio Court of Appeals recognized, petitioner is not entitled to relief unless the special prosecutor's alleged errors "so infected the trial with unfairness as to render the resulting conviction a denial of due process." *See Donnelly v. DeChristoforo,* 416 U.S. 637, 642-43 (1974); *see also Darden v. Wainwright,* 477 U.S. 168, 181 (1986) ("it is not enough that the

---

[7] In a separate concurring opinion, one of the circuit judges in *Frazier* disagreed with the majority on that point, stating that "[i]n the course of enforcing a state-law procedural-default rule, a state court may well address the merits of the federal claim." *Frazier*, 770 F.3d at 506 (Sutton, J., concurring in judgment). Judge Sutton further opined:

> We have been down this road before, and *Fleming* . . . tells us how to navigate it. It makes clear as day that a state court's plain-error review of an issue may receive AEDPA deference when the state court addresses the merits of the federal claim. . . . As it reminds us, the question of procedural default is "independent of the question of whether Congress requires deference pursuant to AEDPA." . . . The one question concerns whether we can review the claim at all; the other concerns how we review it. The majority's approach not only conflicts with our precedent but also with precedent from other circuits. *Lee v. Comm'r, Ala. Dep't of Corrs.*, 726 F.3d 1172, 1207-10 (11th Cir. 2013); *Douglas v. Workman*, 560 F.3d 1156, 1170-71, 1177-79 (10th Cir. 2009).

*Id.*

prosecutor's remarks were undesirable or even universally condemned[;]" rather, the "relevant question" is whether the prosecutor's challenged conduct rendered the trial fundamentally unfair in violation of due process). The alleged misconduct must be examined within the context of the entire trial to determine whether it deprived the defendant of a fair trial. *United States v. Young,* 470 U.S. 1, 11-12 (1985).

The Sixth Circuit has held that in order to prevail on a claim of prosecutorial misconduct, the petitioner must show that the alleged misconduct was "both improper and flagrant." *See, e.g., Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009) (and Sixth Circuit cases cited therein). Improper conduct may be found where prosecutors make statements inciting the passions and prejudices of the jury; inject their personal beliefs and opinions into the record; argue based on evidence not in the record; and inappropriately criticize defense counsel for objecting to improper arguments. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (and cases cited therein). Factors to be considered in weighing whether a prosecutor's improper conduct is flagrant or amounts to a due process violation are: (1) the degree to which the misconduct has a tendency to mislead the jury and to prejudice the accused, *see Darden*, 477 U.S. at 182, and *Young*, 470 U.S. at 12; (2) whether the misconduct is isolated or extensive, *see Donnelly*, 416 U.S. at 646; (3) whether the misconduct is deliberate, *see id.* at 647; and (4) the strength of the competent proof to establish the guilt of the accused, *see Darden*, 477 U.S. at 182. *See also Smith*, 567 F.3d at 256 (citing *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006); *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000)). In addition, because the challenged remarks in this case were made in response to defense counsel's opening statement and closing argument, the court "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *United States v. Henry*, 545 F.3d 367, 381 (6th Cir. 2008) (quoting *Young*, 470

U.S. at 12).  If found that the special prosecutor's challenged remarks were "'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."  *Id.* (quoting *Young*, 470 U.S. at 12-13).  The invited response rule is not intended to excuse the improper comments made by the special prosecutor, but to determine their effect on the trial as a whole.  *Young*, 470 U.S. at 13.  Furthermore, under the harmless-error standard required to be applied on federal habeas review of a state conviction, the petitioner is not entitled to relief unless the special prosecutor's misconduct had a "substantial and injurious effect or influence in determining the jury's verdict."  *See Broom*, 441 F.3d at 412-13 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

It is difficult to determine from the parties' briefs the specific instances of prosecutorial misconduct that remain for review on the merits.  However, in the chart submitted by petitioner specifying each alleged improper remark by the special prosecutor during rebuttal closing argument, petitioner quoted the comments subject to challenge, which were objected to by defense counsel, and generally grouped those particular remarks into three categories involving (1) "[i]rrelevant and inflammatory language"; (2) improper references to "unsworn statements as evidence"; and (3) improper "[b]urden-shifting" remarks.  (*See* Doc. 1, Ex. A; Doc. 12, Ex. 49, Appendix B, at PAGEID# 556-58, 562-64).  The undersigned will address each category of alleged impropriety separately below, but before doing so, it is important to understand the background of the case.

As discussed above, in addition to the charge for which petitioner was convicted, the consolidated indictments contained eight other counts.  Those eight charges involved (1) counts of forgery and tampering with evidence, which were based on petitioner's alleged backdating of court documents; (2) counts of theft in office and misuse of credit cards, which were based on

petitioner's use of her work credit card to pay appellate filing fees in lawsuits brought against her in her official judicial capacity by the Hamilton County Public Defender to address her delay in issuing rulings in certain cases; and (3) one count of having an unlawful interest in a public contract, which stemmed from the employment of petitioner's brother to work overtime hours for petitioner's chambers on April 2, 2013. (*See* Doc. 12, Exs. 1-2).

Petitioner's primary defense at trial was that the criminal charges were "politically motivated, wrong, unfair," and "unfounded." (*See* Doc. 13, Trial Tr. 870, 3582, at PAGEID#: 1573, 4285). Essentially, it was the defense's position that baseless charges were brought against petitioner for retaliatory and vindictive reasons, and for the sole purpose of obtaining her removal from the Hamilton County Juvenile Court bench, because (1) petitioner, the first African-American, female Democrat on that bench, was the successful plaintiff in a contentious, lengthy federal lawsuit filed against the Hamilton County Board of Elections, with the Hamilton County Prosecutor's Office serving as the Board of Elections' counsel, which ultimately resulted in petitioner being declared the winner of the election for the juvenile court judgeship instead of the initial victor, "a well–known, connected Republican"; (2) petitioner had requested an investigation of the Hamilton County Prosecutor's Office and had filed grievances against the Hamilton County Prosecutor and other attorneys in that office for unethical conduct in various matters, including their representation of petitioner in lawsuits filed against her in her official capacity as a judge on the juvenile court;[8] and (3) as a judge, petitioner alienated many

---

[8] Specifically, the Cincinnati Enquirer and another media outlet filed a series of lawsuits against petitioner to challenge her rulings restricting media access to juvenile court proceedings and prohibiting the publication of certain juveniles' names. (*See* Doc. 13, Trial Tr. 1016-18, 1056-79, at PAGEID#: 1719-21, 1759-82). The Hamilton County Prosecutor's Office eventually withdrew as petitioner's counsel and requested the appointment of new independent counsel in that matter after petitioner filed grievances with the Ohio Supreme Court against the Hamilton County Prosecutor and two assistant prosecuting attorneys in the Hamilton County Prosecutor's Office. (*See id.*, Trial Tr. 1080-81, at PAGEID#: 1783-84). Additional complaints against petitioner in her official capacity were filed by the Hamilton County Public Defender to force her to issue rulings in 13 cases pending before her. (*See id.*, Trial Tr. 1468-72, at PAGEID#: 2171-75). Apparently, in those lawsuits, independent counsel was

"powerful people" in Republican-controlled Hamilton County because she "would not submit to arbitrary political authority" and "had the audacity and . . . the constitution to reprimand high ranking officials in the Hamilton County . . . Juvenile Court, to challenge influential people and even file grievances against the most powerful politician in Hamilton County" in her quest to seek reform and change in the juvenile court system. (*See id.*, Trial Tr. 868-70, 878-81, 887-94, at PAGEID#: 1571-73, 1581-84, 1590-97).

In arguing for petitioner's acquittal on all counts, defense counsel made numerous statements in both opening statement and closing argument emphasizing petitioner's "exemplary life" and stellar character, as distinguished from the vindictive conduct of Hamilton County officials who unfairly targeted petitioner for punishment because of her "noncriminal, unprecedented, confrontational, litigious and . . . truculent behavior and attitude" in seeking "reform and change in juvenile court to accomplish" the court's purpose of "positive development of children" and the "preservation of the family unit." (*See id.*, Trial Tr. 866-78, 3624-25, 3675-77, 3781-83, at PAGEID#: 1569-81, 4327-28, 4378-80, 4484-86). It is against that backdrop that the special prosecutor's challenged remarks must be evaluated.

### a. Irrelevant and Inflammatory Remarks.

Five statements by the special prosecutor during rebuttal closing argument, which were objected to at trial, have been cited by petitioner as examples of prosecutorial misconduct involving "[i]rrelevant and inflammatory language."   They are:

> 1.  "Maybe what Deters has to listen to is the social worker who says this child is being sexually abused and we can't get this child out of the home because we can't get Judge Hunter to rule on the case." (Doc. 13, Trial Tr. 3816, at PAGEID#: 4519).
>
> 2.  "And the people that are adversely affected can't appeal it because she won't put on the final appealable order, so the child who is still stuck in the home where

---

appointed to represent petitioner.  (*See id.*, Trial Tr. 1591, at PAGEID#: 2294).

there is sexual abuse until she –" (Doc. 13, Trial Tr. 3857-58, at PAGEID#: 4560-61).

3. "Now he [defense counsel] says she didn't want juveniles identified by their names under any circumstances and guess who had a problem immediately? Well, of course, these juveniles just happen to be the six kids who beat some guy up and hospitalized him in North College Hill because they were bored. It just so happens that those kids –" (Doc. 13, Trial Tr. 3810, at PAGEID#: 4513).

4. "July was not a very good month for Tracie Hunter because on July 9th her brother beat up an inmate at the detention center. And, of course, it's awfully coincidental when people look at whether Hunter cares if a juvenile gets beat up in the detention center and how much she cares about everybody and her first hire was the bailiff who had been terminated for beating children." (Doc. 13, Trial Tr. 3861, at PAGEID#: 4564).

