# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **TRACIE M. HUNTER**, | : | Case No. 1:16-cv-561 |
| Petitioner, | : | Judge Black |
| vs. | : | Magistrate Judge Litkovitz |
| **ATTORNEY GENERAL OF STATE OF OHIO, *et al.*** | : | **PETITIONER TRACIE M. HUNTER'S OBJECTIONS TO MAGISTRATE** |
| | : | **JUDGE'S REPORT AND** |
| Respondents. | : | **RECOMMENDATION** |
| | : | |
| | : | **ORAL ARGUMENT REQUESTED** |
| | : | |

Pursuant to Fed. R. Civ. P. 72(b), petitioner Tracie M. Hunter, through counsel, objects to the magistrate judge's recommendation that the court deny petitioner's petition for a writ of habeas corpus. Petitioner requests oral arguments on her objections. A memorandum of law in support of petitioner's objections is attached.

Respectfully submitted,

 /s/ David A. Singleton
David A. Singleton #0074556
*Trial Attorney for Petitioner*
Ohio Justice & Policy Center
215 E. 9th Street, Suite 601
Cincinnati, OH 45202
(513) 421-1108; (513) 562-3200 (fax)
dsingleton@ohiojpc.org

/s/ Jennifer L. Branch
Jennifer L. Branch #0038893
*Co-counsel for Petitioner*
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100; (513) 345-5543 (fax)
jbranch@gbfirm.com

# TABLE OF CONTENTS

MEMORANDUM OF LAW IN SUPPORT OF OBJECTIONS ...................................... iii

I. INTRODUCTION ................................................................. 1

II. OBJECTIONS ..................................................................... 6

    A.     The magistrate judge erred in rejecting petitioner's argument that 2254(d)(2) required de novo review. ................................................................. 6

    B.     The Magistrate Judge Erred in Applying the Invited Response Doctrine........ 10

        1.     The magistrate judge erred in finding that the four inflammatory statements were made in response to defense arguments........................................................ 12

        2.     Young's invited response doctrine does not apply where the defense makes no improper argument........................................................................... 15

        3.     Even if the invited response doctrine applies, the special prosecutor's inflammatory statements went far beyond righting the scale................................... 20

    C.     The Magistrate Judge Erred by Concluding that the Trial Judge's Instruction – "What the Lawyers Say in Closing Is Not Evidence" – Cured the Harm. ............... 24

    D.     The Magistrate Judge Erred by Concluding that the Jury's Deadlock on Eight of the Counts Indicates that the Prosecutor's Misconduct Did Not Sway the Jury to Convict. ...................................................................................... 28

        1.     The So-Called "Backdating" Charges................................................ 28

        2.     The Theft in Office and Misuse of Credit Card Counts ..................................... 31

        3.     Having Unlawful Interest in a Public Contract – the Overtime Count............. 32

    E.     The Magistrate Judge Erred by Finding that the State's Evidence Was "Strong and Substantial."........................................................................... 33

CONCLUSION ...................................................................... 38

CERTIFICATE OF SERVICE ........................................................ 39

**TABLE OF AUTHORITIES**

Cases

*Cauthern v. Colson*,
    736 F.3d 465 (6th Cir. 2013) ............................................................ 26

*Darden v. Wainwright*,
    477 U.S. 168 (1986).......................................................................... 1

*Granger v. Hurt,*
    215 Fed.Appx. 485 (6th Cir. 2007)..................................................... 6

*Hodge v. Hurley*,
    426 F.3d 368 (6th Cir. 2005) ............................................................ 26

*Holmes v. South Carolina*,
    547 U.S. 319 (2006)......................................................................... 16

*In re Anderson*,
    92 Ohio St.3d 63 (2001)............................................................... 14,30

*Johnson v. Williams*,
    133 S.Ct. 1088 (2013)........................................................................ 6

*Leonard v. Warden, Ohio State Penitentiary*,
    846 F.3d 832 (6th Cir. 2017) .............................................................. 6

*Martin v. Parker*,
    11 F.3d 613 (6th Cir. 1993) ..................................................... passim

*McAdoo v. Elo,*
    365 F.3d 487 (6th Cir. 2004) ............................................................ 34

*McKenzie v. Smith,*
    326 F.3d 721 (6th Cir. 2003) .............................................................. 6

*Parker v. Gladden*,
    385 U.S. 363 (1966)......................................................................... 37

*Pierce v. United States*,
    86 F.2d 949 (6th Cir. 1936) ........................................................ 27, 28

*Salts v. Epps*,
    676 F.3d 468 (5th Cir. 2012) ....................................................... 7,8,9

ii

*Trimble v. Bobby*,
    804 F.3d 767 (6th Cir. 2015) ........................................................................... 6

*United States v. Dispoz-O-Plastics, Inc.*,
    172 F.3d 275 (3d Cir. 1999) ........................................................................... 14

*United States v. Henry*,
    545 F.3d 367 (6th Cir. 2008) ......................................................................... 19

*United States v. Krebs,*
    788 F.2d 1166 (6th Cir. 1986) ....................................................................... 22

*United States v. Leon*,
    534 F.2d 667 (6th Cir. 1976) ......................................................................... 22

*United States v. Payne*,
    2 F.3d 706 (6th Cir. 1993) ............................................................................. 22

*United States v. Roberts*,
    79 Fed.Appx. 368 (10th Cir. 2003) ............................................................... 16

*United States v. Solivan*,
    937 F.2d 1146 (6th Cir. 1991) ................................................................. passim

*United States v. Warshak*,
    631 F.3d 266 (6th Cir. 2010) ......................................................................... 27

*United States v. Woods*,
    486 F.3d 781 (3d Cir. 2007) ........................................................................... 19

*United States v. Young*,
    470 U.S. 1 (1985) ................................................................................... passim

*Washington v. Jarvis*,
    307 F.Supp.2d 794 (E.D. Va. 2004) .............................................................. 8,9

Statutes

28 U.S.C. § 2254(d) .............................................................................................. 5

28 U.S.C. §2254(d)(2) ..................................................................................... 6,7,8

Ohio Rev. Code § 2921.42 .................................................................................. 33

<u>MEMORANDUM OF LAW IN SUPPORT OF OBJECTIONS</u>

## I.  INTRODUCTION

The issue for the court to decide is whether the special prosecutor's rebuttal closing "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotations and citation omitted).[1]   At the heart of that question lie several inflammatory and improper statements which, without any proof, accused petitioner of endangering the community, such as by allowing children to be sexually abused.[2]   These comments effectively allowed the prosecution to assassinate petitioner's character, rather than try her on the charges.

Specifically, three times during the rebuttal closing, the special prosecutor, without any evidence to support his claim, accused petitioner of allowing children to be sexually abused as a result of alleged delays in her ruling on cases.   Defense counsel objected to two of these three statements.   Additionally, over defense objection, the special prosecutor told the jury that Judge Hunter had hired a bailiff who had once been fired from juvenile court for physically abusing a child.   Finally, defense counsel objected when the prosecutor contended that petitioner cared more about protecting the identities of juveniles who appeared before her than about the people they had severely victimized.

---

[1] For purposes of preserving the issues for possible future appellate review, petitioner incorporates herein the arguments she made in her petition, reply, and sur-rebuttal in support of the second and third grounds for relief she asserted in her petition.

[2] While petitioner contended in her state court appeals and in this habeas petition that the special prosecutor engaged in fifty-one instances of misconduct, and while constrained in habeas to only the sixteen objected-to comments, without waiving the remaining twelve objected-to comments, petitioner will focus here on the four remarks the magistrate found inflammatory and improper.  Those four alone were enough to infect the trial with unfairness when viewed in light of the entire record.

The magistrate judge correctly concluded that the four objected-to "remarks directed at attacking petitioner's character and conduct as a juvenile court judge were improper." Report and Recommendation, Doc. 41, at PAGEID # 5513. The magistrate judge also correctly concluded that these statements "were inflammatory and thus had a tendency to mislead the jury." *Id.* The magistrate judge, however, incorrectly determined that these remarks were not prejudicial enough to warrant a new trial. In so concluding, the magistrate judge made a number of errors to which petitioner objects.

First, the magistrate judge's incorrect conclusion that the special prosecutor's inflammatory and improper remarks did no more than "right the scale" in response to defense counsel's argument ignored a critical fact: the prosecution launched its character attack not in response to defense counsel's closing but in his opening, before defense counsel had said one word to the jury. Specifically, in opening, the special prosecutor foreshadowed what he would say during his rebuttal closing, telling the jury that petitioner had endangered children by not ruling on her cases in a timely manner. The special prosecutor also added that petitioner's first act as judge was to hire a bailiff who had been terminated from juvenile court employment for beating a child. The combined impact of these two statements in opening sent an unmistakable, false, and misleading message to the jury: petitioner did not care about the children she was sworn to protect and actually put them at risk. Thus, there was no need for the special prosecutor to "right the scale" during his rebuttal closing because he had already unfairly tilted it in the state's favor during his opening. Moreover, the magistrate judge erred by even applying the invited response doctrine to petitioner's case. Because defense counsel did not argue improperly during closing when he asserted that the

charges petitioner faced were politically motivated, the invited response doctrine simply does not apply here.