5. "And I would suggest to you in this case, there is no question everybody is watching this case. Everybody is watching. And everybody is wondering what is our system of justice about in this community?" (Doc. 13, Trial Tr. 3916, at PAGEID#: 4620).[9]

The undersigned finds that the fifth statement quoted above was not sufficiently

inflammatory to pose a risk that the jury would have been misled by it to find petitioner guilty of

the unlawful-interest-in-a-public-contract offense charged in Count 6 of the indictment in Case

No. B-1400110. The statement about "everybody" watching the case and wondering about the

"system of justice" in the community is simply too vague to trigger any concerns that petitioner

was prejudiced by it. Statements appealing to the community conscience are permissible unless

they are "calculated to incite the passions and prejudices of the jurors" or appeal "to a need to

---

[9] In the chart listing the 51 instances of alleged impropriety, petitioner also included with that comment the following subsequent remark by the prosecutor, which was *not* objected to by defense counsel: "People are looking at this. And the real question is this: All these people I told you about downstairs on the theft cases, all these people I told you about, all these people going to be held accountable. The question is, is a judge going to be held accountable?" (*See* Doc. 1, Ex. A, at PAGEID#: 18; *see also* Doc. 13, Trial Tr. 3916-17, at PAGEID#: 4620-21). Because the subsequent remark was not objected to at trial, any claim based on that statement was procedurally defaulted and is waived. *See supra* pp. 11-16. Therefore, this Court will address only the comment that was objected to by counsel. However, it is noted that both remarks were made as part of the same argument directed at the theft-in-office and misuse-of-credit-card charges. As discussed below in addressing the objected-to comment, the special prosecutor's remarks were "invited" and did not rise to the level of a due process violation. They also did not have a substantial and injurious effect or influence on the jury in determining petitioner's guilt or innocence on the unlawful-interest-in-a-public-contract charge involved in this case.

solve a wider social problem." *United States v. Lawrence*, 735 F.3d 385, 432 (6th Cir. 2013)

(citing *United States v. Solivan*, 937 F.2d 1146, 1150, 1153 (6th Cir. 1991) (finding improper

prosecutor's appeal to the jury's "fear surrounding the War on Drugs" in a calculated attempt to

"arouse passion and prejudice and to inflame jurors' emotions . . . by urging them to send a

message and strike a blow to the drug problem.")); *see also Hicks v. Collins*, 384 F.3d 204, 219

(6th Cir. 2004) (holding that prosecutor's statement that "the people in the community have the

right to expect that you will do your duty" was not improper, but was considered a "proper

general references to the societal need to punish guilty people."). The comment in this case was

not calculated to incite the passion of the jury by appealing to the need to solve a wider social

problem. Rather, the special prosecutors' comment did no more than request jurors to act as the

community conscience. Moreover, it appears from the record that the comment was made in the

context of arguing that petitioner should not be held to a lower standard than the general public

on the theft-in-office and misuse-of-credit-card charges. (*See* Doc. 13, Trial Tr. 3911-17, at

PAGEID#: 4615-21). That argument was "invited" and did no more than substantially "right the

scale," *see Young*, 470 U.S. at 12-13; *Henry*, 545 F.3d at 381, because defense counsel had

suggested when addressing petitioner's use of her work credit card in closing argument that a

judge in a "responsible position" of "honor and integrity" should be accorded "the benefit of

doubt with respect to credibility." (*See id.*, Trial Tr. 3648, at PAGEID#: 4351). In any event,

even assuming that the special prosecutor's general remark could have inflamed the jury, which

is highly doubtful, it had no prejudicial effect because the charges of theft in office and misuse of

credit card, to which the special prosecutor's argument was aimed, did not result in a verdict of

guilty. Rather, the trial resulted in a hung jury on those charges, which were ultimately

dismissed. The comment had no substantial and injurious effect or influence on the jury in

reaching its verdict of guilty on the "Having An Unlawful Interest in a Public Contract" charge involved in this case.

As petitioner has argued, the four remaining remarks directed at attacking petitioner's character and conduct as a juvenile court judge were improper. The remarks were inflammatory and thus had a tendency to mislead the jury. Moreover, as petitioner has argued (*see* Doc. 40, p, 8, at PAGEID#: 5483), the Court must consider the numerous other defaulted instances of alleged misconduct by the special prosecutor that were not objected to at trial in evaluating the following additional factors governing the flagrancy determination: (1) whether the remarks were isolated or extensive; and (2) whether the remarks were deliberately or accidentally made.[10] *See Donnelly*, 416 U.S. at 646-47; *Smith*, 567 F.3d at 256 (and cases cited therein). Upon review of the entire record, including the defaulted instances of alleged misconduct, the undersigned concludes that the four inflammatory statements were not isolated and were deliberately made.

However, as the Ohio Court of Appeals also generally found (*see* Doc. 12, Ex. 56, p. 13, at PAGEID#: 624), the challenged remarks were "invited" responses to the many hyperbolic statements that defense counsel made in his own opening statement and closing argument. *Cf. Young*, 470 U.S. at 12-13; *Henry*, 545 F.3d at 381. As discussed above, petitioner's counsel made numerous remarks portraying petitioner as an exemplary person who did nothing wrong while serving as a Hamilton County Juvenile Court judge, but rather was unjustly targeted for punishment by the "status quo" powers-that-be simply because she was assertive and stood up to the Republican-controlled Hamilton County Board of Elections, Hamilton County Prosecutor's

---

[10] Petitioner has suggested that this Court should also consider a press release that the Hamilton County Prosecutor, Joe Deters, issued two business days before trial, which allegedly "accused Judge Hunter of bearing responsibility for the murders of two people, one of whom she refused to commit to serve detention." (Doc. 32, p. 48, at PAGEID#: 5402; *see also* Doc. 40, p. 5, at PAGEID#: 5480). However, this Court's review of the allegations of prosecutorial misconduct is limited to the record of events that took place during the trial in the jury's presence. Because the press release took place before the trial and was not referred to during the trial before the jury, it is not subject to consideration in determining whether or not petitioner was deprived of a fair trial by the special prosecutor's alleged misconduct during the rebuttal closing argument.

Office, Hamilton County Juvenile Court, media, and Hamilton County Public Defender to do what was "right" in the best interest of children and the preservation of the family unit. (*See, e.g.,* Doc. 13, Trial Tr. 865-95, 919, 3671-72, 3674-78, 3760, 3781-84, at PAGEID#: 1568-98, 1622, 4342-4351, 4374-75, 4377-81, 4463, 4484-87). In addition, petitioner's counsel made numerous remarks impugning the conduct and motives of the Hamilton County Prosecutor and attorneys in the prosecutor's office as wrong, unfair, retaliatory, vindictive, politically motivated, arrogant and hypocritical not only with respect to their participation in the bringing of the criminal charges against petitioner, but also with respect to the Board of Elections lawsuit and interactions between petitioner and the prosecutor's office after she won that lawsuit and became a judge on the juvenile court. (*See, e.g., id.*, Trial Tr. 880-81, 888-91, 894-95, 919, 3639-60, 3684-3705, 3771-73, 3777-78, 3782-83, at PAGEID#: 1583-84, 1591-94, 1597-98, 1622, 4342-63, 4387-4408, 4474-76, 4480-81, 4485-86).

When viewed in that context, the prosecutor's first two challenged remarks insinuating that petitioner's delay in ruling on cases posed a danger to children placed in homes where sexual abuse was occurring constituted a direct response to defense counsel's extensive attack on the allegedly vindictive motives of the Hamilton County Prosecutor's Office and Hamilton County Public Defender and defense counsel's contrasting portrayal of petitioner as the innocent victim who had been unfairly sued by the public defender. Specifically, in responding to defense counsel's claims that Hamilton County Prosecutor Joe Deters was vindictive and motivated by politics to seek petitioner's ouster from the juvenile court bench, the special prosecutor presented an alternative view of the county prosecutor's actions and motivations. He discussed the role of the county prosecutor whose obligations include the protection and removal of children from homes where they are physically and sexually abused and whose duty it is to aggressively

prosecute those who would do harm to these children. (*See id.*, Trial Tr. 3812-3815, at PAGEID#: 4515-4518). The special prosecutor's comment about Deters' inability to remove children from sexually abusive homes due to petitioner's delayed rulings was made in this context and in response to the defense's theory of Deters' improper political motivation. The comments were therefore invited and mitigated against the likelihood that the jury was adversely affected in its ability to fairly evaluate the evidence. (*See id.*, Trial Tr. 3815-16, at PAGEID#: 4518-19).

Petitioner's counsel also devoted a substantial part of his arguments to impugning the conduct and motives of the Hamilton County Public Defender, Ray Faller, who was portrayed as a "partisan" State witness who had acted unfairly and solely for political reasons with respect to the filing of complaints against petitioner in her official capacity for delays in issuing rulings in cases. (*See id.*, Trial Tr. 915, 3670-83, at PAGEID#: 1618, 4373-86). In so arguing, defense counsel emphasized that before Faller filed the lawsuits, petitioner had provided him with "meritorious, legitimate reasons" as to why her cases were pending. (*See id.*, Trial Tr. 3671-74, at PAGEID#: 4374-77). The special prosecutor's statement about petitioner's delays in entering final appealable orders and the impact on children living in homes where there is sexual abuse was made in response to the defense's argument that the Hamilton County Public Defender's actions against petitioner were motivated by politics and partisanship and not for any legitimate reason:

> Ray Faller, as he told you, we have got children waiting to be adopted. We have got children waiting to go get services. We have got children waiting to be taken out of homes or placed in homes. We have got people who want finality and we can't get her to rule on it.
>
> And the people that are adversely affected can't appeal it because she won't put on the final appealable order, home where there is sexual abuse until she –

(*Id.*, Trial Tr. 3857, at PAGEID#: 4560).  The special prosecutor's comments were an invited response to defense counsel's assertion that the public defender was motivated by politics and not for legitimate reasons.

In the remaining two statements challenged by petitioner, the special prosecutor made remarks about (1) petitioner's hiring of a bailiff who had previously "been terminated for beating children," and (2) the violent conduct of six juveniles whose identities petitioner sought to protect from publication, which led to the lawsuits filed by the media against petitioner in her official judicial capacity.  (*Id.*, Trial Tr. 3810, 3861, at PAGEID#: 4513, 4564).

It appears from the record that the special prosecutor's challenged remark about petitioner's bailiff was made in response to many statements by defense counsel in both his opening statement and final argument to the effect that petitioner's actions, including those pertaining to the Hamilton County Youth Center where the incident occurred that led to her brother's termination as a juvenile corrections officer (JCO), were done out of concern for the juveniles' safety and their welfare.  (*See id.*, Trial Tr. 883-86, 3677, 3733, 3782, at PAGEID#: 1586-89, 4380, 4436, 4485).  The special prosecutor's comment suggesting otherwise, therefore, was invited.  In any event, it is highly doubtful that the jury was misled to convict petitioner for having an unlawful interest in her brother's employment termination proceedings on the basis of that comment rather than the evidence, particularly given that the trial court responded to defense counsel's objection by giving the following curative instruction:

> What counsel says in closing argument is not evidence.  The evidence that you will decide this case is what you heard from the mouths of witnesses on the witness stand, plus the exhibits.
>
> You could make reasonable inferences based upon what the evidence is.  You are the sole determiner of the evidence so I will let you determine whether or not you can make reasonable inferences based upon what the evidence is.

(*Id.*, Trial Tr. 3862, at PAGEID#: 4565). As discussed below in addressing the other categories of prosecutorial misconduct alleged by petitioner, *see infra* pp. 38, 44, 46, that instruction was one of many such instructions given by the trial court during the course of the parties' closing arguments, as well as in its final instructions to the jury, which is another factor that weighs against a finding that the special prosecutor's inflammatory remarks prejudicially affected the jury's verdict of guilty in this case.

The remark about the six juveniles was made during the course of the special prosecutor's rebuttal argument attacking the defense's position that the charges were "politically motivated" and vindictive because petitioner had taken certain actions as a juvenile court judge that alienated "high-ranking" and "influential people" in Hamilton County, including representatives of the news media who sued petitioner for restricting access to her courtroom. (*See id.*, Trial Tr. 869, 3807-10, at PAGEID#: 1572, 4510-13). The remark was specifically directed at comments made by petitioner's counsel in his opening statement essentially claiming that petitioner alienated "the media" in Hamilton County when, in an effort "to protect children and develop children positively," she refused to permit the publication of juveniles' names "under any circumstances." (*See id.*, Trial Tr. 887, at PAGEID#: 1590). In those comments, defense counsel also impugned the motive of the media in filing the lawsuits against petitioner by suggesting that the media had a "problem" with petitioner's protective order not because the "crimes were so egregious that we want to protect the public by knowing their name[s]," but "because we want to sell papers." (*See id.*).