Second, the magistrate judge overstated the likelihood that the trial judge's instruction to the jury – "what the lawyers say in argument is not evidence" – cured the harm. As will be discussed, the remarks at issue here – which unfairly and falsely suggested that petitioner posed a danger to the community, especially vulnerable children – were especially prejudicial and could not be cured with this weak instruction. The magnitude of the prejudice petitioner suffered from these comments required the trial judge to do more than simply tell the jury that statements in closing argument are not evidence. *See United States v. Solivan*, 937 F.2d 1146, 1157 (6th Cir. 1991) (reversing on prosecutorial misconduct grounds in part because curative instruction did not "sufficiently convey to the jury a sense of judicial disapproval of the remarks to dispel the harmful content and impact of the prosecutor's egregious statements."). Moreover, in addition to the four statements the magistrate found inflammatory, the special prosecutor made numerous other improper remarks that, while not objected to, were highly prejudicial to petitioner. Although the prosecutor's unobjected-to statements have been defaulted and cannot, in and of themselves, constitute the basis for habeas relief, they are relevant to the review of the record the court must undertake in assessing the prejudicial impact of the four statements the magistrate found improper. The prejudicial impact of the non-defaulted and defaulted instances of prosecutorial misconduct rendered the judge's instructions ineffective.

Third, the magistrate judge erred in concluding that "the fact the jury did not convict petitioner on the eight other charges against her militates against a finding that the special prosecutor's remark inflamed the jury against petitioner or prejudicially affected the jury in

reaching its verdict on the [lone conviction count]." Report and Recommendation at PAGEID # 5518. What the magistrate judge failed to consider in making that conclusion was whether those other charges were strong, weak, or entirely without basis. As will be discussed, the remaining charges were either entirely without a legal basis and should have been dismissed as a matter of law, or were very weak and should have resulted in acquittals. If anything, the fact that the jury hung on those eight counts suggests that the special prosecutor's inflammatory statements blaming petitioner for the non-existent sexual abuse of children and accusing her of not caring about victims caused some jurors to vote to convict on the eight charges for which they should have voted to acquit. In sum, the jury, unable to agree on eight of the charges, convicted petitioner on the one count not because the state had proven guilt beyond a reasonable doubt, but because the prosecution's assault on petitioner's character persuaded the jury it had to convict petitioner of something.

Fourth, the magistrate judge erred by concluding that the evidence of guilt on the lone conviction count was "strong and substantial." *Id.* Here, there was no evidence that petitioner intervened directly on behalf of her brother to help fend off his termination from Juvenile Court, such as by directing that he not be fired or insisting that he be reinstated. Instead, the state's theory was that she used the power and authority of her office to obtain documents, which she then gave her brother. As will be explained in more detail below, the evidence on this count was at best thing for the state because the prosecution never established the identity of the documents petitioner gave her brother, making it impossible

for the jury to ascertain whether she used her position as a Juvenile Court judge to help her brother.[3]

Finally, the magistrate judge erred in rejecting one of petitioner's arguments for de novo review of the prosecutorial misconduct claim, which could prove important if this court or the Sixth Circuit Court of Appeals overrules the magistrate's rationale for applying de novo review. Specifically, although the magistrate judge properly applied de novo review for the reasons set forth at PAGEID # 5504-5506, the magistrate incorrectly rejected petitioner's argument that de novo review also applied under 2254(d)(2), which requires de novo review where the state court adjudication of a federal claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. §2254(d)(2). Petitioner contends that the First District Court of Appeals made an unreasonable determination of the facts when it found that petitioner had "waived all but plain error" for her prosecutorial misconduct claim. As will be discussed below, the magistrate judge erroneously concluded that "2254(d)(2) applies only when the state court's ruling involves an unreasonable determination of the *facts* based on the evidence presented at trial." *Id.* at PAGEID # 5504 (emphasis in original). Contrary to the magistrate's conclusion, 2254(d)(2) also applies where the state court makes unreasonable factual findings regarding whether a habeas petitioner has waived an issue for review.

---

[3] Although petitioner disagrees with the state court's interpretation of the statute and what it forbids, she accepts that the statute's interpretation is a question of state, not federal, law. Moreover, while petitioner disagrees that the evidence was sufficient to support her conviction under the state court's interpretation of the statute, the more important point she seeks to make is that the evidence against her on that count was far from overwhelming, an important factor in considering whether she suffered harm as a result of the special prosecutor's inflammatory and improper statements.

Because the standard of review is an important threshold issue that must be addressed before reaching the merits, petitioner will discuss her objection to the magistrate judge's recommended disposition of petitioner's 2254(d)(2) argument first. Petitioner will then argue her objections to the magistrate judge's conclusion that the special prosecutor's misconduct was not prejudicial enough to require a new trial.

## II. OBJECTIONS

### A. The magistrate judge erred in rejecting petitioner's argument that 2254(d)(2) required de novo review.

A threshold question for this court to decide is whether to defer to the First District's decision rejecting petitioner's prosecutorial misconduct claim. If the claim was adjudicated on the merits, then this court may not grant relief unless the decision: "(1) resulted in a decision that was contrary to . . . clearly established [f]ederal law . . . or, (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Johnson v. Williams*, 133 S.Ct. 1088, 1091 (2013) (quoting 28 U.S.C. § 2254(d)). With respect to 2254(d)(2), if the state appellate court ruling resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented, then [the habeas] court exercises its independent judgment and reviews the claim *de novo.*" *Granger v. Hurt,* 215 Fed.Appx. 485, 489 (6th Cir. 2007) (citing *McKenzie v. Smith,* 326 F.3d 721, 727 (6th Cir. 2003)).

Citing "[t]he conflict in the Sixth Circuit case law" regarding whether plain error review constitutes an adjudication on the merits triggering AEDPA deference, the magistrate judge "assume[d], without deciding, that petitioner's . . . non-defaulted claims were not addressed on the merits and are subject to de novo review in this proceeding." Report and Recommendation at PAGEID # 5506 (citing *Leonard v. Warden, Ohio State Penitentiary*,

846 F.3d 832, 851 (6th Cir. 2017); *see also Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015), *cert. denied*, 137 S.Ct. 41 (2016)). Petitioner does not object to this portion of the magistrate judge's recommendation and agrees that the court should review petitioner's preserved prosecutorial misconduct claims de novo.

However, petitioner objects to the portion of the magistrate judge's recommendation rejecting one of the grounds petitioner offered for de novo review: that the state appellate court made an unreasonable determination of the facts in finding that petitioner "waived all but plain error," with respect to her prosecutorial misconduct claim. Contrary to the First District's finding, the record demonstrates that defense counsel objected sixteen times during the special prosecutor's rebuttal closing, including to the most inflammatory statements the special prosecutor made. Accordingly, petitioner argued in her reply that the First District's finding that she "waived all but plain error" was an unreasonable determination of the facts, thus justifying de novo review under 2254(d)(2). *See* Petitioner Tracie M. Hunter's Reply to Respondent Attorney General and Respondent The Honorable Patrick Dinkelacker's Answers, Doc. 32, PAGEID#: 5411. The magistrate judge rejected petitioner's argument, concluding that "2254(d)(2) applies only when the state court's ruling involves an unreasonable determination of the *facts* based on the evidence presented at trial." Report and Recommendation at PAGEID # 5504 (emphasis in original). It is unclear precisely what the magistrate judge meant by "the facts based on the evidence presented at trial." To the extent the magistrate judge was referring to evidentiary trial facts (e.g., witness testimony or other evidence offered at trial), the conclusion that 2254(d)(2) applies only to such facts is wrong.

Contrary to the magistrate judge's conclusion, nothing in the text of 2254(d)(2) restricts it to findings of evidentiary trial facts. Indeed, courts have applied 2254(d)(2) to

situations like petitioner's, where a state court has made an erroneous finding with regard to whether an issue was preserved for appeal.