Defense counsel's comments about the political nature of the charges against petitioner and the motive of the media in filing suit against petitioner opened the door for the special prosecutor's remarks and lessened the effect the statement had on the jury's ability to evaluate

the evidence fairly. Even if the special prosecutor's remarks were not invited, the Court finds the remark did not have a substantial and injurious effect on petitioner's conviction. Following the defense's objection, the trial court admonished both counsel and instructed the jury, "Same instruction, ladies and gentleman" (*Id.*, Trial Tr. 3811, 4514), meaning the instruction that the court reiterated numerous times during the course of closing arguments: that counsels' arguments were not evidence and that the jury was to make its decision based on the testimony of the witnesses and exhibits admitted into evidence. *See Donnelly*, 416 U.S. at 644 (stressing curative instruction issued by trial court that arguments of attorneys were not evidence and holding petitioner was not deprived of fair trial); *United States v. Warshak*, 631 F.3d 266, 306 (6th Cir. 2010) (any prejudice caused by prosecutor's comments was either extinguished entirely or diminished drastically by curative instructions that closing arguments were not evidence and to disregard personal opinions of counsel); *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) ("the prejudicial effect of improper comments may be negated by curative instructions to the jury"). Any potential prejudice from the special prosecutor's remarks was likely dispelled by the court's instruction. Indeed, the fact that the jury did not convict petitioner on the eight other charges against her militates against a finding that the special prosecutor's remark inflamed the jury against petitioner or prejudicially affected the jury in reaching its guilty verdict on the one charge contained in Count 6.

Finally, strong and substantial evidence was introduced to establish petitioner's guilt on the charge set forth in Count 6 of the indictment in Case No. B-1400110, which was based on petitioner's alleged interference with the employment termination proceedings involving her brother, Steven Hunter. Petitioner has suggested in her reply to the returns of writ that petitioner's conduct was not proscribed by the applicable criminal statute, Ohio Rev. Code §

2921.42(A)(1). (*See* Doc. 32, p. 65, at PAGEID#: 5419). However, the Ohio Court of Appeals rejected that claim on direct appeal, holding that (1) the state statute criminalizes interference by a public official not only in the "initial hiring of a family member," but also in "other areas of employment, including termination proceedings"; and (2) regardless of the outcome of the employment proceeding, the crime is complete at the moment one uses her authority or the influence of her office to secure a family member's continued employment. (Doc. 12, Ex. 56, pp. 7-9, at PAGEID#: 618-20). In this federal habeas proceeding, the Court must defer to and is bound by the state court's ruling on those state-law issues. *See, e.g., Bennett v. Warden, Lebanon Corr. Inst.,* 782 F. Supp.2d 466, 478 (S.D. Ohio 2011) (and cases cited therein) ("[B]ecause the state courts are final authority on state-law issues, the federal habeas court must defer to and is bound by the state court's rulings on such matters."); *Meyers v. Ohio*, No. 1:14cv1505, 2016 WL 922633, at *7 (N.D. Ohio Jan. 21, 2016) (Report & Recommendation) (citing *Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir. 1988)) ("federal habeas courts are bound by decisions of intermediate state courts on questions of state law unless convinced that the state's highest court would decide the issue differently"), *adopted*, 2016 WL 916602 (N.D. Ohio Mar. 9, 2016). *See also Wilson v. Corcoran,* 562 U.S. 1, 5 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions").

In this case, the following evidence was introduced to establish that petitioner committed the offense charged in Count 6. Evidence was presented that late in the evening on July 25, 2013, the same date petitioner's brother received notice that a recommendation had been made for his termination as a JCO at the Hamilton County Youth Center due to an incident with a youth that had occurred earlier that month, petitioner sent an email to employees at the youth

center scheduling a "closed" meeting to discuss certain issues, "several" of which had been raised by her brother as defenses in response to the incident. (*See* Doc. 13, Trial Tr. 2136-41, 2334-35, at PAGEID#: 2839-44, 3037-38). Both the superintendent and assistant superintendent of the youth center, who were excluded from the meeting, testified of concerns they had in reaction to petitioner's email. Specifically, the superintendent, Dwayne Bowman, testified that the email was concerning as it exhibited a "conflict of interest" on the part of petitioner, "would cause confusion with the staff," and could "jeopardize" Steven Hunter's ongoing "termination process." (*Id.*, Trial Tr. 2141, at PAGEID#: 2844). The assistant superintendent, Brian Bell, who recognized the "familial relationship between Steven Hunter and Judge Hunter," testified that because the administration was excluded from the meeting, he "felt as though the judge had some direct concerns about our actions and she was going to speak to the residents about it to conduct basically her own investigation. The staff, pardon me." (*Id.*, Trial Tr. 2336, 2338, at PAGEID#: 3039, 3041).

In addition, evidence was presented that on July 29, 2013, a few days before Steven Hunter's August 1 termination hearing, petitioner asked Bowman to provide her with "all incident reports" related to the individual youth involved in the incident with her brother and "any and all JCOs" and staff involved with that youth "prior or subsequent to the incident with JCO Hunter," including "all incidents reported during any timeframe that [the youth] was detained at the Youth Center." (*Id.*, Trial Tr. 2143-45, 2147, at PAGEID#: 2846-48, 2850). Petitioner also asked Bowman to provide her with "copies of all incidents recorded involving [the youth's] encounter with police," as well as "copies of all drug tests performed" on the youth "during all times at the Youth Center" and "medical reports of any positive drug tests . . . including substances detected." (*Id.*, Trial Tr. 2144, at PAGEID#: 2847). Bowman, who

testified that he was concerned about "even more of a conflict of interest" and was "trying to protect the integrity of the disciplinary process," replied that he would forward the "incident reports and medical documents," but also asked petitioner to clarify whether she wanted him to include "the secondary documents" related to the investigation, which were "above and beyond the information . . . normally provide[d] to someone not directly involved in the investigation." (*Id.*, Trial Tr. 2147-49, 2151-52, at PAGEID#: 2850-52, 2854-55). In her response, petitioner stated: "I would like all documentation of every incident and every employee pertaining to [the youth] during his detention at the Youth Center, including reports made to any staff by police." (*Id.*, Trial Tr. 2152, at PAGEID#: 2855). Thereafter, on July 30, Bowman provided petitioner with the documents she had requested. (*Id.*, Trial Tr. 2153, at PAGEID#: 2856).

Steven Hunter testified that on July 31, the night before his termination hearing and the day after Bowman forwarded to petitioner the documents she had requested, he met with his attorney and provided her with documents that his sister had given him. (*Id.*, Trial Tr. 2328-30, at PAGEID#: 3031-33). The attorney, who was called as a defense witness, testified on direct examination that at that meeting, Steven Hunter only gave her copies of documents provided to him at his initial hearing in the employment matter. (*See id.*, Trial Tr. 3162-63, at PAGEID#: 3865-66). However, on cross-examination, the attorney admitted that she rejected other documents that Steven Hunter showed her that night because she "didn't want to be . . . involved in anything unethical and because [she] was going to look at the documents [that would be provided by the hearing officer] the next morning." (*See id.*, Trial Tr. 3171, 3174, 3177, at PAGEID#: 3874, 3877, 3880). Moreover, the attorney affirmed that she had previously testified before the grand jury that Steven Hunter told her where those documents came from and that she did not accept them because she was "concerned that [she] might have to make an ethical report

to the Supreme Court about the person that gave him the documents." (*Id.*, Trial Tr. 3175-76, 3178-79, 3181, at PAGEID#: 3878-79, 3881-82, 3884).

Such evidence, when viewed as a whole, constitutes strong and substantial evidence that petitioner "knowingly authorized, or employed the authority or influence of her office" as a Hamilton County Juvenile Court judge "to secure the authorization" of her brother's continued employment at the Hamilton County Youth Center. (*See* Doc. 12, Ex. 1, at PAGEID#: 115-16). Petitioner argues in her reply to the returns of writ that the evidence of guilt is weak because three jurors, who had voted to convict petitioner, changed their minds "immediately post-trial" and because the State "did not produce any alleged document that [petitioner] gave her brother before his termination hearing, nor did it elicit testimony describing such document's contents." (Doc. 32, pp. 65-66, at PAGEID#: 5419-20). The undersigned is not persuaded by those arguments. The determination regarding the strength of the evidence is based on an assessment of the evidence in the trial record, not on any reevaluation by individual jurors of their initial verdicts. Bowman gave detailed testimony about the content of the documents requested by petitioner. He also stated that he secured and delivered the requested documents to petitioner on July 30, 2013. Steven Hunter testified that the next night, he provided his attorney with documents given to him by petitioner, his sister. Steven Hunter's attorney further testified that she refused on ethical grounds to accept documents from Steven Hunter that had not been previously provided at an initial hearing in the employment termination matter. Such evidence was sufficient to show that petitioner's conduct not only involved the delivery to her brother of documents that had been provided to her by Bowman the previous day, but also involved, as the Ohio Court of Appeals reasonably found in ruling on petitioner's claim challenging the sufficiency of the evidence, the delivery of documents "to which Steven Hunter was not

entitled." (*See* Doc. 12, Ex. 56, p. 9, at PAGEID#: 620).  Because, as a matter of Ohio law, the criminal offense was "complete, at the latest, when [petitioner] delivered the documents to her brother" (*see id.*), the evidence discussed above was more than sufficient to demonstrate that petitioner used her authority or influence of her office as a Hamilton County Juvenile Court judge to secure a favorable ruling in the termination proceedings pertaining to her brother.

Accordingly, in sum, upon review of the entire record and after weighing all the applicable factors, the undersigned concludes that the five objected-to comments by the special prosecutor during rebuttal closing argument, which have been challenged by petitioner as "irrelevant" and "inflammatory," did not deprive the petitioner of a fair trial and, in any event, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Broom*, 441 F.3d at 412-13 (quoting *Brecht*, 507 U.S. at 638).

**b.  References to Unsworn Statements as Evidence.**

Two remarks by the special prosecutor during rebuttal closing argument, which were objected to by defense counsel at trial, have been challenged by petitioner on the ground that they constitute improper references to "unsworn statements as evidence":

> "And you know that to be true because [defense counsel] told you that.  Here's what he told you in his opening statement.  When you listen to all of the evidence in this case it will be clear that the charges –"  (Doc. 13, Trial Tr. 3806, at PAGEID#: 4509).