*Salts v. Epps*, 676 F.3d 468 (5th Cir. 2012), supports petitioner's argument. There, one lawyer jointly represented a married couple – the Saltses – in their embezzlement trial. *Id.* at 472. On the morning of trial, the Salts' lawyer, who had just been retained, moved to continue the trial, contending that there was "an obvious conflict of interest between the Defendants," and that one lawyer could not represent both. *Id.* The trial judge refused to continue the case, and defense counsel represented both of his clients at trial. *Id.* The jury convicted both defendants. *Id.* The state appellate court held that the Saltses had waived their objection to joint representation. *Id.* at 475. Citing 2254(d)(2), the Fifth Circuit concluded that the state court's waiver determination "was an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding." *Id.*[4]

*Washington v. Jarvis*, 307 F.Supp.2d 794 (E.D. Va. 2004), also supports petitioner's argument. Washington claimed in federal habeas that his second criminal trial for robbery and use of a firearm, after the state trial judge declared a mistrial during his first trial, violated his Fifth Amendment right against double jeopardy. *Id.* at 795. There, the trial judge sua sponte declared a mistrial after the jury had been empaneled and sworn because of a potential shortage of jurors. *Id.* At Washington's second trial, a jury convicted him of the offenses. *Id.* at 796. The state appellate court reversed Washington's conviction on Double Jeopardy grounds. *Id.* The state supreme court, however, reversed and reinstated

---

[4] *Salts* also involved a state appellate court decision that was contrary to clearly established federal law justifying de novo review under 2254(d)(1). *Id.* at 476-479. Although the Fifth Circuit concluded that the state appellate court had made an unreasonable determination of the facts regarding the waiver issue, *id.* at 475, it justified de novo review based only on 2254(d)(1). *Salts* is nonetheless useful in illustrating that 2254(d)(2) applies to unreasonable state court findings of waiver.

Washington's convictions after "holding that Washington had consented to the mistrial by not explicitly objecting to it, thereby waiving his double jeopardy argument." *Id.*

However, contrary to the state supreme court's holding, the record revealed that defense counsel specifically objected to the granting of a mistrial, and twice after the mistrial had been granted, stated that the Double Jeopardy Clause might bar retrial. Citing 2254(d), the federal habeas court held that the state supreme court's "finding that Washington failed to object to the trial judge's *sua sponte* declaration of a mistrial was an unreasonable determination of the facts." *Id.* at 807. The state supreme court's decision was unreasonable, the habeas court added, "because the court relied on facts that are not evidenced by the trial transcripts . . .." *Id.* at 810.[5]

Here, the First District Court of Appeals, as did the state appellate courts in *Salts* and *Washington*, made an unreasonable determination of the facts with respect to whether petitioner had waived claims for appellate review. Specifically, the First District's finding that petitioner "waived all but plain error" is akin to the unreasonable factual determination in *Salts*, that the Saltses had waived their objection to joint representation, and the unreasonable factual determination in *Washington*, that Washington failed to object to court's decision to grant a mistrial after the jury had been empaneled and sworn. The habeas courts in *Salts* and *Washington* both concluded that the state courts' waiver findings constituted unreasonable determinations of the facts. *Salts v. Epps*, 676 F.3d at 475; *Washington v. Jarvis*, 307 F.Supp.2d at 810. Here, this court should hold that the First District's finding that petitioner "waived all but plain error" was an unreasonable determination of the facts in

---

[5] For reasons not relevant here, the habeas court in *Washington* also held, alternatively, that the state supreme court's decision was also an unreasonable application of existing federal law. *Id.* at 796.

light of the record, which shows that defense counsel objected to sixteen alleged instances of prosecutorial misconduct, including the special prosecutor's most inflammatory statements.

In sum, this court owes no deference to the First District's disposition of petitioner's non-defaulted prosecutorial misconduct claims. The First District's unreasonable factual determination that petitioner "waived all but plain error" triggers de novo review under 2254(d)(2).

### B. The Magistrate Judge Erred in Applying the Invited Response Doctrine.

The magistrate judge correctly concluded that the special prosecutor made four statements during the rebuttal closing that "were inflammatory and thus had a tendency to mislead the jury." Report and Recommendation at PAGEID#: 5513. The Report and Recommendation lists those four statements as follows:

1. "Maybe what Deters has to listen to is the social worker who says this child is being sexually abused and we can't get this child out of the home because we can't get Judge Hunter to rule on the case." (Doc. 13, Trial Tr. 3816, at PAGEID#: 4519).

2. "And the people that are adversely affected can't appeal it because she won't put on the final appealable order, so the child who is still stuck in the home where there is sexual abuse until she –" (Doc. 13, Trial Tr. 3857-58, at PAGEID#: 4560-61).

3. "Now he [defense counsel] says she didn't want juveniles identified by their names under any circumstances and guess who had a problem immediately? Well, of course, these juveniles just happen to be the six kids who beat some guy up and hospitalized him in North College Hill because they were bored. It just so happens that those kids –" (Doc. 13, Trial Tr. 3810, at PAGEID#: 4513).

4. "July was not a very good month for Tracie Hunter because on July 9th her brother [had] beat up an inmate at the detention center. And, of course, it's awfully coincidental when people look at whether Hunter cares if a juvenile gets beat up in the detention center and how much she cares about everybody and her first hire was the bailiff who had been terminated for beating children." (Doc. 13, Trial Tr. 3861, at PAGEID#: 4564).

Report and Recommendation at PAGEID#: 5511 (citation format in original).

Additionally, based on her review of the record, including alleged instances of prosecutorial misconduct to which the defense did not object, the magistrate judge concluded that these four statements "were not isolated and were deliberately made." Report and Recommendation at PAGEID#: 5513. Although the magistrate judge did not specifically discuss it, one of the defaulted instances of misconduct concerned an additional statement blaming Judge Hunter for allowing children to be sexually abused:

> They talk about Deters being so upset * * *
>
> He has an obligation to see that the children who are being sexually abused in homes are removed from the homes. He has an obligation to see the children who are being physically abused are removed from the homes.
>
> He has an obligation to see the children that are in drug-infested homes, who are not being treated properly, who are not nourished to remove them from those homes. That's what he has an obligation to do, to see that children are protected, that victims get recompense, and that violent offenders are taken off the street so that they can't reoffend and commit other crimes.

(Tr. Vol. 31, Oct. 7, 2014, at 3813-15, Doc. 13-31, PAGEID#: 4516-4518.)

However, citing *United States v. Young*, 470 U.S. 1 (1985), the magistrate judge found that the four inflammatory and improper remarks "were 'invited' responses to the many hyperbolic statements that defense counsel made in his own opening statement and closing argument." Report and Recommendation at PAGEID#: 5513. The magistrate judge then concluded that "[d]efense counsel's comments . . . opened the door for the special prosecutor's remarks and lessened the effect the statement[s] had on the jury's ability to evaluate the evidence fairly." *Id.* at 5517-18.

Specifically, with respect to the special prosecutor's two statements blaming petitioner for children being sexually abused, the magistrate judge found that those

statements "constituted a direct response to defense counsel's extensive attack on the allegedly vindictive motives of the Hamilton County Prosecutor's Office and Hamilton County Public Defender and defense counsel's contrasting portrayal of petitioner as the innocent victim . . . ." *Id.* at 5514. Additionally, according to the magistrate judge, the special prosecutor's inflammatory references to petitioner's hiring a bailiff who had been terminated for beating a child, "was made in response to many statements by defense counsel in both his opening statement and final argument to the effect that petitioner's actions . . . were done out of concern for the juveniles' safety and their welfare." *Id.* at 5516. Finally, according to the magistrate judge, the special prosecutor's statement that petitioner cared more about protecting the identities of juveniles than the victim they had beaten because they were bored was made in response to defense counsel's accusation that the charges were politically motivated.

### 1. The magistrate judge erred in finding that the four inflammatory statements were made in response to defense arguments.

None of the four statements the magistrate judge found inflammatory or improper can fairly be construed to have been made in response to defense arguments. Regarding the prosecutor's two statements falsely blaming petitioner for children being sexually abused, the special prosecutor foreshadowed that argument in opening – before the defense had the opportunity to say anything. Specifically, the special prosecutor told the jury that juveniles were "suffering" as a result of petitioner's alleged delays in deciding cases. Tr. Vol. 13 at 847, Doc. 13-13, PAGEID#: 1550. This statement was essentially the same argument the special prosecutor made during rebuttal, minus the specific reference to sexual abuse. Thus, under these circumstances, it was wrong for the magistrate judge to conclude that the special prosecutor's remark in rebuttal that petitioner needlessly caused children to be sexually

abused merely responded to defense counsel's claim that petitioner was the victim of politically motivated charges, when in reality the special prosecutor made essentially the same point in opening. The record simply does not support the magistrate judge's conclusion that the defense invited the prosecutor's remarks about sexual abuse.