> "[B]y January 25th, 2013 Tracie Hunter had established a reputation in this community, not just in juvenile court, but in this community of exactly what [defense counsel] says she was in his opening statement which was a judge who won't be controlled by –" (Doc. 13, Trial Tr. 3865, at PAGEID#: 4568).[11]

Upon review of the record, it appears that the special prosecutor's remarks sought to

---

[11] It is noted that although the transcript refers to a date of January 25, 2013, either the special prosecutor or the court reporter erred in that regard because it appears from the record that the statement was made in response to arguments pertaining to events that occurred on July 25, 2013, after petitioner's brother was informed of his employment termination hearing.

emphasize the lack of evidence supporting defense counsel's theory that the charges were politically motivated, as well as the fact that defense counsel had himself characterized the petitioner as confrontational and as a judge who would not be controlled or restricted by the powers-that-be in his opening statement and closing argument. (*See* Doc. 13, Trial Tr. 3805-07, 3865-66, at PAGEID#: 4508-10, 4568-69). Because both were alluded to in counsel's opening statement, the special prosecutor's remarks, when viewed in context, do not appear to be improper but appear to be "appropriate comments on the 'quantitative and qualitative significance of the evidence.'" *United States v. Gonzalez*, 512 F.3d 285, 293 (6th Cir. 2008). It was not improper for the special prosecutor to refer to statements that defense counsel had made in arguing the defense's position. *Id.*

In any event, even assuming that there was any impropriety, the special prosecutor's first remark was invited to "right the scale" as it was made to counter defense counsel's extensive arguments essentially portraying petitioner as having done nothing wrong and the Hamilton County Prosecutor's Office as the "poor loser" in the Board of Elections lawsuit that participated in the bringing of baseless criminal charges against petitioner for politically motivated, vindictive reasons in order to obtain her removal from the bench. (*See id.*, Trial Tr. 3804-09, at PAGEID#: 4507-12; *see also id.*, Trial Tr. 865-82, 888-95, 919, 3639-42, 3652-55, 3659-60, 3697-98, 3704-05, 3760, 3771-72, 3777-78, 3781-83, at PAGEID#: 1568-85, 1591-98, 1622, 4342-45, 4355-58, 4362-63, 4400-01, 4407-08, 4463, 4474-75, 4480-81, 4484-86). As distinguished from the first comment, the special prosecutor's second remark was asserted in the context of a different argument. Specifically, the statement was made in support of the State's position that there was a valid basis for Dwayne Bowman's and Brian Bell's concerns that petitioner was interfering in the employment termination matter involving her brother, Steven

Hunter, when she sent an email on July 25, 2013 scheduling a "closed" meeting with Hamilton County Youth Center employees, three or four hours after her brother received notice of his recommended termination and hearing on August 1, 2013. (*See id.*, Trial Tr. 3864-68, at PAGEID#: 4566-71). The comment was also invited to the extent that defense counsel had asserted in his own closing argument that the meeting referred to in petitioner's email "was planned months ago" and that the special prosecutor's attempt to prove that petitioner "just came up with this idea of a . . . meeting so that she could . . . get information to help Steve" was "nonsense." (*See id.*, Trial Tr. 3729, 3731-32, at PAGEID#: 4432, 4434-35).

After defense counsel objected to the remarks, the jury was instructed, as the court reiterated numerous times during the course of closing arguments, that counsel's arguments were not evidence and that the jury was to make its decision "based upon what you hear from the mouths of the witnesses sitting on the witness stand, plus the exhibits which have been admitted during the course of the trial." (*See id.*, Trial Tr. 3806-07, 3866, at PAGEID#: 4509-10, 4569). Upon review of the entire record, and for the reasons discussed above in addressing the prosecutor's improper inflammatory remarks, the undersigned concludes that the two challenged remarks generally referring to defense counsel's own characterization of the petitioner were not improper and, in any event, did not deprive petitioner of a fair trial or have a substantial and injurious effect or influence in determining the jury's verdict in this case.

**c. Burden-shifting Remarks.**

Finally, petitioner claims that the following statements by the special prosecutor during rebuttal closing argument, which were objected to at trial, improperly shifted the burden of proof from the State to the defendant:

> 1. "And the case we presented to you all proves that we're not involved in the politics because we have not put the politics into play here and we have not put

the people to come in here to bad mouth her and we have not brought the people from Juvenile Court that [defense counsel] is anxious to get in here. If he wanted all those people in here to tell you what they knew about it why didn't he bring them?" (Doc. 13, Trial Tr. 3808-09, at PAGEID#: 4511-12).

2. "If he [defense counsel] wants to be critical of why we didn't do what we would do, he had all opportunity to call anybody he wanted." (Doc. 13, Trial Tr. 3810, at PAGEID#: 4513).

3. "[Defense counsel] keeps wanting to know why I didn't call Joe Deters. Why didn't he call Joe Deters and ask him about the conspiracy?" (Doc. 13, Trial Tr. 3817, at PAGEID#: 4520).

4. "The reason he [defense counsel] didn't call him [Joe Deters] is because he didn't want to hear what he had to say. More importantly, he didn't want you to hear what he had to say. And it's the reason he didn't call any of the other witnesses that he criticized us for not calling because he didn't want you to hear what they had to say." (Doc. 13, Trial Tr. 3818, at PAGEID#: 4521).

5. "Now what do you think the other judges in this county think about that? I didn't see any of them come to her defense and let her pick her own lawyers." (Doc. 13, Trial Tr. 3890, at PAGEID#: 4594).

6. "Do not believe that if there was anyone anyplace that would say as either as a judge I could put any date on there that they would not be here?" [sic] (Doc. 13, Trial Tr. 3907-08, at PAGEID#: 4611-12).

7. "She has been entitled to put any document in the record that she wanted. She has been entitled, and she didn't have to, but she was entitled to put any witness on." (Doc. 13, Trial Tr. 3917, at PAGEID#: 4621).

8. "He [defense counsel] has or not been given the opportunity to bring anybody he wants." [sic] (Doc. 13, Trial Tr. 3919, at PAGEID#: 4623).

9. "But I am the one that could tell you, and he [defense counsel] could object to it, that if he has got that much for them and these people know that much and these people had this case so much he had a duty to call them and he should have called them and he should have proven it to you." (Doc. 13, Trial Tr. 3922, at PAGEID#: 4626).

As an initial matter, contrary to petitioner's contention, the special prosecutor's seventh

and eighth remarks quoted above were not burden-shifting, and it is highly unlikely that the jury

would have interpreted them as shifting the burden of proof from the State to the defense. The

prosecutor merely stated that the petitioner was provided the opportunity during the trial to introduce documents and call any witness she wanted to testify on her behalf.  The remarks were made in the context of arguing that petitioner had received a fair trial.  Moreover, the special prosecutor did properly point out in one of the challenged comments that petitioner was not required to call any witnesses.

In the first, second, sixth and ninth remarks quoted above, the special prosecutor was essentially responding to statements that defense counsel made during his closing argument regarding the State's failure to call "people from Juvenile Court," including judges, whom counsel claimed were the only witnesses who could have established that petitioner committed the charged crimes stemming from the backdating of certain documents and the hiring of petitioner's brother for overtime work at petitioner's office.  When a defendant "implie[s] at closing that the government failed to [present certain evidence] because the evidence would be favorable to the defendant," the prosecutor may properly comment that the "defense [too] could have [presented that evidence] if desired."  *United States v. Newton*, 389 F.3d 631, 638 (6th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005); *see also United States v. Williams*, 662 F. App'x 366, 379 (6th Cir. 2016) (prosecutor's suggestion that defendant could have called particular witness not improper when made in rebuttal to defense implication during closing argument that government failed to call a witness where evidence would be favorable to the defendant); *United States v. Hunt,* 278 F. App'x 491, 497 (6th Cir. 2008) ("[P]rosecutor's remarks were not intended to shift the burden of proof or otherwise mislead the jury or prejudice the defendant.  They were intended simply to dispel the notion, suggested by defendant, that the government had improperly withheld information."); *United States v. Brown*, 66 F.3d 124 (6th Cir. 1996) (holding that prosecution's observation in rebuttal argument that defense counsel had

not called a handwriting expert was appropriate rebuttal to defense's reference in closing to prosecution's failure to call such a witness); *United States v. Clark*, 982 F.2d 965 (6th Cir. 1993) (holding that no improper burden shifting occurred when prosecutor remarked upon defendant's failure to call a witness in response to defense counsel's assertion that the witness would not have corroborated testimony of another government witness). The special prosecutor's responsive remarks were invited given that defense counsel devoted a large part of his closing argument to pointing out all of the witnesses that the State failed to call to prove its case. Specifically, petitioner's counsel argued in reference to the forgery and tampering-with-evidence charges:

> And before I forget, if you want to say that she's the only person that's doing this over at the juvenile court, bring them over here. Call Judge Williams, call Judge Grady, call Judge Lipps, call another judge over here, just one. Prove your case so that there would be evidence that Judge Hunter is the only person that backdated. You're saying what she did is atypical, unusual and fraudulent. Call just one other judge to prove their case to show me what she is doing is not done in juvenile court. Why didn't I do it? Because I don't have the burden of proof.

(Doc. 13, Trial Tr. 3607-08, at PAGEID#: 4310-11). At another point in closing argument, defense counsel stated: "But what you won't hear and what you won't see is factual, objective, neutral testimony from witnesses who know all about this case that were over at the Juvenile Court and that should have been subpoenaed and should have c[o]me in here to prove their case beyond a reasonable doubt besides getting a selective person who can testify in a fashion consistent with your case." (*Id.*, Trial Tr. 3668-69, at PAGEID#: 4371-72). Later, defense counsel argued at even greater length as follows:

> And I'll tell you one thing too. When they rested you were surprised. You were surprised. You thought more was coming. You thought more was coming. . . . You know why you thought more was coming? Because more should have c[o]me to prove their case beyond a reasonable doubt. And you were waiting, but it didn't happen. They rested. You thought, wow. And, yes, I was surprised

when they rested.  You were too because you expected more evidence.

So what evidence wasn't proven?  Well, number one, [the prosecutor] didn't call Lisa Miller[, a journal clerk at the Hamilton County Juvenile Court and petitioner's case manager who was called as a defense witness,] to testify about backdating, about this purpose to mislead, the purpose to defraud when they're doing a judicial entry.

I already told you they didn't call Judge Lipps, Judge Grady, Judge Hendon, Judge Williams.  They didn't call one judge from the Juvenile Court.  It's real simple.  Just call one judge to say, you know what, . . . if you sign your name to a backdated judicial entry you are misleading the prosecutor under these circumstances.  You are trying to corrupt a proceeding.  One judge.  Not one.  What is that?  That's a half-baked cake.  Just like everything else from the investigation all the way up to the charges, all the way up to their presentation at trial.  Why not call them?

****

Now, not only do they not call a judge, they didn't call anybody from the Hamilton County Juvenile Court that could say backdating a judicial entry was not routinely done or that backdating a judicial entry is wrong.

. . . .What does Judge Williams do?  Does he backdate judicial entries? . . .  Ask Judge Williams that.  If this is so wrong, if it's an attempt to mislead, ask Judge Williams.  Why wasn't he called?  He's a sitting judge right now.  He does the exact same thing Judge Hunter does.  Where is the evidence?  I don't have the burden of proof. . . .