Similarly, with respect to the special prosecutor's statement that petitioner had hired a bailiff who had beaten a child, the prosecutor made that statement for the first time in opening, not during rebuttal in response to anything defense counsel said. Specifically, during his opening, the special prosecutor said:

> She noted to people that she wanted to hire her own bailiff, which was her right to do, and she indicated that she wanted to hire Mr. Avery Corbin, which was her right to do. People from the juvenile court were concerned and indicated to her that she might want to rethink that. And the reason that she might want to rethink hiring Avery Corbin as her bailiff is because he had been terminated from juvenile court some 20 years earlier, I believe, for physically abusing a child. * * * [T]hey also indicated to her that they were concerned that if this became public it could snap back adversely, not just on her, but more importantly snap back adversely on the court and the community that you're hiring people as bailiffs that had been terminated for physically abusing children. His personnel file contained a notation, not eligible for rehire because of physical abuse. Judge Hunter, as was her right, persisted in hiring Avery Corbin.

*Id.* at 795-96 PAGEID# 1498-1499. There was no reason for the special prosecutor to make this statement other than to tarnish petitioner's character in the eyes of the jury, for the remarks were completely irrelevant to the charges petitioner faced. More importantly, for purposes of the invited response doctrine, the fact that the special prosecutor made this statement first in opening before repeating it in closing belies the magistrate judge's finding that the prosecution was simply responding to defense counsel's closing when the special prosecutor made a statement along these same lines during the rebuttal closing.

Lastly, the only contested remark not first made during the special prosecutor's opening was his statement that petitioner cared more about protecting the identities of the six juveniles who beat a homeless man than doing justice for their victim. But that statement is in no way directly responsive to anything defense counsel said in closing and was inconsistent with petitioner's statutory responsibility to act in the "best interest" of children. Although the magistrate judge concluded that this statement responded to defense counsel's argument that the charges were politically motivated, it is hard to see how.

Indeed, the fact that petitioner sought to protect the identities of juveniles appearing before her does not rebut defense counsel's contention that the charges were politically motivated. This comment is particularly outrageous because it misled the jury by suggesting that the primary goal of the juvenile court is to protect the community from crime and punish children who commit it, rather than rehabilitating children who run afoul of the law. *See In re Anderson*, 92 Ohio St.3d 63, 66 (2001) ("Punishment is not the goal of the juvenile system, except as necessary to direct the child toward the goal of rehabilitation.") (internal quotation and citation omitted). Although the juvenile system's purpose was not relevant to the charges petitioner faced, the special prosecutor nonetheless used this irrelevant issue to assassinate petitioner's character by insinuating that she did not care about protecting the public from violent juvenile offenders. The invited response doctrine does not permit prosecutors to launch offensive attacks of this manner. *See United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 284-85 (3d Cir. 1999) (noting that the invited response doctrine should not be used as a "springboard" to "launch[] affirmative attacks upon defendants") (internal quotation and citation omitted).

Thus, defense counsel invited none of the four statements the magistrate judge found inflammatory and improper.

**2.   *Young's* invited response doctrine does not apply where the defense makes no improper argument.**

The invited response doctrine is inapplicable here for another reason: defense counsel did not argue improperly during his closing argument, as the magistrate judge implied. Indeed, in *United States v. Young*, 470 U.S. 1 (1985), the Supreme Court made clear that misconduct by the defense is required before the invited response doctrine can apply.

In *Young*, defense counsel, while pointing at the prosecutor, said: "I submit to you that there's not a person in this courtroom including those sitting at this table who think [*sic*] that Billy Young intended to defraud Apco." *Id.* at 4-5. Later, defense counsel said Young was "the only one in this whole affair that has acted with honor and integrity." *Id.* at 5. The prosecutor did not object to either statement, but instead responded in kind.

Addressing defense counsel's first statement, the prosecutor argued: "I think [defense counsel] said that not anyone sitting at this table thinks that Mr. Young intended to defraud Apco. Well, I was sitting there and I think he was. * * * If we are allowed to give our personal impressions *since it was asked of me*." *Id.* at 5 (emphasis in original).

With respect to defense counsel's "honor and integrity" remark, the prosecutor responded:

> I don't know whether you call it honor and integrity. I don't call it that, [defense counsel] does. If you feel you should acquit him for that it's your pleasure. I don't think you're doing your job as jurors in finding facts as opposed to the law that this Judge is going to instruct you, you think that's honor and integrity then stand up here in Oklahoma courtroom [*sic*] and say that's honor and integrity; I don't believe it.

*Id.* at 5-6. The defense did not object to either statement.

The Supreme Court noted that Young's trial "was but one example of an all too common occurrence in criminal trials – the defense counsel argues improperly, provoking the prosecutor to respond in kind." *Id.* at 11. Although the Court concluded that the prosecutor erred by stating his personal beliefs about Young's guilt and whether Young acted with integrity, the Court also found that the defense had "breach[ed] . . . ethical standards" by telling the jury that the prosecutor did not believe Young to be guilty, and by "defense counsel's repeated attacks on the prosecution's integrity." *Id.* at 17-18. The Court ultimately held that that the prosecutor's argument, "although error, did not constitute plain error" requiring reversal of Young's conviction, *id.* at 20, because the jury understood the prosecutor's improper arguments for what they were: "a defense of his decision and his integrity" after defense counsel had improperly attacked him. *Id.* at 19. In other words, the prosecutor's improper arguments "did no more than respond substantially in order to 'right the scale.'" *Id.* at 12-13.

In this case, nothing defense counsel said in closing constituted misconduct or was otherwise improper. Petitioner had a Sixth Amendment right to present a defense. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal quotation and citations omitted)). Petitioner's defense was that all nine charges she faced were politically motivated and vindictive and she had committed no crimes. Provided there is evidence in the record to support the assertion, there is nothing inherently improper about defense counsel arguing that charges are politically motivated. *See United States v. Roberts*, 79 Fed.Appx. 368, 372 (10th

Cir. 2003) (rejecting ineffective assistance of counsel claim because defense counsel's cross-examination of the victim was consistent with the defense theory that the charges were politically motivated).

Here, defense counsel had a factual basis to argue in closing that the charges petitioner faced were politically motivated. The testimony of prosecution witnesses James Harper and Katie Pridemore and defense witness Todd Portune established the following facts from which a jury could infer that politics played a role in Hamilton County Prosecuting Attorney Joe Deters' decision to appoint a special prosecutor to investigate and prosecute petitioner:

- Petitioner, a Democrat, was involved in a hotly contested election with her Republican opponent to serve as a judge on the Hamilton County Juvenile Court. Tr. Vol. 15, Sep. 12, 2014, at 1214-1216, Doc. 13-15, PAGEID#: 1917-1919.

- After the vote tally was announced on election night, petitioner, a Democrat, trailed her Republican opponent by a few votes. Tr. Vol. 14, Sep. 11, 2014, at 1004, Doc. 13-14, PAGEID#: 1707.

- Petitioner sued the Hamilton County Board of Elections claiming that certain votes should have been counted but were not. *Id.*; Tr. Vol. 27, Oct. 1, 2014, at 2981, Doc. 13-27, PAGEID#: 3684.

- The Office of Hamilton County Prosecuting Attorney Joseph T. Deters represented the Board of Elections in the vote-count litigation. Tr. Vol. 14 at 974, 1002, 1011, PAGEID#: 1677, 1705, 1714; Tr. Vol 15 at 1217, PAGEID#: 1920; Vol. 27 at 2982, PAGEID#: 3685.

- Petitioner eventually prevailed and took the bench after a year and a half of litigation that cost $900,000 and resulted in the disputed votes being counted. Tr. Vol. 15 at 1253, PAGEID#: 1956.

- There was acrimony between petitioner and the prosecutor's office after she took the bench. Tr. Vol. 27 at 3027-3029, PAGEID#: 3730-3732.

- Petitioner held an assistant prosecutor in contempt after he disobeyed a discovery order. Tr. Vol. 18, Sep. 17, 2014, at 1693-94, 1711, 1720, PAGEID#: 2397, 2414, 2423.

- Petitioner did not want the prosecutor's office to represent her in certain writ cases the media and the Office of the Public Defender had filed against her because she believed the prosecutor's office had a conflict of interest stemming from its role representing the Board of Elections in the election litigation. Tr. Vol. 15 at 1254-1255, 1268, PAGEID#: 1957-1958, 1971; Tr. Vol. 16, Sep. 15, 2014, at 1348, PAGEID#: 2041; Tr. Vol. 27 at 2986, PAGEID#: 3689.

- The prosecutor's office refused to withdraw from representation. Tr. Vol. 16 at 1393-1394, PAGEID#: 2096-2097; Tr. Vol. 27 at 2987, 2998, PAGEID#: 3690, 3701.