****

You needed Connie Murdock to say - - Connie Murdock.  Where's Connie Murdock?  Connie Murdock is the case management executive at the Hamilton County Juvenile Court.  She is the mother of backdating. . . .

So why don't they call her to say, no, no, no, no, no, I didn't teach anybody no backdating.  I didn't train anybody on backdating.  We don't backdate judicial entries.  Why didn't they get her to say if you [were] signing a backdated judicial entry you were trying to mislead the court[?]  Why couldn't she say that?  She would be the person that would be more competent to do so than just a hired gun from the assistant Hamilton County Prosecutor's Office.

What evidence did they fail to prove with respect to unlawful interest in a public contract, Count 5?  They failed to call Avery Corbin[, petitioner's bailiff,] to prove that the judge told him or made him contact Mr. Bowman regarding Steve Hunter.  That's what you needed and that's what you did not get.

****

> Why didn't you call Karen Oakley Everson, Lisa Miller, Erica Farris that was
> there that day that could say that the judge had something to do with Steve
> coming over? They would know this. Ask them whether or not the judge, as
> compared to Avery Corbin, secured his presence, instead of just making the
> argument. . . .

(*Id.*, Trial Tr. 3749-46, at PAGEID#: 4442-47).

The undersigned finds that in light of defense counsel's extensive arguments, the four

responsive remarks by the special prosecutor did not rise to the level of a due process violation.

They also were not prejudicial because the comments pertained to charges upon which the jury

did not convict and which were ultimately dismissed. In any event, it is highly unlikely the jury

would have been misled by the special prosecutor's remarks to shift the burden of proof from the

State in reaching its verdict on Count 6, particularly given the numerous times petitioner's

counsel emphasized that the defense did not have the burden to prove anything, which was

corroborated by the court's final instruction that the burden of proof rested "entirely" on the

State. (*See, e.g., id.*, Trial Tr. 865, 895, 920, 3647, 3652, 3705, 3706, 3720, 3741, 3746, 3759,

3766, 3784, 3917, 3918, 3919, 3922, at PAGEID#: 1568, 1598, 1623, 4355, 4384, 4408, 4409,

4423, 4444, 4449, 4462, 4469, 4487, 4621, 4622, 4623, 4626; *see also id.*, Trial Tr. 3931, at

PAGEID#: 4635). Indeed, when his first remark was objected to by defense counsel, the special

prosecutor himself confirmed that the defense "has no burden of proof" (*id.*, Trial Tr. 3809, at

PAGEID#: 4512), and he reiterated at another point that the State bore the burden of proof to

establish beyond a reasonable doubt that petitioner committed the offenses charged against her.

(*Id.*, Trial Tr. 3896, at PAGEID#: 4600).

The fifth statement challenged by petitioner was made by the special prosecutor in the

context of arguing about petitioner's wanting her own lawyers in lawsuits filed against her in her

44

official capacity, as opposed to the attorney who was appointed to represent her after the Hamilton County Prosecutor's Office withdrew as her counsel in those cases.  (*See id.*, Trial Tr. 3890, at PAGEID#: 4594).  The comment as to what "the other judges," who did not come to her defense, might think about her "pick[ing] her own lawyers" was a vague, passing remark directed at countering defense counsel's arguments portraying petitioner as having done nothing wrong in alienating the powers-that-be while serving as a judge on the juvenile court.  It is highly unlikely that the comment would have been construed as shifting the State's burden of proof to the defense on any of the criminal charges.  In any event, following defense counsel's objection that "we have no burden," (*Id.*, Trial Tr. 3890, at PAGEID#: 4594), the trial court reiterated its previous instruction:  "What counsel says to you in final argument is not evidence.  The evidence on which you will make your decisions is what comes from the mouths of the witnesses sitting on that witness stand, plus the exhibits. . . .  You are the sole determiner of the evidence. . . . [W]hat they say about the law is not necessarily the law.  What I say the law is, it is.  And I will instruct you on the law. . . ."  (*Id.*, Trial Tr. 3891, at PAGEID#: 4595).  Following the special prosecutor's rebuttal argument, the trial court explicitly instructed the jury that "[t]he burden of proof rests entirely on the State of Ohio."  (*See id.,* Trial Tr. 3931, at PAGEID#: 4635).  Any concerns of impropriety with the special prosecutor's comment were diminished through the trial court's instructions.  *See Wogenstahl v. Mitchell*, 668 F.3d 307, 332 (6th Cir. 2012).

Finally, the third and fourth remarks challenged herein were improper to the extent that the special prosecutor commented on defense counsel's failure to call the Hamilton County Prosecutor as a witness to prove the defense theory that the charges brought against petitioner were politically motivated.  Those comments were not invited because defense counsel never suggested in his arguments to the jury that the State should have called the prosecutor as a

witness to show lack of political motivation in pursuing the criminal charges.  Although "[i]t is improper for the prosecutor to suggest that the defendant has the burden of proof or any obligation to produce evidence to prove his innocence," *Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006); *see also Wogenstahl*, 668 F.3d at 332, the undersigned is convinced that the jury was not misled by the special prosecutor's remarks to shift the burden of proof from the State to the defense in determining its verdict in this case.  As discussed above, defense counsel emphasized numerous times during closing argument that the State had the burden of proving the criminal charges beyond a reasonable doubt and "we do not have to prove anything." (*See id.*, Trial Tr. 3584, 3585-86, 3594, 3596, 3597, 3608, 3635, 3647, 3652, 3676, 3681, 3696, 3706-07, 3741, 3748, 3783-84, at PAGEID#: 4287, 4288-89, 4297, 4299, 4300, 4311, 4338, 4350, 4355, 4379, 4384, 4399, 4409-10, 4444, 4449, 4486-87).  Even more specifically, defense counsel stated: "Political motivation is not a defense.  I don't have to prove political motivation in order for [petitioner] to be found not guilty of all the charges."  (*Id.*, Trial Tr. 3583-84, at PAGEID#: 4286-87).  Defense counsel also reiterated when objecting to some of the prosecutor's remarks that "[t]he defense has no burden of proof."  (*See id.*, Trial Tr. 3817-18, at PAGEID#: 4520-21, 4594, 4612, 4621-22, 4623).  Furthermore, the trial court explicitly instructed the jury before it retired to deliberate that "[t]he burden of proof rests entirely on the State of Ohio" and "[a] defendant must be acquitted unless the State provides evidence which convinces you beyond a reasonable doubt of every essential element of the crime charged in the indictment."  (*See id.*, Trial Tr. 3931, at PAGEID#: 4635).  In addressing the many objections that were lodged by both parties during closing arguments, as well as in its final instructions to the jury, the court also reiterated numerous times that "[w]hat counsel says to you in argument is not evidence";  that "[t]he evidence upon which you will base your decision is what you heard from the witness stand

from the mouths of witnesses sitting on the witness stand, plus the exhibits which have been admitted during the course of the trial"; and that "what the Court tells you when we instruct you is the law" to follow when determining the verdict. (*See id.*, Trial Tr. 3495-96, 3505-06, 3530, 3577, 3610, 3754-55, 3782, 3806-07, 3810, 3816, 3830, 3862-63, 3891, 3924-26, at PAGEID#: 4198-99, 4208-09, 4233, 4280, 4313, 4455-56, 4485, 4509-10, 4513, 4519, 4533, 4564-65, 4595, 4628-30). *See Wogenstahl*, 668 F.3d at 332 (giving nearly identical curative and final instructions in response to comment on defendant's failure to subpoena witnesses and finding "instruction immediately following the prosecution's potentially improper comments as well as the final instructions assuage any concerns of misleading the jury"). Finally, the jury is presumed to have followed the court's instructions on the burden of proof. *See, e.g., Brenson v. Coleman*, __ F. App'x __, No. 15-4015, 2017 WL 722003, at *3 (6th Cir. Feb. 23, 2017); *see also Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

As discussed above in addressing the prosecutor's inflammatory remarks, strong evidence was presented at trial to establish petitioner's guilt for the offense charged in Count 6. In light of that evidence, the numerous statements that were made by counsel and the court properly relaying to the jury that the State had the burden of proof, the court's numerous admonitions to the jury that it was to apply only the court's instructions in determining the petitioner's guilt or innocence on the criminal charges and that counsels' arguments were not evidence upon which the jury could base the verdict, the undersigned concludes that petitioner's claim challenging the nine remarks by the special prosecutor during rebuttal closing argument as "burden-shifting" lacks merit.

### d. Conclusion.

In sum, petitioner has not demonstrated that she is entitled to habeas relief based on the

claims of prosecutorial misconduct alleged in Ground One that remain for review on the merits. Although as a general rule the federal habeas court must apply a deferential standard of review, the undersigned has assumed, without deciding, in petitioner's favor that the remaining claims are subject to de novo review. However, even under that standard, petitioner's claim challenging two remarks allegedly containing references to "unsworn statements" lacks merit. Those remarks were not improper, nor did they deprive petitioner of a fair trial or have a substantial and injurious effect or influence in determining the jury's verdict in this case. Moreover, although some of the special prosecutor's remarks challenged by petitioner as "burden-shifting" may have been improper, the undersigned is convinced upon review of the record that the jury was not misled by those comments to shift the burden from the State to the defense in deciding petitioner's guilt or innocence on the criminal charges. Finally, four of the special prosecutor's comments challenged as involving "irrelevant and inflammatory language" were improper, not isolated and deliberately made. However, upon review of the record, because the remarks were invited responses to the many hyperbolic statements that defense counsel made in his own opening statement and closing argument and because strong and substantial evidence was presented to establish petitioner's guilt for the offense charged in Count 6 of the indictment in Case No. B-1400110, the undersigned concludes that they did not deprive petitioner of a fair trial and, in any event, did not have a substantial and injurious effect or influence in determining the jury's verdict of guilt with respect to that charge.

### B. Petitioner Is Not Entitled To Relief Based On The Claim In Ground Two Challenging Restrictions On Briefing In The Accelerated Direct Appeal Proceeding

In Ground Two of the petition, petitioner alleges that she was denied the effective assistance of appellate counsel under the Sixth Amendment and her due process right to a meaningful appeal when, in accordance with standards governing accelerated appeals, the Ohio

Court of Appeals placed restrictions on the length of her appellate brief and did not provide her with an opportunity to submit a reply brief.  (Doc. 1, at PAGEID#: 5-7, 11-13).

As discussed above in setting forth the procedural background regarding petitioner's direct appeal, after the Ohio Court of Appeals placed petitioner's consolidated appeals on its accelerated calendar, petitioner's counsel filed a motion requesting that the matter be removed to the court's regular calendar because the "fifteen-page page limit" for briefs in accelerated appeals "would be insufficient" to address the issues involved in the case.  (*See* Doc. 12, Ex. 35, at PAGEID#:  329).  Although the Ohio Court of Appeals denied the motion, the parties were granted leave to "file briefs not to exceed 25 pages."  (*Id.*, Ex. 36).