- After the prosecutor refused to withdraw, petitioner filed a grievance with the Ohio Supreme Court alleging that Prosecuting Attorney Joe Deters, Harper, and one of their colleagues had acted unethically in refusing to withdraw from the case given their conflict of interest. Tr. Vol. 15 at 1234, 1241, PAGEID#: 1937, 1944.

- The grievances petitioner filed struck a nerve in the prosecutor's office, prompting Harper to testify that "[t]here sure should be" consequences for someone who sullies another lawyer's reputation by filing an ethics complaint. Tr. Vol. 15 at 1240, PAGEID#: 1943.

This testimony provided a sufficient factual basis for the defense to argue that petitioner's prosecution was politically motivated and vindictive. *See United States v. Woods*, 486 F.3d 781, 788 (3d Cir. 2007) ("Notably, [w]e have generally found the invited response doctrine to be applicable only in instances where the prosecution team was attacked for reasons unsupported by the evidence at trial.") (internal quotation and citation omitted; brackets in original)). Thus, there is no need to invoke the invited response doctrine to determine whether the prosecutor's inflammatory and improper remarks "did no more than respond substantially in order to 'right the scale.'" *Young*, 470 U.S. at 12-13.

To be clear, the prosecution had a right to counter petitioner's defense theory with proper arguments. *See United States v. Henry*, 545 F.3d 367, 380-81 (6th Cir. 2008) (holding that prosecutor engaged in no misconduct during rebuttal argument when he told the jury that only after interviewing the co-conspirators did he determine what if any sentencing reductions to recommend for each witness; such argument "was a proper response to defense counsel's contention that the government's witnesses were lying in order to receive sentence reductions.").[6] However, the special prosecutor had no right to respond to petitioner's argument with inflammatory and improper statements, such as by telling the jury repeatedly

---

[6] The magistrate judge cited *Henry* during its discussion of the invited response doctrine. Report and Recommendation at PAGEID# 5507, 5512-13. Although *Henry* discusses the invited response rule, that case, unlike *Young*, did not involve improper prosecution or defense argument. Thus, *Henry* merely stands for the proposition that the prosecution is entitled to respond to defense argument with proper arguments of its own, a point petitioner does not dispute.

that petitioner caused children to suffer sexual abuse. *See Young*¸ 470 U.S. at 14 (finding that the prosecution's remarks "crossed the line of permissible conduct established by the ethical rules of the legal profession.").

In sum, where defense misconduct in closing provokes the prosecution to respond in kind, the issue is "not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *Id.* at 12. But because there was nothing improper about defense counsel's contention that the charges were politically motivated, there was no need for the prosecution to inflame the passions of the jury in order to "right the scale."

**3.  Even if the invited response doctrine applies, the special prosecutor's inflammatory statements went far beyond righting the scale.**

Even if the invited response doctrine applies to petitioner's case, the magistrate judge erred in concluding that the special prosecutor's inflammatory statements merely "righted the scale." *Young* is instructive.

As *Young* makes clear, improper prosecution statements during closing "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *Young*, 470 U.S. at 12. There, the Court analyzed the prosecutor's improper comments – telling the jury that he believed Young was guilty and did not act with honor and integrity – in light of defense counsel's improper arguments that the prosecution did not believe Young was guilty and that Young was the only person in the case who had acted with honor and integrity. *Id.* at 16-18. Yet, although holding that the prosecution's misconduct did not rise to plain error requiring reversal of Young's conviction, *id.* at 20, the Supreme Court noted nevertheless that the prosecution's invited response "went beyond what was necessary to 'right the scale in the wake of defense counsel's misconduct,"

concluding that "the prosecutor's first error was in failing to ask the District Judge to deal with defense counsel's misconduct." *Id.* at 14.

Here, the context of the entire trial reveals that the special prosecutor engaged in far more egregious misconduct than did the prosecutor in *Young*, who "went beyond what was necessary to 'right the scale.'" *Id.* First, well before his rebuttal closing argument, the special prosecutor unfairly tilted the scale in the state's favor by telling the jury in opening that petitioner caused children to needlessly suffer and had hired a bailiff who had been previously fired from Juvenile Court employment for beating a child. This one-two punch powerfully communicated to the jury a theme the prosecution would build upon during the rebuttal closing: petitioner posed a danger to vulnerable children and should be removed from office.

Second, the prosecution further exploited this theme during the rebuttal closing by injecting into the case the highly inflammatory specter of children being sexually abused as a result of petitioner's alleged delays in deciding cases, despite there being no evidence that any such abuse had occurred on petitioner's watch, nor any reason such statements were relevant to the pending charges. The special prosecutor made this argument not once, not twice, but three times during the rebuttal closing, drawing defense objections to two of these highly inflammatory remarks. There was no need whatsoever for the special prosecutor to argue that petitioner was responsible for children being sexually abused. To the extent that the prosecution was attempting to explain why Hamilton County Public Defender Ray Faller filed writ cases against petitioner for her alleged failure to rule expeditiously on her cases, then it should have simply used Faller's explanation that he filed the writs to force Judge Hunter to make a ruling. Tr. Vol. 17 at 1469, PAGEID#: 2172. At no time did Faller

indicate that children were being sexually abused as a result of petitioner's alleged delays in deciding cases. The special prosecutor went too far in laying responsibility for children being sexually abused at petitioner's feet.

The context of the entire trial also included the numerous instances of inflammatory and improper comments to which the defense did not object. Although petitioner defaulted these claims, the court can – and should – consider them as they bear on the question of whether the four statements at issue here were prejudicial in light of the entire trial record. *See United States v. Payne*, 2 F.3d 706, 712 (6th Cir. 1993) ("If the court finds prosecutorial misconduct, the court must then consider whether, on the entire record, the misconduct can be said to be harmless.") (citing *United States v. Krebs,* 788 F.2d 1166, 1177 (6th Cir. 1986) (citing *United States v. Leon*, 534 F.2d 667, 662 (6th Cir. 1976)).

Other instances of prosecutorial misconduct, to which the defense did not object, include the following statements:

- "[Deters] has an obligation to see that the children who are being sexually abused in homes are removed from the homes. He has an obligation to see the children who are being physically abused are removed from the homes.

  He has an obligation to see the children that are in drug-infested homes, who are not being treated properly, who are not nourished to remove them from those homes. That's what he has an obligation to do, to see that children are protected, that victims get recompense, and that violent offenders are taken off the street so that they can't reoffend and commit other crimes." Vol. 31Tr. 3814-3815, PAGEID#: 4517-4518.

- "The very first decision she made as a juvenile court judge . . . was to hire as her bailiff someone who had been terminated for beating up a child." Tr. Vol. 31, 3812-13, PAGEID#: 4515-4516.[7]

---

[7] Although defense counsel did not object to this particular statement, he did later when the prosecutor made the same point a second time.

- "Well let me ask you this: How come [petitioner] could be so smart about everything else, but so dumb that she doesn't understand what the law is as a judge?" Vol. 32, Tr. 3902, PAGEID#: 4606.

- "And I have been practicing criminal law for 40 years. I have never prosecuted a case. Frankly, the thought never crossed my mind that I would ever prosecute a criminal case. Mr. Shiverdecker has been practicing law because he is a lot older than I am, 42 years. And he has practiced criminal law for the last 30, 31, 32 years. Do you believe that what we would do is trample on every belief we have ever held, on every argument we ever made that defendants are entitled to a fair trial, that defendants are entitled to have cases proven against them beyond a reasonable doubt, that the evidence should be competent from the witness stand and it should not be coached? Do you think that we as the people would argue that all day long would trample on someone's rights and then go back to the defense bar as co-conspirators with the prosecutors for goodness sake?" Vol. 31 Tr. 3795-96, PAGEID#: 4498-4499.

- "Well, when all else fails Clyde has a defense. He has a defense mechanism and he calls it the nuclear bomb. So what he does basically is he will have somebody come to him that gets charged with shoplifting in K-Mart and they look up and he says what happened? They say well, I stole a pad of paper and I stole a box of pencils and I got caught and they have got me on videotape and I confessed. What are we going to do? Clyde looks at him and I mean they have got him on videotape, he confessed, they have got witnesses. I know. We are going to go with the nuclear bomb option.

  So what he does he looks up and puts a witness on the stand. The first witness looks up and says I'm a security guard there. I saw this man come in. He stole a box of pencils and he stole a pad of paper and here's the pictures and here's his confession. Clyde goes okay, fine.

  Well, let me ask you question: If I told you he was a nuclear physicist what would you say? He says well, I don't know what I would say. Clyde says well, if I told you he was a nuclear physicist could you tell me that he is not a nuclear physicist? The guy says no. Clyde says is a nuclear physicist. [sic]. Then he looks up says what if I also told you he works for the CIA, he is a spy for the CIA, could you prove he wasn't? He says I couldn't prove he wasn't. Clyde goes he's a spy for the CIA.