Thereafter, petitioner's counsel filed a 35-page brief on petitioner's behalf, in which three assignments of error were asserted challenging the trial court's (1) denial of petitioner's motion for judgment of acquittal, (2) refusal to poll the jury after the verdict was unsealed and announced in open court, and (3) failure "to meaningfully cure the prosecution's pervasive misconduct during its rebuttal and closing argument."  (*See id.*, Ex. 39).  Because the brief exceeded 25 pages, counsel also filed a motion requesting "the court to accept [petitioner's] brief."  (*Id.*, Ex. 40).  In that motion, petitioner's counsel stated that although he initially believed 25 pages "would be sufficient" for presenting "the two strongest issues counsel anticipated raising at that time: the jury-poll issue and denial of Judge Hunter's Rule 29 motion," he "realized that a third issue needed to be raised:  prosecutorial misconduct in the rebuttal closing argument."  (*Id.*, p. 2, at PAGEID#: 446).  Counsel expressly argued:

> If the court does not allow this brief to be filed as is, undersigned counsel would have to either eliminate the third assignment of error, or reduce the argument to the point of ineffectiveness.  Restricting Judge Hunter's brief to twenty-five pages, given the issues she is raising on appeal, would deny her due process of law under . . . the Fourteenth Amendment . . . and would also deny her the effective assistance of counsel under the Sixth and Fourteenth Amendments.

(*Id.*, p. 3, at PAGEID#: 447). The court of appeals summarily overruled the motion, struck the 35-page appellate brief, and ordered petitioner to file another brief that complied with the 25-page page limit. (*Id.*, Ex. 42).

Petitioner's counsel next filed an amended appellate brief limited to 25 pages raising the same assignments of error that had been presented in the 35-page brief. (*See id.*, Ex. 49). In that brief, counsel specifically contended that because petitioner had "not been given the opportunity to fully brief" certain listed issues of prosecutorial misconduct that were argued in the prior brief, "her due process rights to a meaningful direct appeal and effective assistance of counsel are being violated." (*Id.*, pp. 24-25, at PAGEID#: 548-49). Counsel also attached an appendix to the amended brief, which included a chart detailing the 51 instances of alleged prosecutorial misconduct in the State's rebuttal closing argument. (*See id.*, Appendix B). Including the appendix, the document filed with the court was 45 pages in length. (*See id.*, at PAGEID#: 519).

After the State filed a brief responding to petitioner's amended appellate brief (*see id.*, Ex. 50), petitioner's counsel next filed a motion for leave to file a reply brief. (*Id.*, Ex. 51). In that motion, counsel argued:

> Because Appellant's brief was restricted to twenty-five pages in length, Appellant had only four pages in which to discuss fifty-one instances of egregious prosecutorial misconduct. In this space, Appellant was unable to analyze the law applying to each category of prosecutorial misconduct and to discuss the application of that law to her case. Without the ability to respond to the State's arguments in a reply brief, Appellant will be deprived of Due Process under . . . the United States Constitution because she will be unable to present meritorious grounds of relief.

(*Id.*, p. 2, at PAGEID#: 597). The Ohio Court of Appeals summarily overruled that motion without opinion. (*Id.*, Ex. 52).

As a threshold matter, petitioner contends that her claim challenging the restrictions that

were placed on her appellate counsel by the Ohio Court of Appeals is subject to de novo review, as opposed to review under the deferential standard set forth in 28 U.S.C. § 2254(d), because "no state court has adjudicated this claim on the merits." (Doc. 32, pp. 69-70, at PAGEID#: 5423-24). The undersigned disagrees.

Petitioner's counsel presented the federal claim to the Ohio Court of Appeals in the motion for leave to file a 35-page brief, the amended appellate brief, and the motion for leave to file a reply brief. (*See* Doc. 12, Exs. 40, 49, 51). The Ohio Court of Appeals overruled petitioner's motions as "not well taken" without explicitly addressing petitioner's arguments and it did not address the issue raised in the amended appellate brief in its direct appeal decision. (*See id.*, Exs. 42, 52, 56). Although the Ohio Court of Appeals denied the non-dispositive motions for leave to file a 35-page brief and reply brief without opinion and did not address the issue in its direct appeal decision, the Supreme Court has held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter,* 562 U.S. 86, 99-100 (2011) (holding that when a state court issues an order summarily rejecting a federal claim that is subsequently asserted as a ground for federal habeas relief, the federal habeas court must presume that the federal claim was adjudicated on the merits by the state court absent a showing that "some other explanation for the . . . court's decision is more likely"). The *Harrington* presumption also applies "when the state court addresses some of the claims raised by a defendant but not a claim that is later raised in a federal habeas proceeding." *Johnson v. Williams*, __ U.S. __, 133 S.Ct. 1088, 1091 (2013).

> This presumption is warranted given that it is "by no means uncommon for a state court to fail to address separately" every potential claim raised by a defendant.

> [*Johnson*, 133 S.Ct.] at 1096. For example, a court in a state that interprets a parallel state and federal constitutional provision identically may decide that a discussion of the state claim adequately disposes of the duplicative federal claim. *Id*. at 1094–95. Similarly, state courts have discretion to decide that a "fleeting reference to a provision of the Federal Constitution" does not merit its attention, or that a claim may simply be "too insubstantial to merit discussion." *Id.* at 1095.
>
> While the *Richter/Johnson* presumption is not irrebuttable, it is a "strong one that may be rebutted only in unusual circumstances," *id.* at 1096, such as "when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99, 131 S.Ct. 770. One example of when the presumption may be rebutted occurs when a state court rejects a federal claim "as a result of sheer inadvertence." *Johnson*, 133 S.Ct. at 1097.

*Brown v. Romanowski*, 845 F.3d 703, 711 (6th Cir. 2017). Because "'a state court need not state its reasoning or provide any explanation for its conclusions' to adjudicate a federal claim on the merits," the state court's "silence" or failure to "directly invoke the federal standard" is insufficient to overcome the presumption that the claim was adjudicated on the merits. *Davis v. Johnson*, 661 F. App'x 869, 878 (6th Cir. 2016) (quoting *Brown v. Bobby*, 656 F.3d 325, 329 (6th Cir. 2011)), *petition for cert. filed*, No. 16-8403 (U.S. Jan. 12, 2017).

Here, petitioner has not made any showing to rebut the presumption that the Ohio Court of Appeals' direct appeal decision, as well as its decisions overruling counsel's motions for leave to file a 35-page brief and for leave to file a reply brief, constituted an adjudication of the merits of the constitutional issues that were raised by petitioner in her various pleadings filed in the accelerated appeal. Petitioner explicitly raised her Sixth and Fourteenth Amendment claims in her motions for leave to file a 35-page brief and for leave to file a reply brief. It cannot be said that the Ohio Court of Appeals' finding that the motions were "not well taken" overlooked those claims. Nor can it be said that some other explanation for the court's ruling is more likely. Thus, the *Harrington* presumption of an adjudication on the merits stands and this federal habeas court must apply the § 2254(d) deferential standard of review in assessing petitioner's second

ground for relief.

Pursuant to the applicable standard set forth in 28 U.S.C. § 2254(d), this Court's review of petitioner's claim of constitutional error is limited. Under § 2254(d), a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

 "A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000)). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599-600 (quoting *Williams,* 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600. As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* [563] U.S. [170], 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the

record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . . . This is a "substantially higher threshold.". . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* [562] U.S. [86, 98-99], 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 562 U.S. at 102. In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, 565 U.S. 34, 39-40 (2011); *cf. Otte,* 654 F.3d at 600 (citing *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision"). The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant

state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412); *see also White v. Woodall*, __ U.S. __, 134 S.Ct. 1697, 1702 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012) (internal citation and quotation marks omitted)) ("'[C]learly established Federal law' for purposes of § 2254(d)(1) includes 'only the holdings, as opposed to the dicta, of this Court's decisions.'"). Decisions by lower courts are relevant only "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

In this case, petitioner has not demonstrated that the Ohio Court of Appeals' refusal to allow her counsel to file a brief in excess of 25 pages or to file a reply brief is either contrary to or involves an unreasonable application of Supreme Court precedents applicable to her claim.

As petitioner has argued, although there is no constitutional right to an appeal, once the state grants the right of appeal, it must "act in accord with the dictates of the Constitution and, in particular, in accord with the Due Process Clause" of the Fourteenth Amendment. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985). Due process concerns are implicated when a state that affords an appeal as of right denies the defendant "a fair opportunity to obtain an adjudication on the merits of his appeal." *Id.* at 405. The Supreme Court has recognized that the due process right to a meaningful appeal includes the right to the effective assistance of counsel guaranteed by the Sixth Amendment. *Id.* at 404-05. However, by the same token, "the Supreme Court has never held that the constitutional right to effective assistance of counsel on direct appeal implies a right to file a brief longer than fifteen pages or a reply brief." *Whipple v. Warden, S. Corr. Inst.*, No. 1:14cv119, 2014 WL 4986448, at *17 (S.D. Ohio Oct. 6, 2014) (Merz, M.J.) (Report & Recommendation) (holding in an analogous case that there was no merit to the habeas

petitioner's claim that he was denied his rights under the Fifth, Sixth and Fourteenth Amendments when the Ohio Court of Appeals, First Appellate District, "refused to remove his case from their accelerated calendar which meant he was limited to fifteen pages in his principal brief and allowed no reply brief at all"), *adopted*, 2014 WL 7228021 (S.D. Ohio Dec. 17, 2014) (Black, J.).

Petitioner's attempts to distinguish *Whipple* from the case-at-hand are unavailing. (*See* Doc. 32, pp. 74-76, at PAGEID#: 5428-30). First, contrary to petitioner's contention, petitioner's due process claim is subject to the same deferential standard of review that was applied in *Whipple*. Second, to the extent that petitioner has pointed out that the claim in *Whipple* was procedurally defaulted, the court in *Whipple* rejected the claim not only because it was defaulted, but also because it was "without merit." *See Whipple, supra*, 2014 WL 4986448, at *17. Third, the "flexible," "case specific" inquiry for due process claims that petitioner has contended is applicable here supports the court's conclusion in *Whipple* that the Supreme Court has never held as a matter of clearly-established federal law that due process concerns are triggered by the limitations on briefing for accelerated appeals that are enforced by the Ohio Court of Appeals, First Appellate District. Indeed, the Supreme Court has acknowledged that in cases such as this, where the constitutional standard "is a very general one," courts have "more leeway . . . in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 2155 (2012) (per curiam) (involving a claim of a denial of due process due to the prosecutor's "improper comments" during closing argument); *see also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("Applying a general standard to a specific case can demand a substantial element of judgment. . . . The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."). Fourth, to the extent petitioner claims

the Ohio appellate court's system of setting cases on the accelerated calendar deprives defendants in complicated cases such as this of a meaningful appeal, she has not cited, nor could the Court find, any authority that would suggest the system is subject to constitutional challenge under clearly established federal law as determined by the Supreme Court.