  Then he looks up and says now, if the Russians have a bomb here in the United States and it's going to blow up in two days, if this man is an [sic] CIA agent goes to the defuse it[sic], could you prove that's wrong? Well, I don't know if it's right or wrong. There is a bomb in America.

23

Then he looks up and he says, if I told that you in order to defuse that bomb he needs a pad and paper, could you prove he didn't need a pad and paper to work the formulas? I couldn't disprove it. He needs papers and pencils.

Now let me ask you something: If I told you he had [a] 6-year-old child [who] was in kindergarten who stole his pencil and paper at home, could you dispute that? I can't dispute it. Well, his 6-year-old stole a pencil and paper.

Clyde looks up, yeah, he did. The guy had to steal his pencil and paper to save the world and that's essentially what he is going on here because what he had done he has continually and repeatedly asked questions, people told him they didn't know the answer, he then assumed when they tell him that he can't disprove it he assumes that it's fact and that's what he is arguing with on all of these things that he is talking about. Whether it's time or whatever, that is what he has done here." Vol. 31, Tr. 3823-26, PAGEID#: 4526-4529.

In sum, the prejudice petitioner suffered from the four statements the magistrate judge found improper caused enough prejudice to require reversal of petitioner's convictions. Those statements, viewed in context, went beyond what was necessary to respond to any of defense counsel's argument. If the court also takes into account the harm petitioner suffered as a result of the improper arguments the defense did not object to, it is evident that those statements further tilted the scale unfairly in the state's favor. Thus, the petitioner suffered overwhelming prejudice as a result of the four inflammatory statements the magistrate judge found improper.

### C. The Magistrate Judge Erred by Concluding that the Trial Judge's Instruction – "What the Lawyers Say in Closing Is Not Evidence" – Cured the Harm.

The magistrate judge concluded that "[a]ny potential prejudice from the special prosecutor's remarks was likely dispelled by the court's instruction" that the lawyer's arguments were not evidence. Report and Recommendation at PAGEID#: 5518. However,

given the circumstances of this case, the trial judge's weak instruction was insufficient to cure the harm from the special prosecutor's inflammatory and improper remarks.

*United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991), is instructive. There, the special prosecutor asked the jury to tell Solivan, who had been charged with drug dealing, "and all of the other drug dealers like her – (defense counsel's objection and Court's response omitted) – [t]hat we don't want that stuff in Northern Kentucky . . . ." *Id.* at 1148 (parenthetical description of omission in original). The court then took a recess, during which the court discussed the defense objection. *Id.* When the proceeding resumed, the court admonished the jury as follows: * * * Do not consider any urgings by the prosecutor to send messages to anybody. We're not here to send messages to anybody. We're here to try this defendant's case." *Id.* at 1149. The district court further explained that the jury had to decide the case based on the evidence presented and then reiterated that it was the jury's duty to acquit if the state failed to prove its case beyond a reasonable doubt." *Id.* The jury convicted Solivan on all counts. *Id.*

The Sixth Circuit reversed the conviction on prosecutorial misconduct grounds, finding the prosecutor's "send a message" comment particularly "egregious." *Id.* at 1157. The Court began its analysis by noting that "[t]here are instances where a 'single misstep' on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." *Id.* at 1150 (citing *Pierce v. United States*, 86 F.2d 949 (6th Cir. 1936)).

Addressing the prosecutor's argument that the district judge's instruction cured the harm, the Sixth Circuit disagreed. *Id.* at 1156. The Court explained, "We examine the curative effect, if any, of the cautionary instruction to the jury in the light of the degree and effect of the prejudice. However, an error may be so prejudicial that no cautionary

instruction, however swiftly and forcibly given, can safely eradicate its effect." *Id.* (citing *Pierce*, 86 F.2d at 952-53). The Court concluded that the district judge's instructions "were insufficient and came too late to mitigate the negative and highly prejudicial impact of the remarks on the jurors' minds, especially since the remarks were among the final arguments presented to the jurors prior to their deliberations." *Id.* at 1156.

With regard to the insufficiency of the instructions, the Court criticized it for failing to "convey to the jury a sense of judicial disapproval of the remarks to dispel the harmful content and impact of the prosecutor's egregious statements." *Id.* at 1157. However, even if the district judge had immediately and forcefully instructed the jury to disregard the remarks, the Court "doubt[ed] seriously that any cautionary instruction could have safely eradicated the highly prejudicial effect of the prosecutor's statements in this case." *Id.* In another case, the Court described the insufficiency of statements-by-lawyers-are-not-evidence instruction, concluding that if such a "generic" instruction were sufficient to cure all harm, "there would never be a viable claim for prosecutorial misconduct, because the most basic of instructions would cure the potential for an inflamed jury." *Cauthern v. Colson*, 736 F.3d 465, 477 (6th Cir. 2013).

Here, the special prosecutor engaged not in a single misstep, but a litany of them calculated to inflame the jurors' passion and turn them against petitioner. The four statements the magistrate judge found inflammatory and improper unfairly and untruthfully painted petitioner as an incompetent judge who was unfit to hold office. The statements did so by depicting petitioner as a judge who allowed children to be sexually abused, who hired a bailiff who had once been terminated for beating a child, and who cared more about protecting juveniles' identities than safeguarding the community. These comments,

individually and collectively, told the jury that petitioner did not care about children or the broader community. *See also Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005) (improper for prosecutor to suggest that jury consider "bad character as a thumb on the scale in favor of a finding of guilt").

Moreover, the statements blaming petitioner for permitting sexual abuse were particularly inflammatory. As courts recognize, "[c]ases involving sexual abuse exert an almost irresistible pressure on the emotions of the bench and bar alike." *Martin v. Parker*, 11 F.3d 613, 616 (6th Cir. 1993). Thus, the degree and effect of this prejudice was especially strong. And here, as in Martin, "the evidence of guilt is at best conflicting," and thus "prosecutorial misconduct of this kind rises to the level of a constitutional deprivation, denying the defendant a fundamentally fair trial." *Id.* Although the trial judge in petitioner's case immediately instructed the jury following each defense objection, the instruction, like the instruction in *Solivan*, failed to convey "a sense of judicial disapproval" of the special prosecutor's comments. Telling the jury, as the trial judge did here, that "what the lawyers say in argument is not evidence," or "same instruction," was remarkably insufficient to cure the egregious harm.

While an argument-is-not-evidence instruction may sometimes cure the prejudice resulting from a prosecutor's improper argument,[8] it not only failed to cure the harm

---

[8] The magistrate cited *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), as an example of a case where the Sixth Circuit noted that a closing-arguments-are-not-evidence instruction could cure prejudice resulting from a prosecutor's improper argument. *Id.* at 306. As the magistrate also acknowledged, however, the district court also told the jury to disregard the prosecutor's personal opinions. *Id.* The Sixth Circuit described these instructions as "forceful." *Id.* By contrast, the only instruction the trial judge gave when defense counsel objected to the special prosecutor's misconduct during the rebuttal closing was "What the lawyers say in argument is not evidence," or the shorthand, "Same instruction." For the reasons discussed above, this instruction by itself was insufficient and hardly forceful.

petitioner suffered, but it also exacerbated the harm by not conveying to the jury that the remarks were improper and should be disregarded. Furthermore, because the remarks were so outrageous, it is doubtful that any cautionary instruction could have eradicated the highly prejudicial effect of the prosecutor's statements. Therefore, the magistrate judge was wrong to conclude that the instruction was curative, given the extent of the prejudice petitioner experienced as a result of the special prosecutor's repeated inflammatory attacks on her character during the rebuttal closing.

### D. The Magistrate Judge Erred by Concluding that the Jury's Deadlock on Eight of the Counts Indicates that the Prosecutor's Misconduct Did Not Sway the Jury to Convict.

The magistrate judge concluded that "the fact that the jury did not convict petitioner on the eight other charges against her militates against a finding that the special prosecutor's remark inflamed the jury against petitioner or prejudicially affected the jury in reaching its guilty verdict on the one charge contained in Count 6." Report and Recommendation at PAGEID#: 5518. The magistrate judge, however, should not have made this finding without first analyzing the strength of the evidence on those other eight counts, which the magistrate judge failed to do. As explained below, whether those other counts were weak or entirely baseless is relevant to determining what the failure of the jury to convict on those charges means.

#### 1. The So-Called "Backdating" Charges

Counts One and Three of the original indictment charged petitioner with Tampering with Evidence, and Counts Two and Four charged her with Forgery. With respect to these four counts, the state's theory, as it would later tell the jury in opening statement, was that petitioner committed these offenses when she backdated entries to deprive the prosecutor's

office of its opportunity to appeal rulings in two cases. Tr. Vol. 13, Sep. 10, 2014, at 820-830, Doc. 13-13, PAGEID#: 1523-1533.