Finally, even under the "flexible," "case specific" inquiry petitioner has asserted should be applied here, petitioner has not demonstrated that she was denied a meaningful appeal. Indeed, if the "case specific" inquiry were applicable here, a strong argument can be made that the 15-page page limit that was enforced in *Whipple* was more likely to trigger concerns about the lack of a meaningful appeal than the 25-page page limit that was enforced in the instant case. In her mandamus petition to the Ohio Supreme Court, as well as in her motion for permission to file a 35-page brief, petitioner conceded that the 25-page page limit "would have been more than sufficient" for asserting the two assignments of error challenging the denial of her motion for judgment of acquittal and the trial court's refusal to poll the jury after the verdict was unsealed and announced in open court. (*See* Doc. 12, Ex. 40, at PAGEID#: 446; Ex. 43, ¶ 21, at PAGEID#: 467-68). Indeed, counsel devoted the same number of pages in both the initial 35-page brief and the amended 25-page brief to those two assignments of error. (*See id.*, Exs. 39, 49). It, therefore, appears from the record that the sole basis for Ground Two of the petition is petitioner's claim that she was unable to adequately present her third claim of prosecutorial misconduct in the four pages that remained within the 25-page limit. (*See id.*, Ex. 40, at PAGEID#: 447; Ex. 51, at PAGEID#: 597).[12]

---

[12] In her memorandum in support of jurisdiction to the Ohio Supreme Court from the Ohio Court of Appeals' direct appeal decision, petitioner argued that her appellate counsel was "unable to comply with the briefing limit without seriously compromising the overall quality of the arguments in support of the three assignments of error." (Doc. 12, Ex. 60, p. 13, at PAGEID#: 646). She also argued that she was deprived of the opportunity to present "other claims such as ineffective assistance of counsel and juror misconduct." (*Id.*, p. 14, at PAGEID#: 647). By making those assertions, petitioner suggested that she was deprived of a meaningful appeal not only with

Here, it was not unreasonable for the Ohio Court of Appeals to conclude that the page limitation of 25 pages without an opportunity to file a reply brief did not deprive petitioner of a meaningful appeal or effective assistance of counsel on appeal. The restrictions that were imposed merely limited the manner in which petitioner could present her claims; they did not wholly prevent petitioner from presenting her arguments. *Cf. Seymour v. Walker*, 224 F.3d 542, 551 (6th Cir. 2000) (in rejecting the petitioner's argument that a page-limit restriction on appellate briefs excused the petitioner's procedural default of *pro se* claims that were not asserted in the brief filed by counsel, the Sixth Circuit relied on *Weeks v. Angelone,* 176 F.3d 249, 271 (4th Cir. 1999), wherein the court held that the petitioner's procedural default of claims that were withdrawn from his appellate brief was not excused because of a page limit that petitioner claimed "physically prevented" him from presenting all the assignments of error he wished to raise); *see also Valentine v. Huffman*, 285 F. Supp.2d 1011, 1022 (N.D. Ohio 2003), *rev'd in part on other grounds*, 395 F.3d 626 (6th Cir. 2005); *Tolen v. Norman*, No. 4:10cv2031, 2014 WL 2765282, at *9 (E.D. Mo. June 18, 2014); *Darby v. North Dakota*, No. 1:11cv71, 2013 WL 542082, at *30-31 (D. N.D. Feb. 12, 2013) (Report & Recommendation), *adopted*, 2013 WL

respect to her claim of prosecutorial misconduct, but also with respect to her other two assignments of error as well as additional claims that she was prevented from raising on appeal. However, petitioner made it clear in her prior motions to the Ohio Court of Appeals and Ohio Supreme Court that her claim of denial of a meaningful appeal was based solely on her inability to adequately present the prosecutorial-misconduct assignment of error in the limited number of pages permitted to her. (*See id.*, Exs. 40, 43, 51). Petitioner is unable to prevail on any claim that she was denied a meaningful appeal with respect to her first two assignments of error, particularly given that those claims were argued in the same number pages in both petitioner's initial 35-page brief and amended 25-page brief. (*See id.*, Exs. 39, 49). Petitioner is also unable to prevail on any claim that she was denied a meaningful appeal with respect to any "other claims" not mentioned in those prior motions as additional assignments of error that she was prevented by the page limit from raising. (*See id.*). By failing to bring those issues to the Ohio Court of Appeals' attention when it was considering whether to grant or deny petitioner's requests in the accelerated appeal, petitioner procedurally defaulted and has waived them as grounds for granting relief. *Cf. Seay v. Warden, Oakwood Corr. Inst.*, No. 1:10cv828, 2013 WL 228019, at *10 (S.D. Ohio Jan. 22, 2013) (Merz, M.J.) (Report & Recommendation) (holding that because a claim asserted in a notice of appeal to the Ohio Supreme Court had not been presented to the Ohio Court of Appeals, it was subject to dismissal with prejudice on procedural default grounds), *adopted*, 2013 WL 1438019 (S.D. Ohio Apr. 9, 2013) (Spiegel, J.); *see also Berry v. Warden, S. Ohio Corr. Facility*, No. 3:14cv2518, 2016 WL 4177174, at *4 (N.D. Ohio Aug. 8, 2016) (holding that the petitioner had defaulted a ground for relief that was not fairly presented to the Ohio Court of Appeals), *appeal filed*, No. 16-4028 (6th Cir. Sept. 8, 2016).

1291625 (D. N.D. Mar. 26, 2013); *Butler v. Booker*, No. 2:09cv10898, 2009 WL 1010919, at *2

(E.D. Mich. Apr. 14, 2009).  In the amended appellate brief, petitioner presented most, if not all,

of the arguments that had been presented in a lengthier fashion in the initial 35-page brief.

Specifically, in presenting the arguments in support of her claim of prosecutorial misconduct,

petitioner contended, with footnote citations to the record and other authorities, that the

prosecutor not only made numerous inflammatory remarks but also relied on "extra-record

evidence and unworn testimony," engaged in "absent witness burden-shifting," interjected his

"personal opinion about guilt and sentencing" and made "statements that defense counsel

believed Judge Hunter guilty," which were "not cured by the trial court's general curative

instruction."  (*See* Doc. 12, Ex. 39, pp. 21-34, at PAGEID#: 410-23; Ex. 49, pp. 21-24, at

PAGEID#: 545-48).  Most importantly, counsel attached to the brief a chart detailing each

instance of prosecutorial misconduct that allegedly occurred during the rebuttal closing

argument, as well as each objection that was lodged and any curative instructions that were given

by the court.  (*See id.*, Ex. 49, Appendix B).  In ruling on petitioner's claim of prosecutorial

misconduct, the Ohio Court of Appeals stated it had considered both petitioner's arguments "and

the chart of 51 specific instances of alleged improper comment."  (*See id.*, Ex. 56, p. 13, at

PAGEID#: 624).  This federal court takes the state court at its word.  The Ohio Court of Appeals

did not specifically address each allegation of misconduct or provide a detailed analysis in

rejecting the claim of constitutional error.  However, it appears from the record that petitioner

was not prevented from presenting her arguments to the state court and that the state court did

consider those arguments, as well as all of the allegations of misconduct contained in the chart,

in rejecting the assignment of error.  (*See id.*).

     Accordingly, in sum, the undersigned concludes under the applicable deferential standard

of review set forth in 28 U.S.C. § 2254(d) that petitioner has not demonstrated she is entitled to relief based on her claim that she was denied a meaningful appeal or effective assistance of counsel on appeal because of the restrictions that were enforced by the Ohio Court of Appeals in the accelerated appeal proceeding. Therefore, Ground Two should be denied with prejudice.

### C. Petitioner Is Not Entitled To Relief Based On The Claim In Ground Three Challenging The Trial Court's Refusal To Poll The Jury After The Verdict On Count 6 Was Unsealed And Announced In Open Court

In Ground Three of the petition, petitioner contends that she was denied her right to a jury trial guaranteed by the Sixth and Fourteenth Amendments when the trial court refused to poll the jury after the verdict on Count 6 was unsealed and announced in open court. (Doc. 1, at PAGEID#: 7-9).

During the trial, when the court was informed that the jury was unable to reach a verdict with respect to eight of the criminal charges, but had reached a verdict on Count 6, the jury was polled in open court regarding that verdict without objection. (*See* Doc. 13, Trial Tr. 3993, at PAGEID#: 4697). When polled, each juror unequivocally affirmed that the verdict on Count 6 was his or her "true verdict." (*Id.*, Trial Tr. 3993-94, at PAGEID#: 4697-98). Although the verdict was not announced at that time, it was entered and sealed as a "done deal," and the jury continued its deliberations on the remaining counts following additional instructions. (*See id.*, Trial Tr. 3994-4002, at PAGEID#: 4698-4706). Later in the proceeding, after the court was informed that the jury could not reach a verdict on the remaining counts, the "previously entered" verdict of guilt was read and recorded. (*See id.*, Trial Tr. 4006-07, at PAGEID#: 4710-11). The court then thanked the jury for its service and stated that the jury was excused. (*Id.*, Trial Tr. 4007-11, at PAGEID#: 4711-15). It was at that juncture that defense counsel asked that the jury be polled again. (*Id.*, Trial Tr. 4011, at PAGEID#: 4715). The court denied counsel's

request, stating: "They were polled and they were asked whether Count 6 was their true verdict and they indicated yes and so it's over. I indicated that." (*Id.*). Petitioner filed a motion for new trial, claiming that the trial court's refusal of counsel's request deprived her of a fair trial. (Doc. 12, Ex. 15). The trial court denied the motion, reasoning that "chaos" would ensue and the "integrity of the jury deliberations and the finality of jury verdicts" would be jeopardized if a previously polled juror were permitted to later rescind the verdict. (*See id.*, Ex. 20).

Petitioner challenged the trial court's ruling on direct appeal. The Ohio Court of Appeals, which was the last state court to issue a reasoned decision addressing petitioner's claim, overruled the assignment of error, reasoning in relevant part as follows:

> Because Hunter failed to object when the trial court polled the jury after it received the verdict for Count 6, we will only reverse if the procedure below amounted to plain error. To notice plain error, we must first find that an error occurred, that the error was an obvious defect in the trial proceedings, and that the error affected the outcome of the trial. . . .
>
> On the record before us, we cannot conclude that the decision to poll the jury prior to publication of the verdict was plain error. The Revised Code states that "[b]efore the verdict is accepted, the jury may be polled at the request of either the prosecuting attorney or the defendant." R.C. 2945.77. Similarly, Crim. R. 31(D) states that "[w]hen a verdict is returned and before it is accepted the jury shall be polled at the request of any party or upon the court's own motion." Neither the statute nor the rule requires that the jury verdict be read in open court prior to polling the jury.
>
> In support of her position, Hunter quotes a line from a 2003 decision of the Ohio Supreme Court, which says that "[a] verdict is final if (1) the deliberations are over, (2) the result is announced in open court, and (3) the jury is polled and no dissent is registered." *See State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4396, 794 N.E.2d 27, ¶34, quoting *United States v. White*, 972 F.2d 590, 595 (5th Cir. 1992). But *Williams* does not support Hunter's position.
>
> In *Williams*, the court addressed the question of whether a juror could recant his or her verdict at any time before it is journalized. *Williams* was a death-penalty case in which a juror had asked to recant her verdict on one of the counts after the guilt phase of the trial had concluded but before the penalty phase had begun. The *Williams* court began its analysis by stating that "[n]umerous cases hold that the verdict becomes final once the jury has been polled and each juror has

assented to the verdict in open court." *Williams* at ¶34. The *Williams* court then quoted the *White* language cited by Hunter.