According to the special prosecutor, petitioner did not want those rulings appealed because the prosecutors "had been appealing her regularly and the Court of Appeals had been overturning her appeals," and "she was upset with the Court of Appeals because the Court of Appeals had found her in contempt." *Id.* at 824, PAGEID#: 1527. Thus, according to the special prosecutor, petitioner in one of the cases journalized an entry on August 22 but made it appear on the journal "as if it was signed on July 23 and slipped in . . . chronological order between a lot of other cases showing, or appearing to show, it had been there since July 23." *Id.* at 822-23, PAGEID#: 1525-1526. In the other case, the special prosecutor told the jury in opening that petitioner signed and journalized an entry dated August 12 that was actually created on August 19. *Id.* at 828, PAGEID#: 1531.

But there were problems with the prosecution's theory, as would become evident later in the trial. First, what the prosecution did not tell the jury in opening was that the practice of juvenile court judges was to match the date of an entry to the earlier date of the particular hearing at issue. Lisa Miller, who worked as petitioner's case manager, Tr. Vol. 24, Sep. 26, 2014, at 2485, Doc. 13-24, PAGEID#: 3188, and was responsible for creating petitioner's entries, and who was trained to do entries by a Juvenile Court supervisor, *id.* at 2507, PAGEID#: 3210, told the jury that she "understood it to be" the norm to put the hearing date on an entry created after the hearing. *Id.* at 2506, PAGEID#: 3209. To underscore the point, defense counsel then showed Miller dozens of entries in petitioner's cases which Miller, her supervisor and another case manager had date-matched to reflect the earlier hearing date. *Id.* at 2513-2585, PAGEID#: 3216-3288; Tr. Vol. 25, Sep. 29, 2014, at 2644-2664, Doc. 13-25,

PAGEID#: 3347-3367; 2667-2691, PAGEID#: 3370-3394; 2693-2707, PAGEID#: 3396-3410.

Second, as a matter of law, neither petitioner nor any other Juvenile Court judge could have deprived the state of the right to appeal by date-matching the entry to the earlier hearing date. Margie Slagle, an appellate attorney with the Hamilton County Public Defender's Office, Tr. Vol. 26, Sep. 20, 2014, at 2918, Doc. 13-26, PAGEID#: 3621, explained to the jury that because juvenile cases are civil, not criminal matters, the clerk of courts has to journalize the entry and then serve it on the parties before the time for appeal starts to run. *Id.* at 2930-2933, PAGEID#: 3633-3636. In support of her opinion, Slagle referenced Civil Rule 58, which is entitled "Entry of Judgment." (*Id.* at 2937, PAGEID#: 3640). Slagle testified:

> Well, what it says under [Rule58](A) is that a judgment is effective only when
> entered by the clerk upon the journal. And then it also says it is subject to
> Rule 54(B). So then have you [sic] to look at Rule 54(B) and that says: when
> the court signs a judgment, the Court shall endorse thereon a direction to the
> clerk to serve upon all parties notice of the judgment and its date of entry
> upon the journal. Within three days of entering the judgment upon the
> journal, the clerk shall serve the parties in a manner prescribed by Civil Rule
> (5)(B) and note the service in the appearance docket. * * *

Tr. Vol. 26, Sep. 30, 2014, at 2937-2938, PAGEID#: 3640-3641.

Slagle also discussed Ohio Supreme Court cases that made clear that an entry in Juvenile Court did not become a final appealable order until the clerk journalizes it and serves the entry upon the parties. *Id.* at 2941-43, 2947-48, PAGEID#: 3644-3646, 3650-3651. *See In re Anderson*, 92 Ohio St.3d 63, 67 (2001) (holding that juvenile court proceeding was a civil action, and as such the thirty-day time limit for filing the notice of appeal does not begin to run until the later of: (1) entry of the judgment or order appealed if the notice mandated by rule is served within three days of the entry of the judgment, or (2)

service of the notice of judgment and its date of entry if service is not made on the party within the three-day period). Therefore, the prosecution filed its appeals on time in both cases.

Given the Ohio Supreme Court's holding in *Anderson*, it was legally impossible for petitioner to interfere with the prosecutors' right to appeal. And in light of Lisa Miller's testimony that it was common practice in Juvenile Court to conform the entry date to the hearing date, no reasonable jury could have convicted petitioner on those counts. If anything, the fact that the jury deadlocked on these four baseless counts indicates that the special prosecutor's inflammatory attacks on petitioner's character worked and persuaded at least some of the jury to vote to convict, when they should have voted to acquit.

## 2. The Theft in Office and Misuse of Credit Card Counts

Petitioner also faced charges involving her use of her county issued credit card to pay certain Ohio Supreme Court filing fees. In its opening, the prosecution told the jury that petitioner sought to appeal eleven writs issued against her by the First District Court of Appeals requiring her to issue rulings in those eleven cases. Tr. Vol. 13 at 854-55, Doc. 13-13, PAGEID#: 1557-1558. According to the prosecution, petitioner's use of her county-issued credit card was not merely a violation of the rules but broke the law because "[s]he took $1100 from the county to pay her filing fees, which is theft. No different than if she had taken $1100 from the county to buy a pair of shoes, to buy a dog or cat." *Id.* at 856, PAGEID#: 1559. In support of its theory, the prosecution elicited testimony that petitioner could use her county-issued credit card only for travel expenses. Tr. Vol. 20 at 1968, Doc. 13-20, PAGEID#: 2671. However, the jury also heard evidence that the credit card agreement petitioner signed with Fifth Third Bank authorized her to use the card "only for

31

business purposes of the Borrower and within the employment or agency relationship between the Cardholder and the Borrower." *Id.* at 1978, PAGEID#: 2681.

The three credit card counts were weak in light of the evidence that petitioner's credit card agreement with the bank permitted her to use the card for business purposes generally, not travel expenses exclusively. Accordingly, the jury should have felt hard pressed to find that petitioner had the necessary mens rea to commit the offenses. Thus, as with the so-called backdating charges, the fact that the jury deadlocked on the credit card counts indicates, if anything, the damage the special prosecutor inflicted during the rebuttal closing by pounding home its message that petitioner was a bad judge who caused children to suffer sexual abuse, which swayed some jurors to vote to convict when they should have voted to acquit petitioner of these charges.

### 3. Having Unlawful Interest in a Public Contract – the Overtime Count

The remaining charge for which the jury failed to convict was one count of Having Unlawful Interest in a Public Contract. This count alleged that petitioner used her position to obtain overtime for her brother Steven Hunter, who was employed by the court as a correctional officer. In its opening, the prosecution told the jury: "Judge Hunter asked her bailiff, Avery Corbin, to call the jail and have the jail arrange for her brother to come work in her courtroom. It resulted in him being paid six and a half hours of overtime," Tr. Vol. 13 at 845, Doc. 13-13, PAGEID#: 1578, a charge the special prosecutor conceded was "frankly, in and of itself, not significant." *Id.*

However, Avery Corbin would eventually testify that he was the one who arranged for petitioner's brother to work a security detail in her courtroom. Tr. Vol. 29, Oct. 3, 2014, at 3326-29, Doc. 13-29, PAGEID#: 4029-4032. Corbin explained that he had not spoken

32

with Judge Hunter before calling to arrange for her brother to work security because "she hadn't arrived yet." *Id.* at 3327, PAGEID#: 4030.

Corbin's testimony established petitioner's innocence on this count and at the very least gave the jury a reason to doubt the state's case with respect to this charge. As with the other hung counts, this charge would have likely resulted in acquittal had the special prosecutor not assassinated petitioner's character during the rebuttal closing.

In sum, the magistrate judge's conclusion that the mistrial on these eight counts "militates against a finding that the special prosecutor's remark inflamed the jury against petitioner or prejudicially affected the jury" was ill-informed. Because those eight charges were either entirely baseless or, at best, weak, the jury should have acquitted petitioner of those eight counts. The fact that the jury deadlocked on those charges and convicted petitioner of one count suggests that the jury likely reached a compromise verdict in the face of the special prosecutor's repeated inflammatory attacks on petitioner's character. In any event, the jury's inability to convict on those eight counts does not demonstrate that the special prosecutor's character attack had no effect on the jury's deliberations.

**E. The Magistrate Judge Erred by Finding that the State's Evidence Was "Strong and Substantial."**

The magistrate judge found that "strong and substantial evidence was introduced to establish petitioner's guilt on the charge set forth in Count 6 . . . , which was based on petitioner's alleged interference with the employment termination proceedings involving her brother, Steven Hunter." Report and Recommendation at PAGEID#: 5518. Contrary to the magistrate's finding, the evidence on Count 6 was thin and arguably should have resulted in acquittal.