The language cited as it relates to the requirement of publication prior to finality is dicta. It was not necessary to the court's analysis. And it is not found in the syllabus of *Williams*, which simply states that "[o]nce a poll of the jurors has been completed and all have assented to the verdict, a juror may not thereafter rescind or modify his or her vote." *Id.* at syllabus. Additionally, the *Williams* court cited another federal appellate decision, which stated that "[a] verdict becomes immutable by the jury once announced in open court, or when it has been confirmed by a poll, if ordered." *Id.* at ¶35, quoting *United States v. Dakins*, 872 F.2d 1062, 1065 (D.C. Cir. 1989).

There is no reading of the rule or statute that requires that the jury be polled only after the verdict is announced in open court. In fact, the Eighth Appellate District has held that polling the jury before reading the verdict does not run afoul of Crim. R. 31(D), because the rule requires the court to poll the jury for unanimity before accepting the verdict. . . .

The Ohio Supreme Court has previously addressed the role of the jury poll. In 2000, the court stated

> [a] jury poll's purpose is to "give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented."

*State v. Hessler*, 90 Ohio St.3d 108, 121, 734 N.E.2d 1237 (2000), quoting *Miranda v. United States*, 255 F.2d 9, 17 (1st Cir. 1958). The *Williams* court concluded that:

> the jury poll is well suited to serve as the benchmark of finality. The poll is a solemn ceremony whose formality signals the conclusive nature of the verdict to all who are present. The poll focuses each juror's attention on the verdict and gives each a clear-cut opportunity to declare in open court her assent to or dissent from the [verdict].

*Williams* at ¶36.

The procedure followed by the trial court did not violate any provision of Crim. R. 31(D) or R.C. 2945.77, and its use did not run afoul of the Ohio Supreme Court's view on the role and import of the jury poll. Therefore, the trial court did not commit plain error when it polled the jury prior to publication of the verdict.

We overrule Hunter's second assignment of error.

(Doc. 12, Ex. 56, pp. 9-12, at PAGEID#: 620-23) (some Ohio case citations omitted).

As discussed above with respect to petitioner's allegations of prosecutorial misconduct that were not objected to at trial, *see supra* pp. 11-16, it appears that petitioner procedurally defaulted and has waived the claim that was reviewed by the Ohio Court of Appeals for "plain error" because petitioner failed to contemporaneously object to the polling of the jury at the time the polling occurred in the trial proceeding. *Cf. Rhea v. Jones*, 622 F. Supp.2d 562, 592-93 (W.D. Mich. 2008) (in an analogous case involving a challenge to the method used to poll the jury, the district court held that the ground for habeas relief was "subject to procedural default analysis" because the state court of appeals "found that appellate review was waived by the failure to object at trial, limiting review to plain error affecting the defendant's substantial rights").

In any event, petitioner is not entitled to relief to the extent she contends that, as a matter of state law, the Ohio Court of Appeals erred in ruling that the polling of the jury prior to the publication of the verdict did not violate Ohio law or "run afoul of the Ohio Supreme Court's view on the role and import of the jury poll." (*See* Doc. 12, Ex. 56, p. 12, at PAGEID#: 623). In this federal habeas proceeding, the Court has jurisdiction to review petitioner's claim only to the extent it is based on an alleged violation of the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Wilson v. Corcoran,* 562 U.S. 1, 5 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). This Court must defer to and is bound by the state court's determination that the polling conducted in this case did not violate

Ohio law. *See, e.g., Bennett v. Warden, Lebanon Corr. Inst.,* 782 F. Supp.2d 466, 478 (S.D. Ohio 2011) (and cases cited therein) ("[B]ecause the state courts are final authority on state-law issues, the federal habeas court must defer to and is bound by the state court's rulings on such matters."); *Meyers v. Ohio*, No. 1:14cv1505, 2016 WL 922633, at *7 (N.D. Ohio Jan. 21, 2016) (Report & Recommendation) (citing *Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir. 1988)) ("federal habeas courts are bound by decisions of intermediate state courts on questions of state law unless convinced that the state's highest court would decide the issue differently"), *adopted*, 2016 WL 916602 (N.D. Ohio Mar. 9, 2016).

In addition, to the extent that petitioner contends that her Sixth Amendment right to a jury trial was violated by the polling of the jury prior to the announcement of the verdict, her claim lacks merit. Petitioner has not cited, nor could the undersigned find, any Supreme Court precedent that even remotely suggests the method used to poll the jury in this case abridges any constitutional right. As the district court stated in *Rhea*, 622 F. Supp.2d at 593, when rejecting the habeas petitioner's claim that he was denied due process by the state court's use of a method to poll the jury that failed to specify the count of conviction:

> The Bill of Rights is silent on the issue of polling a jury, and the Supreme Court has never articulated any constitutional requirements under the Due Process Clause. To the extent that the Court has spoken on the subject its cases indicate that a jury poll is not constitutionally required. *See Humphries v. Dist. of Columbia*, 174 U.S. 190, 194, 19 S.Ct. 637, 43 L.Ed. 944 (1899). The lower federal courts have squarely rejected any constitutional requirement for a jury poll. *See Cabberiza v. Moore*, 217 F.3d 1329, 1336-37 (11th Cir. 2000) (collecting cases).

*Accord United States v. Tucker,* 596 F. App'x 616, 618 (10th Cir. 2014) (and cases cited therein) (denying a certificate of appealability on a claim challenging the trial court's use of a jury-polling method that "fail[ed] to poll jurors individually"), *cert. denied*, 135 S.Ct. 2847 (2015); *Pearson v. Racette*, No. 11 Civ. 3452, 2012 WL 4513468, at *10-11 (S.D.N.Y. Aug. 3, 2012)

(Report & Recommendation) (and numerous cases cited therein) (holding that the petitioner's claim that he was "wrongfully denied a right to have the jury polled" was not a cognizable ground for federal habeas relief because "[a]lthough polling the jury is a common practice, we know of no constitutional right to have a poll conducted") (internal quotation marks omitted), *adopted*, 2012 WL 4513656 (S.D.N.Y. Oct. 2, 2012). *Cf. Gau v. Kelly*, No. 4:09-cv-2955, 2010 WL 5698451, at *7 (N.D. Ohio Aug. 11, 2010) (Report & Recommendation) (and numerous cases cited therein) (pointing out that "there is no ingrained Constitutional right to polling the jury" while recognizing that the "purpose of polling the jury is to enable the court and parties to ascertain, with certainty, that each of the jurors approves of the verdict as returned") (internal quotation marks omitted), *adopted*, 2011 WL 400141 (N.D. Ohio Feb. 4, 2011).

Petitioner has not cited any Supreme Court precedent or other authority to suggest that polling of the jury following the rendering of a partial verdict is subject to constitutional challenge. Nor has petitioner provided any authority to support the argument that the poll conducted in this case is subject to constitutional attack because three jurors stated in affidavits that they would have repudiated their initial verdicts if the jury had been polled when the verdict was unsealed and announced in open court. (*See* Doc. 1, at PAGEID#: 8). To the contrary, the Third Circuit has held in addressing the issue under Fed. R. Evid. 606(b) that a jury poll following a partial verdict, which became final when the twelfth juror on the jury panel concurred with that verdict on the record, is not subject to attack by subsequent juror recantation. *See United States v. Stansfield*, 101 F.3d 909, 916-17 (3rd Cir. 1996). In so ruling, the court reasoned:

> The jury poll is not a distinct entity that exists separate and apart from the verdict. Rather, the poll is a mere reflection of the verdict. To attempt to impeach the poll by reference to intimidation that jurors claim they felt during deliberations, or that they feared they would again feel when they resumed their deliberations, is no

different than attacking the verdict directly.  Rule 606(b) forbids this.

> Moreover, adopting [the defendant's] position would mean that no jury poll following the rendering of a partial verdict would be beyond attack through the use of juror testimony, at least until the time that a complete verdict is rendered or a partial mistrial declared.  Since taking a jury poll at that time would thus become a futile gesture, juries would not be polled (and the partial verdict would not be validated) until it became certain that they would deliberate no longer.  Congress could not have intended Fed. R. Evid. 606(b) to so fully diminish the beneficial effects of partial verdicts.

*Id.*  Ohio R. Evid. 606(B) mirrors Fed. R. Evid. 606(b) to the extent that it similarly prohibits, with limited exceptions, inquiry into the validity of a verdict by juror testimony "as to any matter or statement occurring during the course of the jury's deliberations."  Most importantly, however, *Stansfield* supports the conclusion that no federal constitutional issues were triggered by the polling of the jury after the partial verdict on Count 6 was reached and before the jury had concluded its deliberations on the remaining counts.

Accordingly, in sum, the undersigned concludes that petitioner is not entitled to relief based on the claim alleged in Ground Three of the petition.  Petitioner procedurally defaulted and has waived the claim to the extent that she did not object to the poll that was taken when the trial court received the partial verdict.  In any event, petitioner has not stated a cognizable ground for federal habeas relief to the extent she contends that the Ohio Court of Appeals erred in ruling on the polling issues governed by Ohio law.  In addition, petitioner has not demonstrated that the alleged error triggers federal constitutional concerns.  Therefore, Ground Three should be denied with prejudice.

### IT IS THEREFORE RECOMMENDED THAT:

1.  The petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2.  A certificate of appealability should issue only with respect to the prosecutorial

misconduct claims in Ground One, which were addressed on the merits herein, challenging the prosecutor's remarks during rebuttal closing argument that were objected to at trial.  *See supra* pp. 16-48.

On the other hand, a certificate of appealability should not issue with respect to the prosecutorial misconduct claims alleged in Ground One, which this Court has concluded are waived and thus procedurally barred from review, because under the first prong of the applicable two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling.[13] Similarly, a certificate of appealability should not issue with respect to the claim alleged in Ground Three, which this Court has concluded is waived and thus procedurally barred from review, because under the two-part *Slack* test, "jurists of reason" would neither find it debatable whether this Court is correct in its procedural ruling nor find it debatable that petitioner has not stated a viable constitutional claim.  Finally, a certificate of appealaiblity should not issue with respect to the claim alleged in Ground Two, which was addressed on the merits herein, because petitioner has not stated a "viable claim of the denial of a constitutional right," nor are the issues presented in that ground for relief "adequate to deserve encouragement to proceed further."  *See Slack,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and, therefore, should **GRANT** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See*

---

[13]Because the first prong of the *Slack* test has not been met, the Court need not address the second prong of *Slack* as to whether "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim with respect to the defaulted allegations of misconduct set forth in Ground One.  *See Slack,* 529 U.S. at 484.

Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:  5/9/2017                                      s/Karen L. Litkovitz
                                                     Karen L. Litkovitz
                                                     United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TRACIE M. HUNTER,                                    Case No. 1:16-cv-561
      Petitioner,

                                        Black, J.
      vs.                                       Litkovitz, M.J.

OHIO ATTORNEY GENERAL, et al.,
      Respondents.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).