To convict petitioner of Having Unlawful Interest in a Public Contract, the state had

to prove that she, as (1) a public official; (2) knowingly authorized or employed the authority of her office; (3) to secure authorization for a public contract; (4) in which a member of her family had an interest. *See* Ohio Rev. Code § 2921.42. Putting aside the question of whether this statute even applies to the conduct the state alleged petitioner had committed – allegedly interfering with her brother's termination hearing – and assuming that it does, the evidence did not establish that petitioner had committed a crime.

Because there was no evidence that petitioner directly intervened in her brother's termination proceeding by, for example, demanding that he not be fired or insisting that he be reinstated, the case turned on the identity of the documents she gave her brother, and whether she obtained those documents using the power and authority of her office. In concluding that the evidence on Count 6 was "strong and substantial," the magistrate made a fundamental error: adopting the First District Court of Appeals' finding that petitioner gave to her brother Steven the same documents she had requested and obtained from Juvenile Court employee Dwayne Bowman. Specifically, the magistrate quoted from the following portion of the First District's opinion: "[Juvenile Court employee Dwayne] Bowman provided the documents to Hunter that day. Steven Hunter testified that Hunter then provided the documents to him, which he in turn brought to his attorney that evening." Report and Recommendation at PAGEID#: 5491 (quoting First District's Opinion, Doc. 12-2, Ex. 56, at PAGEID#: 615-616).

Although the magistrate correctly notes that an appellate court's factual findings are presumed to be correct absent clear and convincing evidence to the contrary, *see* Report and Recommendation at PAGEID#: 5489 n.4 (citing *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th

Cir. 2004)), the magistrate was wrong to rely on this particular finding because there was never any testimony establishing the identity of the documents petitioner gave her brother.

During petitioner's trial, the state never produced any documents petitioner allegedly gave her brother before his termination hearing, nor did it elicit testimony describing the documents' contents. Specifically, although Bowman described the documents he gave petitioner, Tr. Vol. 21, Sep. 23, 2014, Doc. 13-21, at 2143-2145, 2147, 2152, 2153, PAGEID#: 2846-2848, 2850, 2855, 2856, he did not establish what documents petitioner gave her brother Steven.

Additionally, although Steven testified that petitioner had given him documents that he then presented to the lawyer representing him in the termination proceeding, Tr. Vol. 22, Sep. 24, 2014, Doc. 13-22, at 2328-2330, PAGEID#: 3031-3033, he never told the jury what those documents were, and more importantly, did not establish that they were the same documents Bowman had given petitioner. Interestingly, the prosecution could have asked Steven, a prosecution witness, to describe the documents but chose not to do so, perhaps because it knew that his answer would undercut the state's case.

Moreover, defense witness Janaya Trotter, who represented Steven at his termination hearing, never identified the documents she refused to accept from him. Although Trotter acknowledged testifying in the grand jury that she refused to accept some documents because she was concerned she might have to file an ethics complaint in the Ohio Supreme Court about the person who had given Steven the documents, Tr. Vol. 28, Oct. 2, 2014, at 3176, Doc. 13-28, at 3176, PAGEID#: 3879, she later testified that she was unware of any unethical conduct committed by petitioner with respect to the documents. *Id.* at 3185-3186, PAGEID#: 3888-3889. Trotter's conflicting testimony fails to establish that petitioner used

the power of her office to obtain and give documents to her brother Steven to help with his termination defense.  Instead, Trotter's testimony simply begs the question:  what documents did petitioner give her brother?

Furthermore, although Bowman testified that petitioner's request for documents relating to the incident involving her brother made Bowman "very concerned" about "a direct conflict of interest," Tr. Vol. 21, Sep. 23, 2014, at 2150, PAGEID#: 2853, the jury heard an alternative explanation for her request that was fully consistent with her innocence. Specifically, Bowman acknowledged that petitioner was a "statutory employer of the Hamilton County Juvenile Court," *id.* at 2207, PAGEID#: 2910, and that she had previously requested information about other court employees involved in particular incidents.  *Id.* at 2205-2206, PAGEID#: 2908-2909.  This acknowledgement cast doubt on the prosecution's theory that petitioner's purpose in requesting documents about the incident involving her brother was to help him avoid termination.

Without more, the jury should not have concluded, beyond a reasonable doubt, that petitioner "employed the authority or influence of [her] office" to obtain the document.  For instance, if the document was a public record, or was not obtained via petitioner's authority or influence, then there was no basis for the jury to convict her.  Additionally, without evidence of the document's contents, the jury could not have known whether the document "secured authorization" of her brother's employment contract.  Indeed, if the document was a public record or irrelevant to the determination of his appeal, then petitioner could not have used the authority of her office to interfere with the termination proceeding—assuming for argument's sake, that the document's use in the termination hearing constituted "securing a public contract."

36

In sum, although the evidence was arguably insufficient to support petitioner's conviction, sufficiency of the evidence is not the issue, here. Rather, the question for this court to decide is whether the evidence was strong enough to insulate the jury's verdict from the sway of the prosecutor's flagrant misconduct. The answer to that question is no. The only way the jury could have concluded that petitioner gave her brother documents she obtained from Bowman and that those documents were relevant to her brother's termination hearing was to stack inference upon inference upon inference.

Thus, regardless of whether the evidence was legally sufficient, it was far from overwhelming. Indeed, the fact that three jurors came forward immediately after being discharged to report that they would have indicated that "guilty" was not their true verdict had the trial judge granted the defense counsel's request to poll the jury when the clerk read the verdict in open court, indicates that at least three of the jurors struggled with whether to acquit of convict.[9] Although petitioner's argument that the evidence on Count 6 was weak does not turn on the jurors' affidavits, those affidavits nonetheless bolster petitioner's contention that the evidence against her was hardly overwhelming.

---

[9] Addressing the juror affidavits, the magistrate judge wrote: "The determination regarding the strength of the evidence is based on an assessment of the evidence in the trial record, not on any reevaluation by individual jurors of their initial verdicts." Report and Recommendation at PAGEID#: 5522. Notably, the magistrate cited no cases in support of this proposition. In fact, courts do consider factors other than the evidence admitted at trial in evaluating whether a case is close. *See Parker v. Gladden*, 385 U.S. 363, 365 (1966) (noting that "the jurors deliberated for 26 hours, indicating a difference among them as to the guilt of petitioner"). If length of deliberations is appropriately considered as a factor in determining the closeness of a case, then a juror's affidavit indicating that she would have switched her verdict to "not guilty" had she been polled is also relevant in determining the strength of the prosecution's case.

## CONCLUSION

The prosecution tried petitioner's character, not her charges. The prosecution obtained a conviction on Count Six not by proving each and every element beyond a reasonable doubt, but by assassinating petitioner's character and insinuating that she was a bad person who was unfit to hold office. The prosecution did so by repeatedly telling the jury, during the rebuttal closing, that petitioner bore responsibility for children being sexually abused, by saying that petitioner had hired a bailiff who had been previously been fired for beating a child, and by stating that petitioner cared more about protecting the identity of juveniles who appeared before her than protecting the community from violent crime. The magistrate judge correctly concluded that these statements were improper and inflammatory. However, the magistrate incorrectly concluded that the statements were not prejudicial enough to warrant reversal of petitioner's conviction.

Petitioner urges this Court to read the closing arguments so it can see for itself just how outrageous and egregious the special prosecutor's rebuttal closing was, and how much prejudice it engendered against petitioner. Petitioner, therefore, urges the court to sustain her objection and rule that she is entitled to the relief she seeks.

Should the court deny her petition for a writ of habeas corpus, petitioner requests that the court adopt the magistrate's recommendation to issue a certificate of appealability. Additionally, should the court deny her relief, petitioner requests that the court stay her sentence pending appeal to the Sixth Circuit.

Respectfully submitted,

  /s/ David A. Singleton                     /s/ Jennifer L. Branch      
David A. Singleton #0074556                Jennifer L. Branch #0038893
*Trial Attorney for Petitioner*              *Co-counsel for Petitioner*
Ohio Justice & Policy Center             Gerhardstein & Branch Co. LPA
215 E. 9th Street, Suite 601              441 Vine Street, Suite 3400
Cincinnati, OH 45202                    Cincinnati, OH 45202
(513) 421-1108                           (513) 621-9100
fax (513) 562-3200                      fax (513) 345-5543
dsingleton@ohiojpc.org                 jbranch@gbfirm.com

## CERTIFICATE OF SERVICE

I certify that on June 16, 2017, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the court's electronic filing system.

/s/David A. Singleton
David A. Singleton